**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT COURT OF NEW YORK**

| | |
|---|---|
| IN RE READY CAPITAL CORPORATION SECURITIES LITIGATION | Case No. 1:25-cv-01883-PAE<br><br>**CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br><u>Demand for Jury Trial</u> |

**TABLE OF CONTENTS**

I.    NATURE OF THE ACTION ...................................................................................1

II.   JURISDICTION AND VENUE...............................................................................3

III.  PARTIES ................................................................................................................4

   A.  Plaintiff..............................................................................................................4

   B.  Defendants ........................................................................................................4

   C.  Relevant Non-Parties ......................................................................................5

IV.   SUBSTANTIVE ALLEGATIONS........................................................................6

   A.  READY CAPITAL'S BUSINESS. ...................................................................6

      i.  LMM Originations ......................................................................................6

      ii. LMM Acquisitions. .....................................................................................7

   B.  READY CAPITAL'S DISTRIBUTABLE INCOME METRIC. ...........................9

   C.  READY CAPITAL'S ACCOUNTING FOR ALLOWANCE ON CREDIT
LOSSES ON LOANS. ...............................................................................................10

   D.  THE PORTLAND PROJECT AND MOSAIC MERGER. ...............................17

      i.  The Portland Project – "Block 216". .................................................17

      ii. March 16, 2022 – Ready Capital Closes the Mosaic Merger............21

      iii. March - May 2023 – The Portland Project Suffered from Construction Delays and
      Overruns, and Lackluster Demand as Ready Capital Injects $48 Million of
      Additional Funds to Keep the Portland Project Afloat. ....................................25

E.    DESPITE ITS ONGOING PROBLEMS, READY CAPITAL MANAGEMENT CONTINUE TO SPIN THE MOSAIC MERGER AND THE PORTLAND PROJECT AS POSITIVE. ..................................................................................................................32

    i.   May 9, 2023 – First Quarter 2023 Press Release, Earnings Call, and Form 10-Q. . ........................................................................................................................32

    ii.  August 7-8, 2023 – Second Quarter 2023 Press Release, Earnings Call, and Form 10-Q. ...........................................................................................................34

    iii. November 7, 2023 – Third Quarter 2023 Press Release, Earnings Call, and Form 10-Q ..............................................................................................................42

    iv.  January 29, 2024 – Investor Presentation ...........................................................47

    v.   February 27-28, 2024 – Fourth Quarter 2023 Press Release, Earnings Call, and Form 10-K.............................................................................................................48

    vi.  May 9-10, 2024 – First Quarter 2024 Press Release, Earnings Call, and Form 10-Q..............................................................................................................................58

    vii. June 4, 2024 – Contingent Equity Right Report – March 2024...........................65

F.    THE CONSTRUCTION LOAN HEADS TOWARDS INEVITABLE DEFAULT. ..................................................................................................................................67

G.    AS THE CONSTRUCTION LOAN HEADS TO DEFAULT, READY CAPITAL MANAGEMENT KEEP INVESTORS IN THE DARK..........................................................72

    i.   August 7-8, 2024 – Second Quarter 2024 Press Release, Earnings Call, and Form 10-Q. ...........................................................................................................72

ii. November 7-12, 2024 – Third Quarter 2024 Press Release, Earnings Call, and Form 10-Q. .............................................................................................80

H. MARCH 3-4, 2025 – DEFENDANTS REVEAL THE TRUTH WITH READY CAPITAL'S FOURTH QUARTER AND FULL YEAR 2024 RESULTS ................................93

I. MARCH 3-4, 2025 – THE MARKET AND ANALYSTS REACT TO DEFENDANTS' MARCH 3-4, 2025 DISCLOSURES ...........................................................107

J. MAY 9, 2025 - JULY 22, 2025 – POST-CLASS PERIOD EVENTS ...............113

i. May 9, 2025 – Realty Capital's First Quarter 2025 Earnings Call ....................113

ii. July 22, 2025 – Ready Capital Takes Ownership of Block 216.........................117

iii. August 8, 2025 – Realty Capital's Second Quarter 2025 Earnings Call............117

V. ADDITIONAL SCIENTER ALLEGATIONS.....................................................118

A. The Individual Defendants Had Actual Knowledge of Undisclosed Material Information. ........................................................................................................118

B. Ready Capital's was Managed By Waterfall and a Small Core Group of Waterfall Employees. ...............................................................................................................123

VI. RELIANCE................................................................................................124

VII. LOSS CAUSATION ..................................................................................125

VIII. CLASS ALLEGATIONS ............................................................................127

IX. NO STATUTORY SAFE HARBOR................................................................128

X. COUNTS....................................................................................................129

XI. PRAYER FOR RELIEF................................................................................133

XII.    DEMAND FOR A JURY TRIAL......................................................................134

1.      Lead Plaintiff Allan T. Parr Jr. bring this class action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC"), individually and on behalf of himself and all persons and entities similarly situated, other than Defendants (defined below), who purchased or otherwise acquired Ready Capital Corporation ("Ready Capital") common stock between August 8, 2024 and March 2, 2025, inclusive (the "Class Period").

2.      Plaintiff alleges the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiff's information and belief is based on the investigation of their undersigned attorneys, which included, among other things, review and analysis of: (i) public documents, public filings, and wire and press releases published by and regarding Ready Capital; (ii) Defendants' other public statements, including transcripts of interviews Defendants participated in; (iii) interviews with individuals who are former employees of: Ready Capital, companies acquired by Ready Capital, and/or Waterfall Asset Management LLC; (iv) reports of securities and financial analysts, news articles, and other commentary and analysis concerning Ready Capital and the industry in which it operates; and (v) pertinent court filings.

## I.      <u>NATURE OF THE ACTION</u>

3.      This is a securities class action against Ready Capital and its management. Ready Capital is a real estate finance company that originates, acquires, finances, and services lower-to-middle-market ("LMM") commercial real estate ("CRE") loans, small business administration loans, and other real estate-related investments.

1

4.      From August 8, 2024 to March 2, 2025, Ready Capital and its management intentionally or with deliberate recklessness towards the truth of their statements, misled investors about the health of its loan portfolio thus giving a false impression of the state of its operations and artificially inflating Ready Capital's stock price as a result.

5.      Specifically, on March 16, 2022 Ready Capital acquired Mosaic Real Estate Credit, LLC and related affiliates. Among the assets acquired in this transaction was a $460 million construction loan for the project in Portland, Oregon. The project centered on the construction of a new mixed-use building of retail, commercial and a new Ritz-Carlton hotel and condominiums. After the Mosaic acquisition, the construction loan was Ready Capital's largest single loan in its portfolio representing nearly 5% of the total.

6.      Ready Capital later described the Portland Project as "catastrophic" from the outset. By March 2023, the construction loan was already "out of balance" through insufficient funds and Ready Capital was compelled under the terms of the construction loan to advance additional funds to keep the project from collapsing immediately. By an amendment executed in May 2023, the maturity date for the construction loan was extended to December 31, 2024.

7.      Despite the accommodations by Ready Capital as senior lender, the Portland project remained on life support throughout 2023 and 2024. Only ten condominiums had been sold through 2024 out of a total of 132. By September 2024, Ready Capital had stopped paying interest on the mezzanine loan for the Portland project and was already taking steps to take possession of the building. An appraisal commissioned in November 2024 found that the entire project had a value of $257.2 million. This was a mere 55% of the original $460 million construction loan and less than 50% of the $516 million balance of the construction loan.

2

8.      The imminent default and loss on the construction loan for the Portland project was hidden from investors by Ready Capital management. Instead of disclosing the imminent default, Ready Capital management told investors that the loan portfolio had "improving credit metrics" and continued the modest provision for impaired and non-performing loans from 2023 and earlier in 2024. In November 2024, just as they were commissioning the appraisal reports later used to determine impairment, Ready Capital management told investors that they expected 74% of the Mosaic construction loans to be fully repaid by the end of 2024 and that there were no onetime items expected to negatively affect earnings for the year ended December 31, 2024.

9.      Investors, therefore, were shocked when Ready Capital announced on March 3, 2025 that it was taking a massive $130 million impairment allowance for the Portland construct loan and cutting its dividend by 50%, from $0.25 per share to $0.125. The impairment of the Portland construction loan reduced quarterly earnings by $0.11 per share.

10.     Following this announcement, Ready Capital's shares trading on the New York Stock Exchange immediately started to drop in price, falling $1.86 per share, or 26.84%. The total loss in market capitalization exceeded $300 million.

11.     Plaintiff now seeks to recover these losses that he suffered as well as the losses suffered by the proposed class of Ready Capital investors caused by Defendants' misrepresentations and omissions in violation of the federal securities laws.

## II.    **<u>JURISDICTION AND VENUE</u>**

12.     The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

13.     This Court has jurisdiction over each Defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and § 27 of the Exchange Act because many of the false and misleading statements were made in or issued from this District. Ready Capital is headquartered in this District with its principal place of business at 50 East Broad Street, Rochester, New York.

## III.   PARTIES

### A.   Plaintiff

15.     Lead Plaintiff Allan T. Parr Jr. purchased Ready Capital common stock during the Class Period, as set forth in his Certification of Plaintiff Pursuant to Federal Securities Laws (ECF No. 21-1) which Plaintiff incorporates by reference herein, at prices artificially inflated by Defendants' materially false and misleading public statements and omissions and was damaged thereby.

### B.   Defendants

16.     Ready Capital is incorporated under the laws of Maryland with its principal executive offices located in New York, New York. Ready Capital's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "RC." As of February 28, 2025, Ready Capital had 163,151,086 shares of common stock outstanding.

17.     Thomas E. Capasse ("Capasse") was at all relevant times the President and Chief Executive Officer ("CEO") of Ready Capital. Mr. Capasse has served as the CEO and Chairman of the Board of Ready Capital since October 2016 and as its Chief Investment Officer since

November 2022. Capasse is the co-founder and Manager of Waterfall Asset Management, LLC, Ready Capital's investment manager ("Waterfall").

18.    Andrew Ahlborn ("Ahlborn") was at all relevant times the Executive Vice President and Chief Financial Officer ("CFO") of Ready Capital. Ahlborn has served as the CFO of Ready Capital since March 2019. Ahlborn has also served the Controller of Ready Capital from 2015 to 2019. Since Ready Capital's information in 2011, Ahlborn has focused exclusively on Ready Capital and has played a vital role in numerous significant corporate transactions. Ahlborn is an employee of Waterfall.

19.    Adam Zausmer ("Zausmer") was at all relevant times the Chief Credit Officer ("CCO") of Ready Capital. Zausmer has served in this role since July 2021.

20.    Collectively, Ready Capital, Capasse, Ahlborn, and Zausmer, are referred to herein as the "Defendants."

### C. Relevant Non-Parties

21.    Waterfall Asset Management LLC was at all relevant times the "Manager" of Ready Capital. Waterfall is headquartered in New York, New York and had approximately 160 employees. Waterfall is contracted by Ready Capital to and does manage all of Ready Capital's affairs. Per Ready Capital's 2025 Proxy Statement filed with the SEC on April 29, 2025: "[all] officers of [Ready Capital] are employees of Waterfall or its affiliates." Thus, Defendant Capasse, Defendant Ahlborn, Gary Taylor, Ready Capital's Chief Operating Officer, and Adam Zausmer, Ready Capital's Chief Credit Officer, are employees of Waterfall.

## IV.   SUBSTANTIVE ALLEGATIONS.

### A.   READY CAPITAL'S BUSINESS.

22.   Ready Capital is a real estate finance company that originates, acquires, finances, and services lower-to-middle-market ("LMM") commercial real estate ("CRE") loans, small business administration loans, and other real estate-related investments. Ready Capital has qualified as a real estate investment trust under the Internal Revenue Code of 1986, as amended, and therefore it "must distribute to [its] stockholders each calendar year dividends equal to at least 90% of our REIT taxable income (including certain items of non-cash income), determined without regard to the deduction for dividends paid and excluding net capital gain."

23.   Ready Capital's LMM CRE business consists of two segments: originations and acquisitions.

### i.   LMM Originations.

24.   Ready Capital's loan origination segment focuses on first-priority mortgage loans covering the following four main products:

a.   Construction: typically short maturity loans for construction and/or predevelopment;

b.   Bridge: loans for the acquisition of properties requiring more substantial expenditures for stabilization. These loans are generally interest-only loans with 2 to 4 year maturity and are secured by multifamily, office, retail mixed use or warehouse properties.

c.   Fixed rate: for acquisitions or refinancing secured by multifamily, office, retail mixed use or warehouses typically with amortizing loans with maturities ranging 5 to 20 years; and

d. <u>Freddie Mac</u>: initial principal amounts ranging from $1 million to $7.5 million secured by multifamily properties under the Freddie Mac SBL program and loans for developers/owners of multi-family affordable rental housing utilizing streamlined tax-exempt and taxable financing solutions

25. Per Ready Capital's Form 10-K for the year ended 2024 filed on March 3, 2025 (the "2024 Form 10-K"), "LMM commercial loans generally ranging in initial principal amount of between $500,000 and $40 million, and typically with an average duration of approximately two to six years at origination."

26. In the 2024 Form 10-K, Ready Capital summarized its originated loan features by product:

| | GROUND-UP | HEAVY TRANSITIONAL | LIGHT TRANSITIONAL | | STABILIZING | STABILIZED | | | AFFORDABLE HOUSING |
|---|---|---|---|---|---|---|---|---|---|
| PRODUCT | CONSTRUCTION | BRIDGE | BRIDGE-TO-PERM | BRIDGE-TO-AGENCY | STRUCTURED FIXED RATE | CMBS DIRECT | CORRESPONDENT AGENCY | FREDDIE MAC SBL | AFFORDABLE HOUSING |
| LOAN PURPOSE | Construction Predevelopment Renovation Acquisition | Vacant Rehabilitation Adaptive Re-Use Renovation Value Add | Renovation Lease Up Rent Optimization Event Driven Bridge to Near Term Refinance | | Final Lease Up Seasoning Lease Expiration Prepay Flexibility Mid-Term Refinance | | Cash Out Term Refinance Interest Rate Arbitrage Bridge Refinance Permanent Acquisition/Recapitalization | | Construction to Perm Private Loan Financing for Eventual LIHTC Takeout |
| LOAN SIZE | $15-75MM | $5-75MM $75MM+ Portfolios | $2-75MM $75MM+ Portfolios | $1-100MM | $2-45MM | | $1-100MM | $1-$7.5MM | $5MM+ |
| MAX LEVERAGE | 80% Loan-to-Cost | | | | | 80% Loan-to-Value | | | 90% Loan-to-Value |
| TERM | Typically, 2-3 Years Plus Extensions | | Up to 3 Years Plus, Extensions | Up to 2 Years Plus, Extensions | 2 – 10 Years | 5, 7, 10 Years | Up to 30 Years | 5, 7, 10 Years Hybrid: 20 Years | Typically, 7 Years |
| PREPAYMENT | Spread maintenance; last 6 months open | Minimum Interest | | | Customized Declining Yield Maintenance | Defeasance Yield Maintenance | Declining Yield Maintenance | | Defeasance Yield Maintenance |
| RATE TYPE | SOFR + Spread | Floating Rate Hybrid | | Floating Rate Hybrid | Fixed Rate | | Floating Rate Fixed Rate | Floating Rate Hybrid | Floating Rate Fixed Rate |
| PROPERTY TYPE | Multifamily Build-to-Rent Future availability to be announced | Multifamily, Industrial, Office, Self-Storage, Essential Retail | Multifamily | | All Property Types | | Multifamily | | Multifamily Affordable |

**ii.    LMM Acquisitions.**

27. Ready Capital's LMM acquisition segment includes loans that it generally acquires through mergers and acquisitions as well as non-performing LMM loans acquired by it through proprietary loan re-performance programs.

28. Ready Capital describes its strategy is to "hold performing LMM loans to term and seek to maximize the value of the non-performing LMM loans acquired by us through borrower-

based resolution strategies." Ready Capital explained in its Form 10-K for the quarter and year ended December 31, 2023 filed with the SEC on February 28, 2024 ("2023 Form 10-K") that its acquisitions strategy is to "hold LMM loans to term, and we seek to maximize the value of the non-performing LMM loans acquired by us through proprietary loan reperformance programs. Where this is not possible, we seek to effect property resolution through the use of borrower based resolution alternatives to foreclosure."

29.     As to the non-performing loans, Ready Capital states that it "typically" acquires them "at a discount to their unpaid principal balance ("UPB") when we believe that resolution of the loans will provide attractive risk-adjusted returns." As of December 31, 2023, Ready Capital's acquired loans had an UPB and carrying value of $1.6 billion, which represented 14.8% of Ready Capital's carrying value of its total loan portfolio. Notably, construction loans, $1.213 billion UPB was 11.1% of Ready Capital's $10.7 billion total loan portfolio as of December 31, 2023.

30.     The analyst firm Ladenburg Thalmann aptly summarized Ready Capital's acquisition business strategy in "Investments Risk" section of their analyst reports stating:

> **RC acquires loans with past credit-quality issues**. Often it purchases these loans at a discount to their unpaid balance in the expectation it can earn a profit when these loans perform better than their acquired price implies. However, this strategy entails material underwriting risk which may not be uncovered in the due diligence process conducted before underwriting such loans. Alternatively, RC may mis-judge the credit-risk of an investment. Either way, this could negatively affect book value/share and/or the sustainability of the shareholder dividend.

31.     Despite these known risks, investors were unaware of the specific risks that Ready Capital knew and concealed about the $460 million construction loan for a real estate development project in Portland, Oregon that it acquired through its March 16, 2022 merger with Mosaic Real Estate Credit, LLC ("MREC"), Mosaic Real Estate Credit TE, LLC ("MREC TE"), MREC

8

International Incentive Split, LP ("MREC IIS," and together with MREC and MREC TE, and related affiliates ("Mosaic").

## B. READY CAPITAL'S DISTRIBUTABLE INCOME METRIC.

32.    As a REIT, Ready Capital believes its "key financial measures and indicators for our business are earnings per share, dividends declared per share, distributable earnings, return on equity, and net book value per share."

33.    Ready Capital uses "Distributable Earnings" as key metric although it is not a measure that is prepared in accordance to the accounting principles generally accepted in the United States of America ("GAAP"). Notwithstanding, it is a metric that Ready Capital uses "to evaluate [its] performance and determine dividends, excluding the effects of certain transactions and GAAP adjustments that [it] believe[s] are not necessarily indicative of our current loan activity and operations" and believes it "gives investors greater transparency into the information used by management in our financial and operational decision-making, including the determination of dividends." Ready Capital details how it calculates its Distributable Earnings and provides a reconciliation of this amount to net income with its financial statements.

34.    Included within Ready Capital's calculation of net income is the interest income it earns on its loans. As explained by Ready Capital, "Interest Income" includes interest that has accrued under a loan but has not yet paid. In its Form 10-Q for the third quarter 2024 ended September 30, 2024 ("3Q 2024 Form 10-Q"), Ready Capital defined interest income as:

> **Interest income**. Interest income on loans, held-for-investment, loans, held at fair value, loans, held for sale, and MBS, at fair value is accrued based on the outstanding principal amount and contractual terms of the instrument, including loans with contractual PIK interest for which the Company has not yet collected cash. Discounts or premiums associated with the loans and investment securities are amortized or accreted into interest income as a yield adjustment on the effective interest method, based on contractual cash flows through the maturity date of the investment.

35.    Ready Capital also defines this type of accrued but not paid interest as "Paid-In-Kind Interest" or ("PIK"). Ready Capital defined "PIK" in its 3Q 2024 Form 10-Q as:

> ***Paid-In-Kind ("PIK") Interest.*** PIK interest is computed at the contractual rate specified in each loan agreement and statement of operations. The Company will generally cease accruing PIK interest if there is insufficient value to support the accrual or management does not expect the borrower to be able to pay all principal and interest due. To maintain the Company's status as a REIT, this non-cash source of income is included within the 90% of its taxable income required to be distributed to shareholders.

## C. READY CAPITAL'S ACCOUNTING FOR ALLOWANCE ON CREDIT LOSSES ON LOANS.

36.    On January 1, 2020, Accounting Standards Codification ("ASC") 326, Financial Instruments-Credit Losses, became effective for Ready Capital. On this date, the "incurred loss" methodology previously required by GAAP was replaced with the current estimate of expected lifetime credit losses or the current expected credit loss ("CECL") model.

37.    As described by Ready Capital, in its 2023 Form 10-K:

> Under the CECL model, we are required to present certain financial assets carried at amortized cost, such as loans held for investment, at the net amount expected to be collected. The measurement of expected credit losses is to be based on past events including historical experience, current conditions, and reasonable and supportable forecasts that affect the collectability of the reported amount. This measurement will take place at the time the financial asset is first added to the balance sheet and updated quarterly thereafter.

38.    The purpose of CECL is to reflect the losses that will be incurred over the contractual life of the contract. This credit impairment is not a direct write-down of the amortized cost basis of a financial asset, but rather is an allowance or a contra-asset account that effectively reduces an entity's net assets and the book value of the entity. The purpose of the CECL is to capture the risk of loss, even if it is remote, and to incorporate the credit loss estimates based on

10

the lender's reasonable and supportable forecasts reflective of the assumed future economic conditions.

39.     An increase in CECL will impact an entity's financial statements and metrics, including its leverage ratio. When an entity increases its allowance for credit losses, this directly impacts a company's income statement as this lowers net income. For example, Ready Capital's increase of its CECL loan reserves by $285 million at the end of 2024 was included as a line item on its Consolidated Statements of Operations, i.e. its Income Statement, which reduced Net interest income by a total of $292.759 million, resulting in a loss of $92.239 million compared with income in excess of $200 million the prior two years. Such reductions also reduce the "carrying value" of loans and a company's net book value, and consequently a company's net assets. Such changes thus, flow through to other metrics relevant to a company and investors such as a company's leverage ratio.

40.     To estimate the current expected future losses, ASC 326-20-30-7 states than "an entity shall consider available information relevant to assessing the collectibility of cash flows" and "shall consider relevant qualitative and quantitative factors that relate to the environment in which the entity operates and are specific to the borrower(s)." Thus, an entity must not only include historical loss information adjusted for current conditions but also forecasts about future economic conditions that are reasonable and supportable. Entities must update the CECL reserves at each reporting period, which as to Ready Capital is on quarterly basis.

41.     GAAP also requires lenders to evaluate loans for credit losses at the time they determine that "foreclosure is probable." Such a determination triggers a requirement that the collateral's fair be measured at the reporting date instead of delaying it until the actual foreclosing

11

of the asset. This requirement further applies to collateralized loans with borrowers that were experiencing financial difficulty have been restructured.

42.    Specifically, ASC326-20-35-4 provides that "an entity shall measure expected credit losses based on the fair value of the collateral at the reporting date when the entity determines that foreclosure is probable" and therefore "shall remeasure the financial asset at the fair value of the collateral at the reporting date (less costs to sell, if applicable) so that the reporting of a credit loss is not delayed until actual foreclosure":

**Financial Assets Secured by Collateral**

**Collateral-Dependent Financial Assets**

**326-20-35-4**

***Regardless of the initial measurement method, an entity shall measure expected credit losses based on the fair value of the collateral at the reporting date when the entity determines that foreclosure is probable***. The entity shall adjust the fair value of the collateral for the estimated costs to sell if it intends to sell rather than operate the collateral. ***When an entity determines that foreclosure is probable, the entity shall remeasure the financial asset at the fair value of the collateral at the reporting date (less costs to sell, if applicable) so that the reporting of a credit loss is not delayed until actual foreclosure.*** An entity also shall consider any credit enhancements that meet the criteria in paragraph 326-20-30-12 that are applicable to the financial asset when recording the allowance for credit losses. An allowance for credit losses that is added to the amortized cost basis of the financial asset(s) shall not exceed amounts previously written off.

Emphasis added in bold, italicized text.

43.    Under GAAP as of a reporting period, a lender may also use a practical expedient, when it determines that the "borrower is experiencing financial difficulty based on the entity's assessment as of the reporting date" where "the repayment is expected to be provided substantially through the operation or sale of the collateral when the borrower is experiencing financial difficulty based on the entity's assessment as of the reporting date":

**Financial Assets Secured by Collateral**

**Collateral-Dependent Financial Assets**

.    .    .

**326-20-35-5**

*An entity may use, as a practical expedient, the fair value of the collateral at the reporting date when recording the net carrying amount of the asset and determining the allowance for credit losses for a financial asset for which the repayment is expected to be provided substantially through the operation or sale of the collateral when the borrower is experiencing financial difficulty based on the entity's assessment as of the reporting date (collateral-dependent financial asset).* If an entity uses the practical expedient on a collateral-dependent financial asset and repayment or satisfaction of the asset depends on the sale of the collateral, the fair value of the collateral shall be adjusted for estimated costs to sell. However, the entity shall not incorporate in the net carrying amount of the financial asset the estimated costs to sell the collateral if repayment or satisfaction of the financial asset depends only on the operation, rather than on the sale, of the collateral. When the fair value (less costs to sell, if applicable) of the collateral at the reporting date exceeds the amortized cost basis of the financial asset, an entity shall adjust the allowance for credit losses to present the net amount expected to be collected on the financial asset equal to the fair value (less costs to sell, if applicable) of the collateral as long as the allowance that is added to the amortized cost basis of the financial asset(s) does not exceed amounts previously written off. *If the fair value of the collateral is less than the amortized cost basis of the financial asset for which the practical expedient has been elected, an entity shall recognize an allowance for credit losses on the collateral-dependent financial asset, which is measured as the difference between the fair value of the collateral, less costs to sell (if applicable), at the reporting date and the amortized cost basis of the financial asset.* An entity also shall consider any credit enhancements that meet the criteria in paragraph 326-20-30-12 that are applicable to the financial asset when recording the allowance for credit losses.

Emphasis added in bold, italicized text.

44.    GAAP provides guidance to lenders as to common indicators of "financial difficulties", which under ASC 310-10-50-45, include:

**Financial Instruments — Credit Losses — Measured at Amortized Cost**

**Disclosure**

13

**310-10-50-45**

*In evaluating whether the debtor is experiencing financial difficulties* for the purpose of the disclosure requirements in paragraphs 310-10-50-42 through 50-44, *a creditor shall consider the following indicators*:

a. The debtor is currently in payment default on any of its debt. *In addition, a creditor shall evaluate whether it is probable that the debtor would be in payment default on any of its debt in the foreseeable future without the modification. That is, a creditor may conclude that a debtor is experiencing financial difficulties, even though the debtor is not currently in payment default.*

b. The debtor has declared or is in the process of declaring bankruptcy.

c. There is substantial doubt as to whether the debtor will continue to be a going concern.

d. The debtor has securities that have been delisted, are in the process of being delisted, or are under threat of being delisted from an exchange.

e. *On the basis of estimates and projections that only encompass the debtor's current capabilities, the creditor forecasts that the debtor's entity-specific cash flows will be insufficient to service any of its debt (both interest and principal) in accordance with the contractual terms of the existing agreement for the foreseeable future.*

f. *Without the current modification, the debtor cannot obtain funds from sources other than the existing creditors at an effective interest rate equal to the current market interest rate for similar debt for a nontroubled debtor.*

The above list of indicators is not intended to include all indicators of a debtor's financial difficulties.

Emphasis added in bold, italicized text.

45.    Once a company has decided that the substantial repayment of the loan is from the sale of the collateral or through its operation, a calculation of a reserve is required. Thus, once the asset qualifies for the practical expedient for collateral-dependent financial assets, the decision is simply whether or not the lender will sell the asset or operate the asset as to determine the appropriate level of reserve. This decision making process for the lender is summarized in the

below decision tree illustration in Ernst & Young LLP's ("EY") *Financial reporting developments A comprehensive guide Credit impairment under ASC 326 Recognizing credit losses on financial assets measured at amortized cost, AFS debt securities and certain beneficial interests* (July 2024) ("EY ASC 326 Guide"):



46.    Even if an entity does not believe repayment is expected substantially through the operation of sale of the collateral, entities are still required to assess the potential changes to the risks facing the collateral value when evaluating its CECL reserves.

47.    Ready Capital echoes these accounting standards in its 2023 Form 10-K, and other filings with the SEC, in its description of its methodology for determining the allowance for credit losses, including at the individual loan level, and the accompanying reserves it books for its CECL reserves:

**Allowance for credit losses**

The allowance for credit losses consists of the allowance for losses on loans and lending commitments accounted for at amortized cost. ***Such loans and lending commitments are reviewed quarterly considering credit quality indicators, including probable and historical losses, collateral values, LTV ratio and economic conditions.*** The allowance for credit losses increases through provisions charged to earnings and reduced by charge-offs, net of recoveries.

***We utilize loan loss forecasting models for estimating expected life-time credit losses, at the individual loan level, for its loan portfolio. The Current Expected Credit Loss ("CECL") forecasting methods used by the Company include (i) a probability of default and loss given default method using underlying third-party CMBS/CRE loan database with historical loan losses and (ii) probability weighted expected cash flow method, depending on the type of loan and the availability of relevant historical market loan loss data.*** We might use other acceptable alternative approaches in the future depending on, among other factors, the type of loan, underlying collateral, and availability of relevant historical market loan loss data.

***We estimate the CECL expected credit losses for our loan portfolio at the individual loan level. Significant inputs to our forecasting methods include (i) key loan-specific inputs such as LTV, vintage year, loan-term, underlying property type, occupancy, geographic location, and others, and (ii) a macro-economic forecast.*** These estimates may change in future periods based on available future macro-economic data and might result in a material change in our future estimates of expected credit losses for its loan portfolio.

***In certain instances, we consider relevant loan-specific qualitative factors to certain loans to estimate its CECL expected credit losses. We consider loan investments that are both (i) expected to be substantially repaid through the operation or sale of the underlying collateral, and (ii) for which the borrower is experiencing financial difficulty, to be "collateral-dependent" loans. For such loans that we determine that foreclosure of the collateral is probable, we measure the expected losses based on the difference between the fair value of the collateral (less costs to sell the asset if repayment is expected through the sale of the***

*collateral) and the amortized cost basis of the loan as of the measurement date. For collateral-dependent loans that we determine foreclosure is not probable, we apply a practical expedient to estimate expected losses using the difference between the collateral's fair value (less costs to sell the asset if repayment is expected through the sale of the collateral) and the amortized cost basis of the loan.*

*While we have a formal methodology to determine the adequate and appropriate level of the allowance for credit losses, estimates of inherent loan losses involve judgment and assumptions as to various factors, including current economic conditions. <u>Our determination of adequacy of the allowance for credit losses is based on quarterly evaluations of the above factors</u>.* Accordingly, the provision for loan losses will vary from period to period based on management's ongoing assessment of the adequacy of the allowance for credit losses.

Emphasis added.

48.     EY explained that "[w]hen a borrower is experiencing financial difficulty, an entity may renew, extend or modify a loan as a means of mitigating credit risk. Modifications that provide more time to pay off a loan extend the contractual life and therefore could affect the allowance for credit losses."

49.     As noted by EY in the EY ASC 326 Guide, "[c]redit losses on a financial asset can happen at any point during the financial asset's life" with "some financial assets, credit losses tend to occur early in an asset's life while for others, credit losses tend to occur closer to maturity." Notably, EY stated that commercial mortgages "typically experience defaults near the end of their terms because defaults are often triggered by a lack of available funding to refinance the loan."

### D.  <u>THE PORTLAND PROJECT AND MOSAIC MERGER.</u>

#### i.      The Portland Project – "Block 216".

50.     Ready Capital's Portland project is a $650 million real estate development project located at 900-936 SW Washington Street, Portland, Oregon 97205, marketed as "Block 216" (the "Portland Project"). The Portland Project involved the development and construction of 35-story

17

building consisting of a 251-room Ritz-Carlton luxury hotel, 132 Ritz-Carlton residential condominiums, 158,000 square feet of premier office space, and 11,000 square feet of retail space.

51.    On June 28, 2019, and in less than 30 days, Mosaic Portland Hotel, LLC (hereinafter, and then later BRMK Lending SPE JP, LLC and as successor to and together with Mosaic Portland Hotel, LLC, including Ready Capital, the "Lender") as senior lender provided BDC/Washington Street, LLC, BDC/Block 216 Office, LLC, BDC/Block 216 HOTEL, LLC, and BDC/Block 216 RESIDENTIAL, LLC, (collectively, the "BDC Borrowers") with a $460 million four-year construction loan to build Block 216 (the "Construction Loan") when Mosaic Portland Hotel as senior lender and BDC/Washington Street LLC and affiliates, collectively as senior borrower, entered into a Construction Loan Agreement ("Construction Loan Agreement"), whereby Lender committed a $460,000,000 loan to the BDC Borrowers with a maturity date of June 29, 2023.

52.    The project, led by real estate developer Walter C. Bowen, involved the development, construction, operation, management, and sale of a Ritz-Carlton-branded hotel and residential condominiums, five floors of office space, and retail complex. Walter C. Bowen was the project's primary underlying equity sponsor. Walter C. Bowen was the representative of the senior borrower and was also designated as the "Guarantor" of the transaction

53.    Attached to Construction Loan Agreement were detailed exhibits, including the "Approved Budget" for the Portland Project's development, a detailed "Draw Schedule" for disbursement of the loan proceeds laying the amount of funds to dispersed at each month, the "Construction Schedule", and "Sales Progress Schedule" that set the target schedule for selling the Ritz-Carlton condominium units.

54.    Section 2.8 of the Construction Loan, granted options to the BDC Borrowers to extend the maturity date of the loan two times for 1 year each time, if certain conditions were met including the target schedule for selling Block 216 units by the respective extension date, including that "Not Event of Default has occurred", that the Sales Schedule has been complied with, the BDC Borrowers had accepted non-refundable deposits under sales agreements "for at least 50%" of the Ritz-Carlton condominium units to exercise the first extension, and that BDC Borrowers had "sold at least 65%" of Ritz-Carlton condominium units to exercise the second option.

55.    Section 8.7 of Construction Loan Agreement also required the Guarantor and the BDC Borrowers to provide quarterly and annual financial statements to the Lender. As part of these requirements, the Guarantor had to also submit compliance certificates within 30 days after each fiscal quarter to evidence their liquid assets and tangible net worth, as well as that they "were "were in full and complete compliance with the respective requirements applicable thereto set forth in the Loan Documents (the Construction Loan Agreement along with all other documents executed by Borrower in connection with the Construction Loan Agreement). Bowen, as the Guarantor, Bowen was required to maintain liquid assets in the amount of $25,000,000 and a tangible net worth of $175,000,000. Notably, as reported by local news in December 2024, Bowen failed to meet lesser financial obligations in December 2023 on a different hotel project which required only have $4.735 million in liquid assets. The financial struggles Bowen was experiencing during the Class Period would have been reflected in his periodic finances reporting to Ready Capital.

56.    The Construction Loan Agreement required an interest reserve to secure payment of interest accrued on the loan. Both the principal amount and the accrued and unpaid interest were due in full on the maturity date. Notably, in the Seventh Amendment to Loan Agreement and Other

Loan Documents dated December 28, 2023, Section 2.3(a) of the Construction Loan Agreement was deleted and a provision was added that allowed for the accruing of certain interest with such accrued interest to be added to principal balance a portion Construction Loan. This accrued but not paid interest or "PIK" interest would only become due upon a default, maturity of the Construction Loan, repayment in full of the loan.

57.    Also along with the Construction Loan Agreement, the BDC/Washington St. Holdings, LLC (an entity related to Bowen and the BDC Borrowers) had entered into an additional loan agreement with Broadway EB-5 Fund, LLC ("Broadway" or the "Mezzanine Lender") whereby BDC/Washington St. Holdings received $49 million in mezzanine loan funding (the "Mezzanine Loan").

58.    From its inception, the construction of the Block 216 project was marked with setbacks, delays and bad timing. Its construction largely coincided with the Covid-19 pandemic and a crisis of livability and public safety in downtown Portland associated with George Floyd's death protests and rioters that destroyed businesses and fought with the police regularly.

59.    Even when the loan originated, prior to the pandemic and the deterioration of downtown Portland, it was considered a high-leverage, risky loan. In a 2018 interview, Bowen said the building boom might be "in the eighth inning," but he remained "bullish on high-quality, well-designed, newly constructed office space in Portland's urban core." A review of Bowen's pitch to investors shows that Bowen planned to charge between $1,350 and $1,900 per square foot for the 138 Ritz-Carlton residences. However, they were "prices never before seen in Portland," according to local reporters. Bowen also forecasted that the Ritz-Carlton hotel would get $450 a night by its fourth year in business, which nearly doubled the then rates charged by Portland's most expensive luxury hotels.

20

60.    In May 2021 local news reported that "the Ritz will cost nearly $600 million to build, making it one of the largest and most expensive real estate developments in city history. The risk of the project has soared due to the pandemic, social unrest in downtown Portland, and the lasting effect either could have on tourism or high-end real estate."

### ii.    March 16, 2022 – Ready Capital Closes the Mosaic Merger.

61.    On November 4, 2021, Ready Capital announced it "has entered into a definitive merger agreement Mosaic pursuant to which Ready Capital has agreed to acquire a series of privately held, real estate structured finance opportunities funds, with a focus on construction lending" (the "Mosaic Merger"). At the time of the announcement of the merger, the implied value of the Ready Capital shares being transferred to Mosaic investors as consideration in the Mosaic Merger was approximately $471 million.

62.    This $471 million amount was a $98.9 million discount to the book value of the Mosaic assets being acquired by Ready Capital. As Ready Capital disclosed in its Form S-4 registration statement related to the Mosaic Merger: "[t]he Discount Amount represents the reduction to the amount of the acquired portfolio in determination of fair value, which was internally developed by Ready Capital based on its due diligence review of the acquired assets and agreed upon by Ready Capital and the Mosaic Manager."

63.    In addition to the $471 million in Ready Capital share consideration, Ready Capital also agreed to grant as part of the consideration non-transferable contingent equity rights ("CERs") to the Mosaic investors. Under the terms of the merger agreement, Ready Capital was to pay up to 90% of the discount amount in Ready Capital common stock, or approximately $89 million based on the performance of the Mosaic asset portfolio over the three-year period following the completion of the Mosaic Merger. Given the $471 million purchase price, the acquisition of the

21

Mosaic portfolio resulted in an accounting "bargain purchase price" for Ready Capital as it acquired Mosaic's assets for less than their current fair market value.

64.     At the time, Ready Capital purportedly expected that the CERs would be paid off. During the May 6, 2022 earnings call to discuss Ready Capital's first quarter 2022 results for the quarter ended March 31, 2022 ("1Q 2022 Earnings Call"), Defendant Zausmer commented that "[b]ased on our current projections and the history since we underwrote the deal at 9/30, we do expect that the CER will be paid off. And that valuation on our balance sheet today, that $84 million contingent liability, is reflective of our assumption that that will ultimately crystallize."

65.     Prior to the Mosaic Merger, Ready Capital had an equity capital base of $1.288 billion. In the press release announcing the Mosaic Merger, Ready Capital highlighted that the addition of the Mosaic portfolio would increase Ready Capital's to in excess of $1.7 billion and would "further expand Ready Capital's investment portfolio to include a diverse portfolio of construction assets with attractive portfolio yields resulting in expected earnings accretion and a reduced leverage profile." Thus, as a result of acquiring the un-levered Mosaic portfolio, Ready Capital anticipated and received, as per Ready Capital's November 4, 2021 presentation on the Mosaic Merger ("Mosaic Presentation"), an "immediate de-leveraging impact" to its balance sheet.

66.     At the time Ready Capital announced the Mosaic Merger, the transaction was portrayed as "the next phase of [Ready Capital's] growth plan" as "[t]his transaction furthers Ready Capital's competitive advantage via seamless expansion in our product mix from heavy transitional bridge to construction lending." As later noted by Defendants, by completing the Mosaic Merger, Ready Capital added construction lending products into its portfolio as well as $440 million in equity.

22

67.    Ready Capital executives portrayed a promising outcome for the Mosaic Merger after purportedly conducting extensive due diligence. For instance, Capasse assured the investing public that Ready Capital and Defendant Zausmer "conducted extensive diligence" prior to the merger transaction. When asked about Mosaic's credit profile, Zausmer underscored that he confirmed the strength of the Mosaic portfolio of loans stating that: "[t]he overall credit profile of this portfolio is strong. We have a healthy basis in the loan portfolio"; the "[m]oderate weighted average as is LTV is based on fresh valuations that we ordered through our due diligence process"; "[t]he portfolio has a good property type and geographic diversity, approximately 95% of assets are in what we call geo tiers 1 through 3, which are the largest and most liquid assets, excuse most liquid markets across the country."

68.    On March 16, 2022, Ready Capital announced that it closed the Mosaic Merger and acquired Mosaic's loan portfolio. Mosaic's portfolio consisted of 32 investments which consisted of $565 million of funded assets (i.e., loans or investments where the money has already been disbursed to the borrower or investment owner). These funded commitments consisted of 75.4% in senior secured first liens, 22.7% in preferred equity, and the remainder in second liens. Of the funded commitments, 56.9% of the portfolio, or $321 million, was concentrated in construction financing. These loans included the Portland Project's Construction Loan.

69.    During the 1Q 2022 Earnings Call, Ready Capital further detailed the composition of the assets in the Mosaic portfolio as "about 40% of the portfolio is mixed use", "40% is residential and [] consists of multifamily and condominiums", and "roughly about 10% of the hotel exposures is hotel in the land." Ready Capital further explained that "70% of the total commitment is construction, and then the remainder is between pre-development and preferred equity."

23

70.     Notably, a large component of the Mosaic portfolio was comprised of the Portland Project Construction Loan, but Defendants did not highlight this to Ready Capital's investors. In fact, Ready Capital executives minimized the risks associated with the Mosaic Merger by choosing to speak about the Mosaic portfolio as a whole. In discussing the Mosaic portfolio during the earnings call discussing Ready Capital's financial results for the third quarter 2021, Defendant Zausmer downplayed any risk from the portfolio's larger loans stating "I think with the Mosaic portfolio, these larger loan sizes, the sponsors and developers are often more institutional than the small balance borrowers. Like I mentioned, more experienced, well capitalized, should they run into issues that can easily tap into their equity partners if needed. So that certainly gives us some comfort on the loan side."

71.     The Portland Project loans and the Mosaic portfolio had a material importance on stockholder value following the closing of the Mosaic Merger. During the earnings call to discuss Ready Capital's financial results for the second quarter 2022 ended June 30, 2022 ("2Q 2022 Earnings Call"), Defendant Capasse highlighted the significance of the Mosaic portfolio on stockholders' equity noting that as of August 5, 2022 it "accounts for close to 25% of stockholders' equity, above our targeted allocation of 10% into construction lending."

72.     Thereafter, Ready Capital continued to discuss the Mosaic portfolio as a whole and reassured investors of its performance and lack of issues. During the 2Q 2022 Earnings Call and in response to an analyst questions, Defendant Zausmer stated that the Mosaic "portfolio is performing very well" and "the credit challenges in that portfolio today are mainly concentrated in 1 office building and 1 hospitality development located in California. But I think the performance of the Mosaic portfolio is really in line with our expectations when we underwrote the loans prior to the merger."

24

### iii. March - May 2023 – The Portland Project Suffered from Construction Delays and Overruns, and Lackluster Demand as Ready Capital Injects $48 Million of Additional Funds to Keep the Portland Project Afloat.

73. In an affirmation filed in *Broadway EB-5 Fund, LLC v. Ready Capital Corp., et al.,* Case No. 651523/2025 pending in the Supreme Court of the State of New York, County of New York ("Broadway Action"), Ready Capital's Alex Ovalle, Ready Capital's Managing Director and Head of Construction Lending and Syndications and former Head of Originations at Mosaic Real Estate Investors and a member of its Investment Committee, stated that "*the [Portland] Project faced catastrophic setbacks from the beginning.*"

74. According to Ovalle, shortly after construction commenced in Spring 2019:

the Project encountered numerous and substantial delays…In fact, the Project faced catastrophic setbacks from the beginning. As construction on the Project was commencing, the COVID-19 pandemic erupted and halted progress on the construction. Certain COVID-19 restrictions remained in place for the next several years, which exacerbated construction delays and the Project's financial difficulties. Moreover, during this same time, downtown Portland, where the Project is located, was beset by significant civil unrest. Protests, demonstrations, looting, and vandalism plagued downtown, and further impeded the Project's development. In addition, a water leak caused substantial damage. As a result, the Project cost far more to construct than originally contemplated and the value, upon completion of construction, was far less than projected. In consequence, deadlines and obligations relating to both the Senior Loan and Mezzanine Loan were amended and extended to provide additional time to finance and complete the Project.

75. According to Ovalle, "[t]hese unprecedented events forced the parties to reevaluate both their original funding plan and the expected timeframes to complete the Project."

76. Even with this knowledge, Ready Capital undertook the acquisition of the Construction Loan Agreement by acquiring Mosaic.

77. The issues with the Construction Loan had already started to come fruition in March 2023 when the Construction Loan became out of balance in violation of the terms of the

Construction Loan. As Ovalle stated "[b]y March 2023, the [Portland] Project had become out-of-balance, meaning that there were insufficient funds allocated to the construction budget. The Project became out of balance due to increased costs of construction and the failure of the Project Sponsor to make the required equity contributions to properly fund the increased costs of completion for the [Portland] Project." As such, conversation began around that time for Lender to provide additional funds to the BDC Borrowers.

78.     As a result, on May 5, 2023, the parties to the Construction Loan Agreement and Bowen as the Guarantor entered into the Fifth Amendment to Loan Agreement and Other Loan Documents ("the "Fifth Amendment") that, among other things, provided for Ready Capital to advance through its subsidiary $47,861,512.65 in exchange for a preferred equity investment (the "Preferred Equity Investment") and extend the Construction Loan's maturity date from June 29, 2023 to December 31, 2024. The Fifth Amendment was signed by Defendant Zausmer on behalf of the now Ready Capital subsidiaries and/or affiliates. A copy of Fifth Amendment was *not* filed by Ready Capital with the SEC and only became available as part of the record in the Broadway Action.

79.     Notably, given the terms of the Construction Loan, given both the lack of deposits on the Ritz-Carlton condominium units since they first began to be marked in mid-2022 and the violation of the Construction Loan Agreement, the BDC Borrowers were unable to exercise their option to extend the maturity date. As such, absent such a modification, the Construction Loan would have matured prior to construction of the Portland Project was completed.

80.     Both as part of the negotiations over the Fifth Amendment and as part of their routine supervision of Ready Capital's operations, senior Ready Capital management, including

Defendants Ahlborn and Zausmer, regularly monitored the status of the Construction Loan and the Portland Project.

81.     From late 2020 to April 2024, CW1 worked as a Vice President at Waterfall. In this role, CW1, was responsible for the Ready Capital's combination accounting and SEC reporting, particularly for the Broadmark and Mosaic portfolios, and helped prepare information for Ready Capital's 10-Ks, including CECL reserves. CW1 reported directly to Defendant Ahlborn.

82.     CW1 described how the Portland Project, Block 216, was the largest and most significant asset acquired by Ready Capital, stating that it was "the biggest asset we had[.]" Given Block 216's size, CW1 stated that Defendant Ahlborn and the asset management teams reviewed the Portland Project and that it was discussed as the board level.

83.     As the largest asset, Block 216 demanded most of CW1's attention and CW1 spent significant time on an evaluation on the acquisition date supporting a large loan modification. CW1 explained that although the project itself was structurally sound that the external factors in the city of Portland significantly undermined its performance noting that the visible homelessness crisis and political challenges, were major issues impacting the development. Notwithstanding, CW1 explained that prior to CW1's departure in April 2024, the Construction Loan was classified as a performing loan as the cash was still flowing.

84.     CW1 discussed that appraisals were not performed quarterly due to the costs. Rather, CW1 stated that loan valuations, not appraisals, were performed quarterly. CW1 explained that performing loans were processed through a third-party application called Trepp, which aggregated loan and market data to generate CECL reserve figures, that management generally accepted its outputs at face value. CW1 stated that because Block 216 was treated as performing, only a minimal general reserve was taken.

27

85.     CW1 further explained that cadence of quarterly and year-end reporting was highly formalized. At each close, Ready Capital held a meeting to review reserve figures; this was attended by asset managers, senior members of the credit team, the chief credit officer (Defendant Zausmer), the CFO (Defendant Ahlborn), the controller, and other executives responsible for reserves. The meetings often included detailed discussions of loan-by-loan data, particularly for non-performing assets. Each stage required confirmation that the figures had been reviewed and approved.

86.     CW1 explained that the issues about Portland Project's slow condo sales and Bowen were known internally. In CW1's position, CW1 noted receiving monthly condo sales reports which in turn CW1 reported these figures to Defendant Ahlborn and asset management on a monthly basis. CW1 noted that only two or three condos sold during CW1's tenure at Waterfall. CW1 also recalled that Bowen had compliance issues with his credit agreement, but said these were handled at the asset management level. CW1 stated that the delays, weak condo sales, Portland market challenges, and the sponsor's financial weakness were known and documented.

87.     CW1 confirmed that although the Construction Loan was initially a cash-paying loan, that it then shifted to partial, "cash plus paid-in-kind" interest. CW1 further confirmed that the Fifth Amendment was to cover the Portland Project's cost overruns and interest payments related its loans.

88.     CW2 was Ready Capital's VP Marketing Operations/ M&A from mid-2023 to April 2024. CW2 described the Block 216 as "a challenging project, from the get-go." This knowledge was based on 20+ year background as a realtor in Portland, which allowed CW2 to hear consistently from industry peers that the project was struggling; and second, from informal discussions among Broadmark sales staff, during the merger process. In February and May 2023,

28

while Broadmark was still independent, CW2 heard from Broadmark sales executives that the Construction Loan had defaulted. CW2 stated that Brian Graf, Jordan Siao, and Mike Incrocci, all vice presidents of sales at Broadmark were told by Ovalle about the default.

89.    CW3 was Ready Capital's Vice President of Construction Finance between July 2023 and October 2023. CW3 stated that during Ready Capital's national sales meeting in Nashville, in September 2023, management presented a review of all company mergers, including Broadmark and Mosaic, along with Block 216.

90.    Additionally, CW3's understood that the Block 216 project was doomed from the beginning. CW3, who lives just outside of Portland, stated that it was widely understood in Portland real estate circles that the project had struggled from the start. CW3 explained that appraisal values dropped due to broader conditions in downtown Portland as the city underwent a dramatic decline, beginning in the COVID-19 era. CW3 explained that Portland once had a vibrant downtown, where families could visit and nightlife flourished, but that it had become defined by visible homelessness, open drug use, and public safety concerns. CW3 noted that emphasized that these broader conditions directly impacted the Ritz-Carlton project. CW3 explained that the Pearl District, where Block 216 is located or borders, was once one of Portland's most desirable neighborhoods, saw its condo market collapse. CW3 recalled that the area had previously been seen as the "place to live," but, by the time of the merger, sales of luxury condos had slowed to a crawl. In CW3's view, the city's public safety and policy issues made it impossible for Block 216 to meet its sales targets. CW3 explained that was a commonly shared view in the real estate community, reinforced by the lack of visible progress on construction, and the sluggish pace of condo sales. CW3 noted that both local real estate dynamics and company-level priorities

29

suggested that Ready Capital would abandon large construction lending, and Block 216 stood as a symbol of that shift.

91.     CW4 joined Ready Capital in August 2023 following its acquisition of Broadmark. CW4 stayed at Ready Capital until March 31, 2024. CW4 had previously worked at Broadmark since 2020. CW4 worked as an asset manager.

92.     CW4 stated he prepared monthly and quarterly reports that were sent to the accounting department. These reports contributed to the inputs used in CECL reporting. CECL reports were filed annually, however, CW4 and other asset managers were required to submit supporting data quarterly. These reports included information such as loans currently in default, unpaid principal balance (UPB), cost to complete, interest, and supporting documentation, such as appraisals and closing statements.

93.     Ready Capital was thus aware of the status of the Portland Project, including the lack of the Ritz-Carlton condominium sales. Notably, according to a January 2025 appraisal of the Ritz-Carlton hotel and condominiums ordered by Ready Capital, as of November 20, 2024, there were only 10 completed or pending Ritz-Carlton condominium sales, seven (7) of which were sold on or after December 2023 (the other three units dates of sale being redacted). A list of the executed unit sales agreements for the Ritz-Carleton condominium units as of May 5, 2023 were also attached as Appendix 2 to the Fifth Amendment.

94.     The sale of the Ritz-Carlton condominiums were crucial to the Portland Project's success. Unlike the hotel and offices, condo sales could provide capital and liquidity in short order. The problem was that the Portland condo market had dramatically decreased over the last seven years. The average sales price in 2022 was $593,928, down 12% from the year before and the seventh consecutive year prices have declined. But the declining condo market in Portland was not

the only challenge. The Ritz-Carlton condos were on the market for $1,500 or more per square foot, while the rest of Portland city's condos were sold on average for $499 per square foot. Block 216, like so many Portland downtown towers, struggled to land office tenants. Even as of March 2025, Ready Capital reported that just 23% of the office space was leased and only 8% of the 132 Ritz-Carlton condominiums were sold at an average of $1,105 per square foot, not for $1,500 as anticipated.

95.    Ready Capital was further aware of key information including delays and costs overruns in the Portland Project's construction and the financial wherewithal of the BDC Borrowers and Guarantor through the periodic financial reports and certifications from them.

96.    Notably, the Fifth Amendment included detailed comparisons of the previously approved budget to the new proposed budget for construction and related financing costs as well as the updated construction and draw schedules. The proposed budget listed the added funding was needed for the increased costs construction costs as well as payments to keep the interest payments on loans current, including monthly payments to Broadway in the amount of $490,000 to satisfy Mezzanine Loan's interest accruals. Subject to certain further amendments of related loan documents, such payments were to be dispersed under the Portland Project's budget under the control and responsibility of Ready Capital as the controlling entity of Lender.

E. **DESPITE ITS ONGOING PROBLEMS, READY CAPITAL MANAGEMENT CONTINUE TO SPIN THE MOSAIC MERGER AND THE PORTLAND PROJECT AS POSITIVE.**

i.  **May 9, 2023 – First Quarter 2023 Press Release, Earnings Call, and Form 10-Q.**

97.    During the May 9, 2023, earnings call to discuss Ready Capital's financial results for the first quarter 2023 ended on March 31, 2023 ("1Q 2023 Earnings Call"), Defendants Capasse and Ahlborn again discussed the Mosaic portfolio as a whole and highlighted the lack of risk related to its constituent loans. In his prepared remarks Defendant Capasse discussed how Ready Capital's portfolio was "unique relative to the sector" noting that of the 2,200 loans in its CRE portfolio, that the average balance was only $4.3 million, and that the top 10 loans "totaled only 10% of the loan book and excluding the loans from the '22 Mosaic merger, only 7%." In making this comment, Capasse did not discuss that the remaining 3% was concentrated in the Portland Project.

98.    Capasse continued to downplay the risk of the Mosaic loans during his prepared remarks, including the ones for the Portland Project, had on Ready Capital and its investors noting "that the Mosaic loans are covered by a contingent reserve equal to 15% of the remaining outstanding balances. This granularity reduces the statistical skewness faced by large balance lenders where a few large defaults can materially impact book value." As Defendant Ahlborn clarified, that of this approximately $90 million contingent reserve that $30 million had already been used for losses and that a $61 million cushion remained:

> Correct, so when we structured the Mosaic transaction, part of the consideration was a contingent equity right that had a total value of roughly $90 million. And it basically serves as a first loss piece against losses from the Mosaic portfolio. And so what is remaining in terms of the cushion on that portfolio is roughly $61 million.

32

99.    Ready Capital's disclosures to investors did not highlight that the construction loans were highly concentrated in the Portland Project's Construction Loan. Importantly, during the Class Period, Ready Capital regularly discussed the Mosaic portfolio but did not discuss specifically the Portland Project despite it being over 3.65% of Ready Capital's total loan portfolio with Ready Capital other 9 largest loans collectively totaling approximately 7%.

100.    Defendants were also aware of issues facing the Portland Project as it pertained to the Ritz-Carlton hotel. As reported by local Portland news outlet, OregonLive/The Oregonian reported on July 28, 2023, the Ritz-Carlton hotel had delayed its opening by two months as the hotel was no longer accepting reservations for mid-August 2023 with the earliest reservations for October 15, 2023. Although OregonLive reported that a delay for a hotel of this size may not be unusual, it emphasized that the "scrutiny of the ambitious project is intense as it comes to market at a difficult time in the city's history. Bowen hopes to sell over-the-top luxury in a city struggling with crime, poverty and drugs." OregonLive further noted that it Bowen was continuing to sell of his assets with one of his companies selling an office building for $13.6 million that month. Notably, Bowen and/or the BDC Lenders were required as part of the Fifth Amendment to raise and contribute another $16,985,363 in additional cash equity to not only replenish a "return reserve" for Ready Capital's subsidiary, Sutherland Asset I, LLC, but also to fund cost overruns for the Portland Project.

101.    According to Ready Capital's earning reports, after the Ritz-Carlton hotel opened in October 2023, it also underperformed with Ready Capital reporting revenue per available room was $188 during the fourth quarter 2024. This was in comparison to the $343.28 average for all Ritz-Carlton hotels during 2024.

33

        **ii.**      **August 7-8, 2023 – Second Quarter 2023 Press Release, Earnings Call, and Form 10-Q.**

102.    On August 7, 2023, after market close, Ready Capital filed a Form 8-K that included as exhibits a press release announcing its financial results for the second quarter 2023 ended June 30, 2023 ("2Q 2023") (the "2Q2023 Press Release") and a presentation titled "Supplemental Financial Data Q2 2023[.]"

103.    The 2Q 2023 Press Release announced highlights for the quarter including Realty Capital's "***DISTRIBUTABLE EARNINGS PER COMMON SHARE OF $0.36***" and "***Net book value of $14.52 per share of common stock as of June 30, 2023.***" (Emphasis added in bold, italicized text).

104.    The 2Q 2023 Press Release also provided Ready Capital's table reconciling its Net Income of "***$253,373***", or $253,373,000, to its "Distributable earnings per common share – basic" of "***$0.36***":

The table below reconciles Net Income computed in accordance with U.S. GAAP to Distributable Earnings.

| (in thousands) | Three Months Ended June 30, 2023 | |
|---|---|---|
| **Net Income** | $ | 253,373 |
| **Reconciling items:** | | |
| Unrealized gain on MSR | | (8,818) |
| Increase in current expected credit loss reserve | | 19,410 |
| Non-cash compensation | | 2,062 |
| Merger transaction costs and other non-recurring expenses | | 14,177 |
| Bargain purchase gain | | (229,894) |
| **Total reconciling items** | $ | (203,063) |
| Income tax adjustments | | 973 |
| **Distributable earnings** | $ | 51,283 |
| Less: Distributable earnings attributable to non-controlling interests | | 2,035 |
| Less: Income attributable to participating shares | | 2,373 |
| **Distributable earnings attributable to common stockholders** | $ | 46,875 |
| **Distributable earnings per common share - basic** | $ | 0.36 |
| **Distributable earnings per common share - diluted** | $ | 0.35 |

105.    In the Supplemental Financial Data Q2 2023 presentation, Ready Capital reiterated its statements about Ready Capital's net book value and its distributable earnings, summarizing its later slides on these topics:

## Second Quarter 2024 Results

| | Multi-strategy real estate finance company that originates, acquires and services lower-to-middle-market ("LMM") investor and owner occupied commercial real estate loans |
|---|---|
| Earnings / Dividends | • Net loss from continuing operations[1] of $ (31.4) million, or $ (0.21) per common share<br>• Distributable earnings[2] of $16.6 million, or $0.07 per common share<br>• Distributable earnings before realized losses[3] of $36.9 million, or $0.19 per common share<br>• Declared dividend of $0.30 per common share |
| Returns | • Return on Equity from continuing operations[4] of (6.1)%<br>• Distributable Return on Equity[5] of 2.6%<br>• Distributable Return on Equity from continuing operations before realized losses[6] of 5.8%<br>• Dividend Yield[7] of 14.7% |
| Balance Sheet | • Net book value per share of $12.97 per common share<br>• Total leverage of 3.5x and recourse leverage ratio[8] of 1.0x |

106.    In the Supplemental Financial Data Q2 2023 presentation, Ready Capital stated that the Mosaic acquired assets consisted of 19 loans with an UPB of $607 million and a "BOOK VALUE" of "*$603M*".



## SBC Lending and Acquisitions



| PRODUCT TYPE | LOAN COUNT[1] | UPB | BOOK VALUE[7] | WA LTV | WA COUPON | FIXED/FLOAT[2] | 60+ Days Past Due |
|---|---|---|---|---|---|---|---|
| | 2,278 | $10.2B | $10.1B | 65.2% | 8.8% | 21.8 / 78.2% | 4.6% |
| FIXED RATE[5] | 235 | $994M | $997M | 60.6% | 5.2% | 98.7 / 1.3% | 2.1% |
| BRIDGE | 566 | $7.20B | $7.16B | 68.6% | 8.9% | 0.6 / 99.4% | 2.6% |
| CONSTRUCTION (RC ORIGINATED) | 4 | $35M | $34M | 48.9% | 8.3% | 100.0 / 0.0% | 0.0% |
| MOSAIC ACQUIRED ASSETS | 19 | $607M | $603M | 64.5% | 13.0% | 32.2 / 67.8% | 8.9% |
| BROADMARK ACQUIRED ASSETS | 150 | $813M | $779M | 60.2% | 10.5% | 94.2 / 5.8% | 22.2% |
| OTHER[6] | 1,304 | $528M | $522M | 38.3% | 6.4% | 38.7 / 61.3% | 4.2% |

| | 2,278 | $10.2B | $10.1B | 65.2% | 8.8% | 21.8 / 78.2% | 4.6% |
|---|---|---|---|---|---|---|---|
| ORIGINATED | 830 | $8.29B | $8.25B | 67.5% | 8.5% | 12.9 / 87.1% | 2.6% |
| ACQUIRED | 1,448 | $1.89B | $1.84B | 55.2% | 10.2% | 61.0 / 39.0% | 13.1% |

### CURRENT QUARTER HIGHLIGHTS

- Bridge loan originations of $123.1 million at average spread of plus 466 bps

- SBC money up pipeline of $1.2 billion, including $94.8 million funded in July.

- Mosaic Acquired Assets protected against losses due to a $61 million contingent equity right reserve

### GROSS LEVERED YIELD

| | Q2 2022 | Q3 2022 | Q4 2022 | Q1 2023 | Q2 2023 |
|---|---|---|---|---|---|
| Income on joint venture investments and gains on loans, held for sale [3] | 0.9% | 1.0% | 0.5% | 0.6% | 1.3% |
| Gross levered yield (ex. gains) [4] | 11.3% | 10.5% | 11.1% | 10.9% | 10.2% |

1. Excludes joint venture investments
2. 72% of fixed rate loans match funded
3. Includes realized and unrealized gains (losses) on loans held for sale and MSR creation
4. Includes interest income, accretion of discount, and servicing income net of interest expense and amortization of deferred financing costs
5. Includes originated SBC floating rate loans that are included in our RCMT securitization and therefore, categorized as Fixed/CMBS
6. Loans with the "Other" classification are generally SBC acquired loans that have nonconforming characteristics for the Fixed rate, Bridge, or Construction categories
7. Gross of general reserves

8

107.    On the morning of August 8, 2023, before market trading hours, at 8:30 a.m. Eastern, Defendants held a conference call with analysts and investors to present Ready Capital's financial and operational results for 2Q 2023 (the "2Q 2023 Earnings Call").

108.    During his prepared remarks on the 2Q 2023 Earnings Call, Defendant Capasse discussed Ready Capital's acquisitions of Mosaic, including Ready Capital's loss reserves for these assets, noting that Defendants "do not anticipate losses" above their current reserves. Specifically, Defendant Capasse stated:

> First, while consolidated 60-day delinquency percentage increased 50 basis points to 4.6%, this was entirely attributable to additional NPLs associated with the closing of the Broadmark transaction. Second, while the 60-day delinquency rate on the acquired portfolio, primarily Mosaic and Broadmark is 13%, the 60-day percentage for our originated portfolio actually decreased 10 basis points to a near industry low 2.6%, with conservative LTVs and debt yields of 68% and 9%,

36

respectively. ***Last, given the $61 million current contingent equity reserve on the Mosaic portfolio*** and 4% CECL reserves on the Broadmark portfolio, ***we do not anticipate losses above these reserves.*** Now beyond the reserving on the acquired portfolio, the credit strength of the originated portfolio can be attributed to the following factors.

Emphasis added in bold and italicized text.

109.    During his prepared remarks on the 2Q 2023 Earnings Call, Defendant Ahlborn discussed Ready Capital's financial performance during the quarter stating "***quarterly GAAP and distributable earnings per common share were $1.87 and $0.36, respectively. Distributable earnings of $51.3 million equates to a 9.3% return on average stockholders' equity*** and "[o]n the balance sheet, book value per share declined 3.6% to ***$14.52*** -- the change was attributable to 3% dilution from the Broadmark merger and 0.6% dilution from CECL reserves." Defendant Ahlborn concluded his remarks stating reassuring the market that Ready Capital is "***positioned to maintain a dividend consistent with our stated 10% target return on equity while protecting book value***[.]."

110.    After the conclusion of Defendants' prepared remarks, the 2Q 2023 Earnings Call transitioned to the question and answer portion of the call. In responding to an inquiry from an analyst with Bruyette, & Woods, Inc., Defendant Capasse side-stepped the question about the absence of recent major loan losses "was surprising" given the "continued deterioration in commercial real estate credit performance." Although the analyst noted that the major deals that have seen losses were those "that had issues for some time", the analyst further asked whether the lack of major losses was the result of an improvement in the overall macro environment or instead was something that only arose when loans reached maturity. In response, Defendant Capasse stated he believe that the 2Q 2023 was the "bottoming" in the markets as the rate of decline in credit performance had decreased and specifically noted that Realty Capital only had a small exposure to office buildings in central business districts given that certain submarkets in office space were

37

completely collapsing. Specifically, during the exchange, the analyst and Defendant Capasse stated:

> ***Jade Joseph Rahmani Keefe***, *Bruyette, & Woods, Inc., Research Division – Managing Director*
>
> Just wanted to ask a big picture question, somewhat related to the loan portfolio sales question at the outset. Generally, from my vantage point, I would characterize second quarter earnings as continued deterioration in commercial real estate credit performance. But for the most part, no big new shoes to drop. It's been somewhat surprising. I think that the major loan losses we've seen have been deals that had issues for some time. And then I think on multifamily overall, performance has been pretty resilient. Do those comments square with what you're seeing? Do you think that this represents an improvement in the economic outlook and moderation in inflation, and that's why we haven't seen major new loan losses? Or do you think it's really just a timing factor as loans come up for maturity?
>
> ***Thomas Edward Capasse*** *Ready Capital Corporation – Chairman, CEO & Chief Investment Officer*
>
> I'll add to my comments. But I think, Jade, we're definitely seeing in this quarter I hate the term bottoming, but a deceleration in the rate of decline is the best way to frame it. In particular, in office, some of the submarkets are just collapsing completely. Others are stabilizing. Obviously, we're a small balance. We only have 5% office. ***So, CBD is not our pain.*** But in the multifamily space, there is a front page journal article today. There's definitely some idiosyncratic issues with, in particular, luxury multifamily and a surprise of negative absorption due to new supply coming online. That was some of the trends we saw, again, not affecting us because we're more workforce small balance. But yes, there's definitely been a deacceleration in the rate of decline in a lot of the markets that we track. I don't know, Adam, I don't know if you would add to that from a macro perspective, what you're seeing in particular on the multifamily front.

Emphasis added in bold and italicized text

111.    After market hours on August 8, 2023, Ready Capital filed its Form 10-Q for 2Q 2023 ("2Q2023 Form 10-Q"). The 2Q 2023 Form 10-Q was signed by Defendants Capasse and Ahlborn.

112.    The 2Q 2023 Form 10-Q repeated the same statements concerning Ready Capital's 2Q 2023 results for its net book value of "*$14.52*" per share of common stock, distributable earnings per share of "*$0.36*", and net income of *$253,373,000*:

**Results of Operations**

**_Key Financial Measures and Indicators_**

As a real estate finance company, we believe the key financial measures and indicators for our business are earnings per share, dividends declared per share, distributable earnings, and net book value per share. As further described below, distributable earnings is a measure that is not prepared in accordance with GAAP. We use distributable earnings to evaluate our performance and determine dividends, excluding the effects of certain transactions and GAAP adjustments that we believe are not necessarily indicative of our current loan activity and operations. See "—Non-GAAP Financial Measures" below for a reconciliation of net income to distributable earnings.

The table below sets forth certain information on our operating results.

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| ($ in thousands, except share data) | | 2023 | | 2022 | | 2023 | | 2022 |
| Net Income | $ | 253,373 | $ | 58,965 | $ | 290,351 | $ | 123,228 |
| Earnings per common share - basic | $ | 1.87 | $ | 0.47 | $ | 2.30 | $ | 1.13 |
| Earnings per common share - diluted | $ | 1.76 | $ | 0.45 | $ | 2.17 | $ | 1.07 |
| Distributable earnings | $ | 51,283 | $ | 60,102 | $ | 89,432 | $ | 108,965 |
| Distributable earnings per common share - basic | $ | 0.36 | $ | 0.48 | $ | 0.67 | $ | 1.00 |
| Distributable earnings per common share - diluted | $ | 0.35 | $ | 0.46 | $ | 0.65 | $ | 0.94 |
| Dividends declared per common share | $ | 0.40 | $ | 0.42 | $ | 0.80 | $ | 0.84 |
| Dividend yield | | 14.2 % | | 14.1 % | | 14.2 % | | 14.1 % |
| Return on equity | | 47.7 % | | 12.8 % | | 29.6 % | | 15.4 % |
| Distributable return on equity | | 9.3 % | | 13.1 % | | 8.8 % | | 13.6 % |
| Book value per common share | $ | 14.52 | $ | 15.28 | $ | 14.52 | $ | 15.28 |
| Adjusted net book value per common share | $ | 14.52 | $ | 15.28 | $ | 14.52 | $ | 15.28 |

113.    In "Note 6. Loans and allowance for credit losses", the 2Q 2023 Form 10-Q detailed Ready Capital's carrying value of its construction loans and its allowance for loan losses. Specifically, Defendants stated "Construction" loans had a "Carrying Value" of $"***1,334,225*** or $1,334,225,000 and "Allowance for loan losses" for Ready Capital's loan portfolio of $"*(77,025)*" or ($77,025,000) as represented in the following excerpt:

**_Loan portfolio_**

The table below summarizes the classification, UPB, and carrying value of loans held by the Company including loans of consolidated VIEs.

| | | June 30, 2023 | | | | |
|---|---|---|---|---|---|---|
| (in thousands) | | Carrying Value | | UPB | | |
| **Loans** | | | | | | |
| Bridge | $ | 1,402,220 | $ | 1,403,510 | $ | |
| Fixed rate | | 183,991 | | 177,774 | | |
| Construction | | 1,334,225 | | 1,345,230 | | |
| Freddie Mac | | 9,969 | | 9,861 | | |
| SBA - 7(a) | | 490,025 | | 509,312 | | |
| Residential | | 3,932 | | 3,932 | | |
| Other | | 224,183 | | 228,232 | | |
| **Total Loans, before allowance for loan losses** | $ | 3,648,545 | $ | 3,677,851 | $ | |
| **Allowance for loan losses** | $ | (77,025) | $ | — | $ | |

114.    Also in Note 6, the 2Q 2023 Form 10-Q discussed "*Loan modifications made to borrowers experiencing financial difficulty.*" In this section, Ready Capital noted *without* identifying it as the Portland Project that "SBC loans modified during the period ended" June 30,

2023, was modified by a "Term extension" whose financial effect was merely "*18 months added to the weighted average life of the loans*":

*Loan modifications made to borrowers experiencing financial difficulty*
In certain situations, the Company may provide loan modifications to borrowers experiencing financial difficulty. These modifications may include interest rate reductions, principal forgiveness, term extensions, and other-than-insignificant payment delay intended to minimize the Company's economic loss and to avoid foreclosure or repossession of collateral.

The table below presents loan modifications made to borrowers experiencing financial difficulty.

| | | Three Months Ended June 30, 2023 | |
|---|---|---|---|
| *(in thousands)* | Carrying Value | % of Total Carrying Value of Loans, net | Financial Effect |
| **SBC loans modified during the period ended** | | | |
| Term extension | $ 381,895 | 3.65 % | 18 months added to the weighted average life of the loans |

This disclosure also highlighted the materiality of the Construction Loan as it constituted 3.65% of Ready capital's total carrying value of loans as of June 30, 2023.

115.    Notably, there was no related material increase in the reserves for the non-PCD construction loans which included the Portland Project loans despite the Fifth Amendment and its month maturity extension. Rather the $27,617,000 in allowance for credit losses were attributable to the PCD loans acquired in the Ready Capital's merger with Broadmark Realty Capital Inc.

The table below presents a summary of the changes in the allowance for loan losses.

| *(in thousands)* | Bridge | Fixed Rate | Construction |
|---|---|---|---|
| **Three Months Ended June 30, 2023** | | | |
| Beginning balance | $ 40,319 $ | 9,085 $ | 373 $ |
| Provision for loan losses | 3,538 | 4,523 | 7,935 |
| PCD | — | — | 27,617 |
| Charge-offs and sales | — | (1,404) | — |
| Recoveries | — | — | — |
| **Ending balance** | $ 43,857 $ | 12,204 $ | 35,925 $ |
| **Three Months Ended June 30, 2022** | | | |
| Beginning balance | $ 19,878 $ | 6,524 $ | 5,323 $ |
| Provision for (recoveries of) loan losses | (1,485) | (302) | (201) |
| Charge-offs and sales | — | — | — |
| Recoveries | — | — | — |
| **Ending balance** | $ 18,393 $ | 6,222 $ | 5,122 $ |
| **Six Months Ended June 30, 2023** | | | |
| Beginning balance | $ 49,905 $ | 6,531 $ | 17,334 $ |
| Provision for (recoveries of) loan losses | (5,437) | 7,177 | 7,872 |
| PCD | — | — | 27,617 |
| Charge-offs and sales | (611) | (1,504) | (16,898) |
| Recoveries | — | — | — |
| **Ending balance** | $ 43,857 $ | 12,204 $ | 35,925 $ |
| **Six Months Ended June 30, 2022** | | | |
| Beginning balance | $ 19,519 $ | 6,861 $ | — $ |
| Provision for (recoveries of) loan losses | (1,126) | (639) | 122 |
| PCD | — | — | 5,000 |
| Charge-offs and sales | — | — | — |
| Recoveries | — | — | — |
| **Ending balance** | $ 18,393 $ | 6,222 $ | 5,122 $ |

40

116.    Accordingly, Ready Capital disclosed that "specific" construction loans had only

**"$111"** , or $111,000 in allowance for credit losses:

*Allowance for credit losses*
The allowance for credit losses consists of the allowance for losses on loans and lending commitments accounted for at amortized cost. Such loans and lending commitments are reviewed quarterly considering credit quality indicators, including probable and historical losses, collateral values, LTV ratios, and economic conditions.

The table below presents the allowance for loan losses by loan product and impairment methodology.

| (in thousands) | Bridge | | Fixed Rate | | Construction | | SBA - 7(a) | | Residential | | Other | | Total Allowance for loan losses |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **June 30, 2023** | | | | | | | | | | | | | |
| General | $ | 32,862 | $ | 9,048 | $ | 8,197 | $ | 11,400 | $ | — | $ | 2,160 | $ | 63,667 |
| Specific | | 10,995 | | 3,156 | | 111 | | 5,409 | | — | | 1,199 | | 20,870 |
| PCD | | — | | — | | 27,617 | | — | | — | | — | | 27,617 |
| **Ending balance** | $ | **43,857** | $ | **12,204** | $ | **35,925** | $ | **16,809** | $ | **—** | $ | **3,359** | $ | **112,154** |
| **December 31, 2022** | | | | | | | | | | | | | |
| General | $ | 42,979 | $ | 2,397 | $ | 325 | $ | 10,801 | $ | — | $ | 1,208 | $ | 57,710 |
| Specific | | 6,926 | | 4,134 | | 1,037 | | 3,498 | | — | | 1,242 | | 16,837 |
| PCD | | — | | — | | 15,972 | | — | | — | | — | | 15,972 |
| **Ending balance** | $ | **49,905** | $ | **6,531** | $ | **17,334** | $ | **14,299** | $ | **—** | $ | **2,450** | $ | **90,519** |

117.    In a related August 24, 2023 "Investor Presentation" ("August 2023 Presentation"),

Ready Capital again presented that Mosaic acquired assets consisted of 19 loans with a UPB of

$607 million and a "BOOK VALUE" of "**$603M**":

## SBC Lending and Acquisitions



| PRODUCT TYPE | LOAN COUNT[1] | UPB | BOOK VALUE[5] | WA LTV | WA COUPON | FIXED/FLOAT[2] | 60+ Days Past Due |
|---|---|---|---|---|---|---|---|
| | 2,278 | $10.2B | $10.1B | 65.2% | 8.8% | 21.8 / 78.2% | 4.6% |
| *FIXED RATE[3]* | 235 | $994M | $997M | 60.6% | 5.2% | 98.7 / 1.3% | 2.1% |
| *BRIDGE* | 566 | $7.20B | $7.16B | 68.6% | 8.9% | 0.6 / 99.4% | 2.6% |
| *CONSTRUCTION (RC ORIGINATED)* | 4 | $35M | $34M | 48.9% | 8.3% | 100.0 / 0.0% | 0.0% |
| *MOSAIC ACQUIRED ASSETS* | 19 | $607M | $603M | 64.5% | 13.0% | 32.2 / 67.8% | 8.9% |
| *BROADMARK ACQUIRED ASSETS* | 150 | $813M | $779M | 60.2% | 10.5% | 94.2 / 5.8% | 22.2% |
| *OTHER[4]* | 1,304 | $528M | $522M | 38.3% | 6.4% | 38.7 / 61.3% | 4.2% |

| | 2,278 | $10.2B | $10.1B | 65.2% | 8.8% | 21.8 / 78.2% | 4.6% |
|---|---|---|---|---|---|---|---|
| *ORIGINATED* | 830 | $8.29B | $8.25B | 67.5% | 8.5% | 12.9 / 87.1% | 2.6% |
| *ACQUIRED* | 1,448 | $1.89B | $1.84B | 55.2% | 10.2% | 61.0 / 39.0% | 13.1% |



**GEOGRAPHY**

**PROPERTY TYPE**

Powered by Bing
© GeoNames, Microsoft, TomTom

13% • 5% • 5% • 8% • 69%

• Multi-family • Mixed-use • Retail • Office • Other Investments

1. Excludes joint venture investments
2. 72% of fixed rate loans match funded
3. Includes originated SBC floating rate loans that are included in our RCMT securitization and therefore, categorized as Fixed/CMBS
4. Loans with the "Other" classification are generally SBC acquired loans that have nonconforming characteristics for the Fixed rate, Bridge, Construction, or Mosaic acquired categories
5. Gross of general reserves

13

41

### iii.    November 7, 2023 – Third Quarter 2023 Press Release, Earnings Call, and Form 10-Q

118.    On November 7, 2023, after market close, Ready Capital filed a Form 8-K that included as exhibits a press release announcing its financial results for the third quarter 2023 ended September 30, 2023 ("3Q 2023") (the "3Q 2023 Press Release") and a presentation titled "Supplemental Financial Data Q3 2023[.]"

119.    The 3Q 2023 Press Release announced highlights for the quarter including Realty Capital's "***DISTRIBUTABLE EARNINGS PER COMMON SHARE OF $0.28***" and "***Net book value of $14.42 per share of common stock as of September 30, 2023.***" (Emphasis added in bold and italicized text).

120.    The 3Q 2023 Press Release also provided Ready Capital's table reconciling its Net Income of "***$47,179***", or $47,179,000, to its "Distributable earnings per common share – basic" of "***$0.28***":

The table below reconciles Net Income computed in accordance with U.S. GAAP to Distributable Earnings.

| (in thousands) | | Three Months Ended September 30, 2023 |
|---|---|---|
| **Net Income** | $ | 47,179 |
| **Reconciling items:** | | |
| Unrealized gain on MSR | | (2,563) |
| Decrease in CECL reserve | | (12,151) |
| Non-cash compensation | | 2,275 |
| Merger transaction costs and other non-recurring expenses | | 2,536 |
| Loss on bargain purchase | | 14,862 |
| **Total reconciling items** | $ | 4,959 |
| Income tax adjustments | | 26 |
| **Distributable earnings** | $ | 52,164 |
| Less: Distributable earnings attributable to non-controlling interests | | 1,566 |
| Less: Income attributable to participating shares | | 2,334 |
| **Distributable earnings attributable to common stockholders** | $ | 48,264 |
| **Distributable earnings per common share - basic** | $ | 0.28 |
| **Distributable earnings per common share - diluted** | $ | 0.28 |

42

121.    In the Supplemental Financial Data Q3 2023 presentation, Ready Capital reiterated its statements about Ready Capital's net book value and its distributable earnings, summarizing its later slides on these topics:

## Third Quarter 2023 Results



| | |
|---|---|
| Earnings / Dividends | ▪ Net income of $47.2 million[1], or $0.25 per common share<br>▪ Distributable earnings of $52.2 million[2], or $0.28 per common share<br>▪ Declared dividend of $0.36 per common share |
| Returns | ▪ Return on Equity[3] of 7.2%<br>▪ Distributable Return on Equity[4] of 8.0%<br>▪ Dividend Yield[5] of 14.2% |
| Loan Originations[6] / Acquisitions | ▪ CRE originations of $464.4 million<br>▪ SBA loan originations of $128.6 million<br>▪ Residential mortgage loan originations of $390.8 million |
| Capital Markets | ▪ Repaid $115 million of 7.00% Convertible Senior Notes that matured on August 15, 2023 |
| Balance Sheet | ▪ Net book value per share of $14.42 per common share<br>▪ Total leverage of 3.4x and recourse leverage ratio of 0.9x[7] |

1. Before dividends on preferred securities and inclusive of non-controlling interest
2. Before dividends on preferred securities and inclusive of non-controlling interest. Refer to the "Distributable Earnings Reconciliation by Quarter" slide for a reconciliation of GAAP Net Income to Distributable Earnings
3. Return on equity is an annualized percentage equal to quarterly net income over the average monthly total stockholders' equity for the period
4. Distributable return on equity is an annualized percentage equal to distributable earnings over the average monthly total stockholders' equity for the period. Refer to the "Distributable Earnings Reconciliation by Quarter" slide for a reconciliation of GAAP Net Income to Distributable Earnings
5. Q3 dividend yield for the period is based on the 9/29/2023 closing share price of $10.11
6. Represents fully committed amounts
7. Recourse leverage ratio excludes $1.1 billion of secured borrowings that are non-recourse to the Company

3

122.    In the Supplemental Financial Data Q3 2023 presentation, Ready Capital stated that the Mosaic acquired assets consisted of 8 loans with an UPB of $628 million and a "BOOK VALUE" of "*625M*":



## SBC Lending and Acquisitions



| PRODUCT TYPE | LOAN COUNT[1] | UPB | BOOK VALUE[2] | WA LTV[8] | WA COUPON | FIXED/FLOAT[3] | 60+ Days Past Due |
|---|---|---|---|---|---|---|---|
| | 2,162 | $10.0B | $9.9B | 64.9% | 9.0% | 21.1 / 78.9% | 5.4% |
| FIXED RATE[4] | 238 | $1.05B | $1.05B | 60.2% | 5.1% | 98.7 / 1.3% | 2.6% |
| BRIDGE | 539 | $7.09B | $7.05B | 68.1% | 9.2% | 0.6 / 99.4% | 2.9% |
| CONSTRUCTION (RC ORIGINATED) | 4 | $12M | $11M | 38.6% | 8.5% | 61.0 / 39.0% | 0.0% |
| MOSAIC ACQUIRED ASSETS | 8 | $628M | $625M | 67.1% | 13.5% | 32.8 / 67.2% | 8.6% |
| BROADMARK ACQUIRED ASSETS | 128 | $697M | $671M | 58.5% | 10.1% | 89.9 / 10.1% | 34.3% |
| OTHER[5] | 1,245 | $491M | $487M | 36.3% | 6.5% | 37.6 / 62.4% | 2.5% |

| | 2,162 | $10.0B | $9.9B | 64.9% | 9.0% | 21.1 / 78.9% | 5.4% |
|---|---|---|---|---|---|---|---|
| ORIGINATED | 798 | $8.20B | $8.16B | 67.0% | 8.7% | 13.2 / 86.8% | 2.9% |
| ACQUIRED | 1,364 | $1.77B | $1.73B | 55.4% | 10.6% | 57.0 / 43.0% | 17.1% |

### CURRENT QUARTER HIGHLIGHTS

- Bridge loan originations of $90.7 million at average spread of plus 494 bps

- SBC money up pipeline of $690 million, including $31 million funded in October

- Mosaic Acquired Assets protected against losses due to a $61 million contingent equity right reserve

### GROSS LEVERED YIELD

| | Q3 2022 | Q4 2022 | Q1 2023 | Q2 2023 | Q3 2023 |
|---|---|---|---|---|---|
| Income on joint venture investments and gains on loans, held for sale [6] | 1.0% | 0.5% | 0.6% | 1.3% | 1.7% |
| Gross levered yield (ex. gains) [7] | 10.5% | 11.1% | 10.9% | 10.2% | 9.1% |

1. Excludes joint venture investments
2. Gross of general reserves
3. 73% of fixed rate loans match funded
4. Includes originated SBC floating rate loans that are included in our RCMT securitization and therefore, categorized as Fixed/CMBS
5. Loans with the "Other" classification are generally SBC acquired loans that have nonconforming characteristics for the Fixed rate, Bridge, or Construction categories
6. Includes realized and unrealized gains (losses) on loans held for sale and MSR creation
7. Includes interest income, accretion of discount, and servicing income net of interest expense and amortization of deferred financing costs
8. Loan-to-value (LTV) is calculated by dividing the current unpaid principal balance by the most recent collateral value received. The most recent value for performing loans is often the third-party

7

123. On the morning of November 8, 2023, before market trading hours, at 8:30 a.m. Eastern, Defendants held a conference call with analysts and investors to present Ready Capital's financial and operational results for 3Q 2023 (the "3Q 2023 Earnings Call").

124. During his prepared remarks on the 2Q 2023 Earnings Call, Defendant Ahlborn discussed Ready Capital's financial performance during the quarter stating "*[q]uarterly GAAP and distributable earnings per common share were $0.25 and $0.28, respectively. Distributable earnings of $52.2 million equate to an 8% return on average stockholders' equity*" and "*[o]n the balance sheet, book value is $14.42[.]*"

125.    After market hours on November 8, 2023, Ready Capital filed its Form 10-Q for 3Q 2023 ("3Q 2023 Form 10-Q"). The 3Q 2023 Form 10-Q was signed by Defendants Capasse and Ahlborn.

126.    The 3Q 2023 Form 10-Q repeated the same statements concerning Ready Capital's 3Q 2023 results for its net book value of "*$14.42*" per share of common stock, distributable earnings per share of "*$0.28*", and net income of *$47,179,000*:

**Results of Operations**

**_Key Financial Measures and Indicators_**

As a real estate finance company, we believe the key financial measures and indicators for our business are earnings per share, dividends declared per share, distributable earnings, and net book value per share. As further described below, distributable earnings is a measure that is not prepared in accordance with GAAP. We use distributable earnings to evaluate our performance and determine dividends, excluding the effects of certain transactions and GAAP adjustments that we believe are not necessarily indicative of our current loan activity and operations. See "—Non-GAAP Financial Measures" below for a reconciliation of net income to distributable earnings.

The table below sets forth certain information on our operating results.

| | Three Months Ended September 30, | | | | Nine Months Ended September 30, | | | |
|---|---|---|---|---|---|---|---|---|
| ($ in thousands, except share data) | | 2023 | | 2022 | | 2023 | | 2022 |
| Net Income | $ | 47,179 | $ | 66,253 | $ | 337,530 | $ | 189,481 |
| Earnings per common share - basic | $ | 0.25 | $ | 0.53 | $ | 2.33 | $ | 1.66 |
| Earnings per common share - diluted | $ | 0.25 | $ | 0.50 | $ | 2.30 | $ | 1.56 |
| Distributable earnings | $ | 52,164 | $ | 58,186 | $ | 141,596 | $ | 167,151 |
| Distributable earnings per common share - basic | $ | 0.28 | $ | 0.46 | $ | 0.93 | $ | 1.46 |
| Distributable earnings per common share - diluted | $ | 0.28 | $ | 0.44 | $ | 0.92 | $ | 1.38 |
| Dividends declared per common share | $ | 0.36 | $ | 0.42 | $ | 1.16 | $ | 1.26 |
| Dividend yield | | 14.2 % | | 16.6 % | | 14.2 % | | 16.6 % |
| Return on equity | | 7.2 % | | 14.5 % | | 21.0 % | | 15.1 % |
| Distributable return on equity | | 8.0 % | | 12.7 % | | 8.6 % | | 13.3 % |
| Book value per common share | $ | 14.42 | $ | 15.40 | $ | 14.42 | $ | 15.40 |
| Adjusted net book value per common share | $ | 14.42 | $ | 15.40 | $ | 14.42 | $ | 15.40 |

127.    In "Note 6. Loans and allowance for credit losses", the 3Q 2023 Form 10-Q detailed Ready Capital's carrying value of its construction loans and its allowance for loan losses. Specifically, Defendants stated "Construction" loans had a "Carrying Value" of $"*1,224,777*" or $1,224,777,000 and "Allowance for loan losses" for Ready Capital's loan portfolio of $"*(74,147)*" or $74,147,000 as represented in the following excerpt:

45

*Loan portfolio*

The table below summarizes the classification, UPB, and carrying value of loans held by the Company including loans of consolidated VIEs.

| | | September 30, 2023 | | |
|---|---|---|---|---|
| (in thousands) | | Carrying Value | | UPB |
| **Loans** | | | | |
| Bridge | $ | 1,527,335 | $ | 1,533,962 | $ |
| Fixed rate | | 247,507 | | 241,905 |
| Construction | | 1,224,777 | | 1,228,654 |
| Freddie Mac | | 9,934 | | 9,826 |
| SBA - 7(a) | | 1,007,451 | | 1,015,099 |
| Residential | | 1,672 | | 1,672 |
| Other | | 207,394 | | 209,947 |
| **Total Loans, before allowance for loan losses** | $ | 4,226,070 | $ | 4,241,065 | $ |
| **Allowance for loan losses** | $ | (74,147) | $ | — | $ |
| **Total Loans, net** | $ | 4,151,923 | $ | 4,241,065 | $ |
| **Loans in consolidated VIEs** | | | | |
| Bridge | $ | 5,536,226 | $ | 5,558,814 | $ |
| Fixed rate | | 804,303 | | 804,880 |
| SBA - 7(a) | | 223,046 | | 237,883 |
| Other | | 267,186 | | 267,939 |
| **Total Loans, in consolidated VIEs, before allowance for loan losses** | $ | 6,830,761 | $ | 6,869,516 | $ |
| **Allowance for loan losses on loans in consolidated VIEs** | $ | (26,261) | $ | — | $ |

128.    In the 3Q 2023 Form 10-Q, Ready Capital disclosed that "specific" construction loans had only *"$235"* , or $235,000, in allowance for credit losses:

*Allowance for credit losses*

The allowance for credit losses consists of the allowance for losses on loans and lending commitments accounted for at amortized cost. Such loans and lending commitments are reviewed quarterly considering credit quality indicators, including probable and historical losses, collateral values, LTV ratios, and economic conditions.

The table below presents the allowance for loan losses by loan product and impairment methodology.

| (in thousands) | | Bridge | | Fixed Rate | | Construction | | SBA - 7(a) | | Residential | | Other | | Total Allowance for loan losses |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **September 30, 2023** | | | | | | | | | | | | | | |
| General | $ | 24,039 | $ | 7,655 | $ | 6,622 | $ | 12,987 | $ | — | $ | 2,079 | $ | 53,382 |
| Specific | | 11,506 | | 3,107 | | 235 | | 5,555 | | — | | 150 | | 20,553 |
| PCD | | — | | — | | 26,473 | | — | | — | | — | | 26,473 |
| **Ending balance** | $ | 35,545 | $ | 10,762 | $ | 33,330 | $ | 18,542 | $ | — | $ | 2,229 | $ | 100,408 |
| **December 31, 2022** | | | | | | | | | | | | | | |
| General | $ | 42,979 | $ | 2,397 | $ | 325 | $ | 10,801 | $ | — | $ | 1,208 | $ | 57,710 |
| Specific | | 6,926 | | 4,134 | | 1,037 | | 3,498 | | — | | 1,242 | | 16,837 |
| PCD | | — | | — | | 15,972 | | — | | — | | — | | 15,972 |
| **Ending balance** | $ | 49,905 | $ | 6,531 | $ | 17,334 | $ | 14,299 | $ | — | $ | 2,450 | $ | 90,519 |

129.    In a related November 17, 2023 "Investor Presentation" ("November Presentation"), Ready Capital disclosed that Mosaic acquired assets consisted of 8 loans with a UPB of $628 million and a "BOOK VALUE" of "*$625M*".

46



## SBC Lending and Acquisitions

| PRODUCT TYPE | LOAN COUNT[1] | UPB | BOOK VALUE[2] | WA LTV[6] | WA COUPON | FIXED/FLOAT[3] | 60+ Days Past Due |
|---|---|---|---|---|---|---|---|
| | 2,162 | $10.0B | $9.9B | 64.9% | 9.0% | 21.1 / 78.9% | 5.4% |
| FIXED RATE[4] | 238 | $1.05B | $1.05B | 60.2% | 5.1% | 98.7 / 1.3% | 2.6% |
| BRIDGE | 539 | $7.09B | $7.05B | 68.1% | 9.2% | 0.6 / 99.4% | 2.9% |
| CONSTRUCTION (RC ORIGINATED) | 4 | $12M | $11M | 38.6% | 8.5% | 61.0 / 39.0% | 0.0% |
| MOSAIC ACQUIRED ASSETS | 8 | $628M | $625M | 67.1% | 13.5% | 32.8 / 67.2% | 8.6% |
| BROADMARK ACQUIRED ASSETS | 128 | $697M | $671M | 58.5% | 10.1% | 89.9 / 10.1% | 34.3% |
| OTHER[5] | 1,245 | $491M | $487M | 36.3% | 6.5% | 37.6 / 62.4% | 2.5% |

| | LOAN COUNT | UPB | BOOK VALUE | WA LTV | WA COUPON | FIXED/FLOAT | 60+ Days Past Due |
|---|---|---|---|---|---|---|---|
| | 2,162 | $10.0B | $9.9B | 64.9% | 9.0% | 21.1 / 78.9% | 5.4% |
| ORIGINATED | 798 | $8.20B | $8.16B | 67.0% | 8.7% | 13.2 / 86.8% | 2.9% |
| ACQUIRED | 1,364 | $1.77B | $1.73B | 55.4% | 10.6% | 57.0 / 43.0% | 17.1% |

**GEOGRAPHY**

**PROPERTY TYPE**

Powered by Bing
© GeoNames, Microsoft, TomTom

SBC Lending and Acquisitions — 69% • 12% • 5% • 5% • 9%

■ Multi-family ■ Mixed-use ■ Retail ■ Office ■ Other Investments

1. Excludes joint venture investments
2. Gross of general reserves
3. 73% of fixed rate loans match funded
4. Includes originated SBC floating rate loans that are included in our RCMT securitization and therefore, categorized as Fixed/CMBS
5. Loans with the "Other" classification are generally SBC acquired loans that have nonconforming characteristics for the Fixed rate, Bridge, Construction, or Mosaic acquired categories
6. Loan-to-value (LTV) is calculated by dividing the current unpaid principal balance by the most recent collateral value received. The most recent value for performing loans is often the third-party as-is valuation utilized during the original underwriting process

13

### iv.    January 29, 2024 – Investor Presentation

130.    On or about January 29, 2024, Ready Capital released an "Investor Presentation" ("January 2024 Presentation").

131.    In the January 2024 Presentation, Ready Capital provided a "Breakdown of Investments Strategy Economics" that detailed that its construction lending had a max leverage of "75% Loan-to-Cost[.]" On another slide, Ready Capital detailed that "Construction" loans contributed 19% of "[trailing twelve months] distributable earnings contribution[.]"

132.    In a later slide, Ready Capital stated that its "Carrying Amount" for its "Construction Loans" was "*1,224,777*", or $1,224,777,000:

47





### v. February 27-28, 2024 – Fourth Quarter 2023 Press Release, Earnings Call, and Form 10-K.

133. On February 27, 2024, after market close, Ready Capital filed a Form 8-K that included as exhibits a press release announcing its financial results for the fourth quarter 2023 ended December 31, 2023 ("4Q 2023") (the "4Q 2023 Press Release") and a presentation titled "Supplemental Financial Data Q4 2023[.]"

134. The 4Q 2023 Press Release announced highlights for the quarter including Realty Capital's "***DISTRIBUTABLE EARNINGS PER COMMON SHARE OF $0.26***" and "***Net book value of $14.10 per share of common stock as of December 31, 2023.***" (Emphasis added in bold and italicized text). In the press release, Defendant Capasse was quoted stating "***[w]e believe our***

*portfolio is well positioned to withstand market headwinds as a result of our avoidance of office collateral, its granularity with over 5,000 positions and its concentration in strong markets.*"

135.    The 4Q 2023 Press Release also provided Ready Capital's table reconciling its Net Income of **"$10,881"**, or $10,881,000, to its "Distributable earnings per common share – basic" of "**$0.26**":

The table below reconciles Net Income computed in accordance with U.S. GAAP to Distributable Earnings.

| (in thousands) | | Three Months Ended December 31, 2023 |
|---|---|---|
| **Net Income** | $ | 10,881 |
| **Reconciling items:** | | |
| Unrealized loss on MSR - discontinued operations | | 20,715 |
| Unrealized loss on joint ventures | | 2,124 |
| Unrealized loss on foreign exchange hedges | | 1,582 |
| Increase in CECL reserve | | 3,195 |
| Non-cash compensation | | 1,360 |
| Merger transaction costs and other non-recurring expenses | | 7,361 |
| Loss on bargain purchase | | 7,060 |
| **Total reconciling items** | $ | 43,397 |
| Income tax adjustments | | (5,754) |
| **Distributable earnings** | $ | 48,524 |
| Less: Distributable earnings attributable to non-controlling interests | | 1,358 |
| Less: Income attributable to participating shares | | 2,206 |
| **Distributable earnings attributable to common stockholders** | $ | 44,960 |
| **Distributable earnings per common share – basic** | $ | 0.26 |
| **Distributable earnings per common share – diluted** | $ | 0.26 |

136.    In the Supplemental Financial Data Q4 2023 presentation, Ready Capital reiterated its statements about Ready Capital's net book value and its distributable earnings, summarizing its later slides on these topics:

49



## Fourth Quarter 2023 Results

| | Multi-strategy real estate finance company that originates, acquires and services lower-to-middle-market ("LMM") investor and owner occupied commercial real estate loans |
|---|---|
| Earnings / Dividends | • Net income from continuing operations[1] of $24.6 million, or $0.12 per common share<br>• Distributable earnings[2] of $48.5 million, or $0.26 per common share<br>• Declared dividend of $0.30 per common share |
| Returns | • Return on Equity from continuing operations[3] of 3.7%<br>• Distributable Return on Equity[4] of 7.5%<br>• Dividend Yield[5] of 11.7% |
| Balance Sheet | • Net book value per share of $14.10 per common share<br>• Total leverage of 3.3x and recourse leverage ratio[6] of 0.8x |
| Discontinued Operations | • The disposition of the Company's residential mortgage banking segment expected to be completed by June 30, 2024 |

137.    In the Supplemental Financial Data Q4 2023 presentation, Ready Capital provided its "2023 Highlights" detailing *the amounts of Ready Capital's earnings, distributable earnings, and return on equity in 2023 all which included that from 2Q 2023, 3Q 2023, and 4Q 2023*:



138.    In the Supplemental Financial Data Q4 2023 presentation, Ready Capital detailed that Construction was "12%" of Ready Capital's total portfolio and that it was Ready Capital's third largest revenue contributor with **$13,286,000** in revenue in 2023.



Diversified, Complementary, & Scalable Platforms

139.    In the Supplemental Financial Data Q4 2023 presentation, Ready Capital stated that the Mosaic acquired assets consisted of 7 loans with an UPB of $640 million and a "BOOK VALUE" of "*$634M*":

## LMM Commercial Real Estate



| PRODUCT TYPE | LOAN COUNT[1] | UPB | BOOK VALUE[2] | WA LTV[3] | WA COUPON | FIXED/FLOAT[4] | 60+ Days Past Due |
|---|---|---|---|---|---|---|---|
| | 2,071 | $9.7B | $9.6B | 64.5% | 9.0% | 21.3 / 78.7% | 9.9% |
| FIXED RATE | 234 | $1.03B | $1.03B | 60.1% | 5.1% | 100.0 / 0.0% | 2.6% |
| BRIDGE | 511 | $6.84B | $6.80B | 67.5% | 9.2% | 0.6 / 99.4% | 7.9% |
| CONSTRUCTION (RC ORIGINATED) | 6 | $48M | $47M | 60.8% | 7.4% | 74.0 / 26.0% | 0.0% |
| MOSAIC ACQUIRED ASSETS | 7 | $640M | $634M | 59.2% | 13.9% | 31.5 / 68.5% | 9.0% |
| BROADMARK ACQUIRED ASSETS | 112 | $634M | $609M | 66.4% | 10.7% | 90.1 / 9.9% | 50.7% |
| OTHER[5] | 1,201 | $469M | $466M | 37.3% | 6.6% | 36.4 / 63.6% | 1.2% |

| | LOAN COUNT | UPB | BOOK VALUE | WA LTV | WA COUPON | FIXED/FLOAT | 60+ Days Past Due |
|---|---|---|---|---|---|---|---|
| | 2,071 | $9.7B | $9.6B | 64.5% | 9.0% | 21.3 / 78.7% | 9.9% |
| ORIGINATED | 769 | $7.94B | $7.90B | 66.4% | 8.7% | 13.7 / 86.3% | 7.2% |
| ACQUIRED | 1,302 | $1.72B | $1.69B | 56.1% | 10.7% | 56.3 / 43.7% | 22.3% |

### CURRENT QUARTER HIGHLIGHTS

- Liquidation and payoff of $429 million, including $94 million of assets acquired in the Broadmark Merger

- LMM money up pipeline of $451 million, including $43 million funded in January

- Mosaic Acquired Assets protected against losses due to a $61 million contingent equity right reserve



### GROSS LEVERED YIELD

1. Excludes joint venture investments
2. Gross of general reserves
3. Loan-to-value (LTV) is calculated by dividing the current unpaid principal balance by the most recent collateral value received. The most recent value for performing loans is often the third-party as-is valuation utilized during the original underwriting process
4. 72% of fixed rate loans match funded
5. Loans with the "Other" classification are generally LMM acquired loans that have nonconforming characteristics for the Fixed rate, Bridge, or Construction categories
6. Includes realized and unrealized gains (losses) on loans held for sale and MSR creation
7. Includes interest income, accretion of discount, and servicing income net of interest expense and amortization of deferred financing costs

8

140.    On the morning of February 28, 2024, before market trading hours, at 8:30 a.m. Eastern, Defendants held a conference call with analysts and investors to present Ready Capital's financial and operational results for 4Q 2023 (the "4Q 2023 Earnings Call").

141.    During his prepared remarks on the 4Q 2023 Earnings Call, Defendant Ahlborn discussed Ready Capital's financial performance during the quarter stating:

> ***Quarterly GAAP earnings and distributable earnings per share were $0.12 and $0.26, respectively. Distributable earnings of $48.5 million equates to a 7.5% distributable return on average stockholder's equity. 2023 full year GAAP earnings and distributable earnings per share were $2.25 and $1.18, respectively, equating to an 8.6% distributable return on average stockholder's equity.***

> *   *   *

> ***Book value per share was $14.10.***

Emphasis added in bold, italicized text.

142.     During the question and answer portion of the 4Q 2023 Earnings Call, Defendants Ahlborn and Zausmer reassured the market that they believe that Ready Capital's CECL reserves were adequate. Specifically, Defendants Ahlborn and Zausmer stated:

> ***Crispin Elliot Love*** *Piper Sandler & Co., Research Division – Director & Senior Research Analyst*
>
> Can you just talk a little bit about what recent credit trends could mean for potential losses, delinquencies have increased, but what kind of losses do you believe that could lead to just based on what current debt service coverage ratios are and LTVs in the book, and then how you might plan to work out some of the lower performing loans?
>
> ***Thomas Edward Capasse*** *Ready Capital Corporation – Chairman, CEO & Chief Investment Officer*
>
> Andy, do you want to touch on the loss reserves and Adam, maybe touch on the credit component?
>
> ***Andrew Ahlborn*** *Ready Capital Corporation – CFO & Secretary*
>
> Hey, good morning, Crispin. Yes, on the loss reserve, we look at the book in two ways when we determine CECL. There is a general overlay, which accounts for roughly 50% of the reserve and then the asset management team is adding on specific reserves for those loans contained in our higher risk category. ***So we think the current CECL reserves account for the expected losses on those assets in our higher risk buckets based on sort of the detailed work, the asset management teams, current mark-to-market LTVs, et cetera***.
>
> ***Adam Zausmer*** *Ready Capital Corporation – Chief Credit Officer*
>
> And then hey, it's Adam. Yes, on the credit front, certainly seeing delinquencies as you highlighted increase quarter-over-quarter. We do feel that our basis is still healthy in the majority of our portfolio. We feel that if you look at the bridge delinquencies, where there was a spike, you're certainly seeing -- we think that the realized losses will be more at the equity level versus the debt level. So, as Andrew highlighted, ***we think that our reserves are certainly adequately sized.*** DSCR distress, LTVs are generally below 100% on the majority of the portfolio, ***and really don't anticipate material losses,*** but some loans will certainly require some modifications or restructuring, and certainly some sort of time to resolve and kind of have some time available for the marketer to rebound.

Emphasis added in bold, italicized text.

143.    In a follow-up question by another analyst concerning whether the "purchase discount" on the Mosaic portfolio was sufficient to cover any losses in that portfolio, Defendant Zausmer stated that the Mosaic CER was significant enough to "prevent future principal losses." Specifically, Defendants Zausmer stated:

> *Jade Joseph Rahmani Keefe, Bruyette, & Woods, Inc., Research Division – Managing Director*
>
> Just on the credit side with Broadmark and Mosaic, you said 28% purchase discount. Do you believe that that's sufficient to absorb losses, and therefore from those 2 portfolios, they would have no further deterioration on book value?
>
> *Thomas Edward Capasse Ready Capital Corporation – Chairman, CEO & Chief Investment Officer*
>
> Andy, do you want to comment?
>
> *Andrew Ahlborn Ready Capital Corporation – CFO & Secretary*
>
> Yes, maybe we will break it down into 2 components. *On the Mosaic side, that deal was structured with a contingent equity, right? That was at close -- approximately $90 million. We do not expect to exceed that contingent equity revenue*. On the Broadmark side, as we mentioned in the remarks, the discount applied to the NPLs, we still continue to believe is enough to cover expected principal losses. *I think what you will see over the next 2 quarters is movement -- I would call them, immaterial movements around the bargain purchase gain in both directions, as sort of values get finalized. But yes, we do believe the purchase discounts in both of those mergers will prevent future principal losses.*

Emphasis added in bold, italicized text.

144.    An analyst from Ladenburg Thalmann further whether the level of distributable ROE for 2024 would be below the 10% target to which Defendant Capasse responded that

> *Christopher Whitbread Patrick Nolan Ladenburg Thalmann & Co. Inc., Research Division – Executive Vice President of Equity Research*
>
> And so for 2024, we should see probably a distributable ROE somewhere below your 10% target, is that fair?

***Thomas Edward Capasse*** *Ready Capital Corporation – Chairman, CEO & Chief Investment Officer*

I think that's fair. We expect that the cumulative earnings of the company over the full year to cover the dividend. ***So, you will -- what we are expecting is a ramp up from where we're at today to something towards the back half of the year, that is covering the current $0.30. And then the growth in earnings from that level into our historical return target to happen in as we move into 2025.***

Emphasis added in bold, italicized text.

145.    After market hours on February 28, 2024, Ready Capital filed the 2023 Form 10-K for the quarter and year ended December 31, 2023. The 2023 Form 10-K was signed by Defendants Capasse and Ahlborn.

146.    The 2023 Form 10-K repeated the same statements concerning Ready Capital's 4Q 2023 and FY 2023 results for its net book value of "***$14.10***" per share of common stock, distributable earnings per share of "***$0.26***", and net income of ***$24,574,000*** during 4Q 2023 and "***$14.10***" per share of common stock, distributable earnings per share of "***$1.18***", and net income of ***$351,245,000*** for FY 2023:

**Results of Operations**

***Key Financial Measures and Indicators***

As a real estate finance company, we believe the key financial measures and indicators for our business are earnings per share, dividends declared per share, distributable earnings, return on equity, and net book value per share. As further described below, distributable earnings is a measure that is not prepared in accordance with GAAP. We use distributable earnings to evaluate our performance and determine dividends, excluding the effects of certain transactions and GAAP adjustments that we believe are not necessarily indicative of our current loan activity and operations. See "—Non-GAAP Financial Measures" below for a reconciliation of net income to distributable earnings.

The table below sets forth certain information on our operating results.

| ($ in thousands, except share data) | Three Months Ended December 31, 2023 | | Year Ended December 31, 2023 | | 2022 |
|---|---|---|---|---|---|
| Net Income from continuing operations | $ | 24,574 | $ 351,245 | $ | 159,551 |
| Earnings per common share from continuing operations - basic | $ | 0.12 | $ 2.27 | $ | 1.32 |
| Earnings per common share from continuing operations - diluted | $ | 0.12 | $ 2.24 | $ | 1.28 |
| Distributable earnings | $ | 48,524 | $ 190,120 | $ | 218,732 |
| Distributable earnings per common share - basic | $ | 0.26 | $ 1.18 | $ | 1.87 |
| Distributable earnings per common share - diluted | $ | 0.26 | $ 1.17 | $ | 1.79 |
| Dividends declared per common share | $ | 0.30 | $ 1.46 | $ | 1.66 |
| Dividend yield | | 11.7 % | 13.5 % | | 12.3 % |
| Return on equity from continuing operations | | 3.7 % | 17.2 % | | 10.1 % |
| Distributable return on equity | | 7.5 % | 8.6 % | | 12.8 % |
| Book value per common share | $ | 14.10 | $ 14.10 | $ | 15.20 |
| Adjusted net book value per common share | $ | 14.10 | $ 14.10 | $ | 15.20 |

147.    In "Note 6. Loans and allowance for credit losses", the 2023 Form 10-K detailed Ready Capital's carrying value of its construction loans and its allowance for loan losses.

Specifically, Defendants stated "Construction" loans had a "Carrying Value" of $"*1,207,783*" or

$1,207,783,000 and "Allowance for loan losses" for Ready Capital's loan portfolio of $"*(81,430)*"

or ($74,147,000) as represented in the following excerpt:

*Loan portfolio*
The table below summarizes the classification, UPB, and carrying value of loans held by the Company including loans of consolidated VIEs.

| | | December 31, 2023 | | |
| --- | --- | --- | --- | --- |
| *(in thousands)* | | Carrying Value | | UPB |
| **Loans** | | | | |
| Bridge | $ | 1,444,770 | $ | 1,448,281 $ |
| Fixed rate | | 247,476 | | 241,674 |
| Construction | | 1,207,783 | | 1,212,526 |
| Freddie Mac | | 9,500 | | 9,719 |
| SBA – 7(a) | | 995,974 | | 1,003,323 |
| Other | | 196,087 | | 198,499 |
| **Total Loans, before allowance for loan losses** | $ | 4,101,590 | $ | 4,114,022 $ |
| **Allowance for loan losses** | $ | (81,430) | $ | — $ |
| **Total Loans, net** | $ | 4,020,160 | $ | 4,114,022 $ |
| **Loans in consolidated VIEs** | | | | |
| Bridge | | 5,370,251 | | 5,389,535 |
| Fixed rate | | 790,068 | | 790,967 |
| SBA – 7(a) | | 213,892 | | 227,636 |
| Other | | 257,289 | | 258,029 |
| **Total Loans, in consolidated VIEs, before allowance for loan losses** | $ | 6,631,500 | $ | 6,666,167 $ |
| **Allowance for loan losses on loans in consolidated VIEs** | $ | (20,175) | $ | — $ |
| **Total Loans, net, in consolidated VIEs** | $ | 6,611,325 | $ | 6,666,167 $ |
| **Loans, held for sale, at fair value** | | | | |
| Fixed rate | | — | | — |
| Freddie Mac | | 20,955 | | 20,729 |
| SBA – 7(a) | | 59,421 | | 55,769 |
| Other | | 1,223 | | 1,297 |
| **Total Loans, held for sale, at fair value** | $ | 81,599 | $ | 77,795 $ |
| **Total Loans, net and Loans, held for sale, at fair value** | $ | 10,713,084 | $ | 10,857,984 $ |
| **Paycheck Protection Program loans** | | | | |
| Paycheck Protection Program loans, held-for-investment | | 34,432 | | 35,637 |
| Paycheck Protection Program loans, held at fair value | | 165 | | 165 |
| **Total Paycheck Protection Program loans** | $ | 34,597 | $ | 35,802 $ |
| **Total Loan portfolio** | $ | 10,747,681 | $ | 10,893,786 $ |

148.    In the 2023 Form 10-K, Ready Capital disclosed that "specific" construction loans

had only "*$5,726*" , or $5,726,000, in allowance for credit losses after a $6,363,000 addition for

construction loans as a whole of which $5.491 million was allocated to "specific" construction

loans:

*Allowance for credit losses*

The allowance for credit losses consists of the allowance for losses on loans and lending commitments accounted for at amortized cost. Such loans and lending commitments are reviewed quarterly considering credit quality indicators, including probable and historical losses, collateral values, LTV ratios, and economic conditions.

The table below presents the allowance for loan losses by loan product and impairment methodology.

| (in thousands) | Bridge | Fixed Rate | Construction | SBA – 7(a) | Other | Total |
|---|---|---|---|---|---|---|
| **December 31, 2023** | | | | | | |
| General | $ 17,302 | $ 7,884 | $ 3,722 | $ 12,679 | $ 2,886 | $ 44,473 |
| Specific | 18,939 | 5,714 | 5,726 | 5,188 | 143 | 35,710 |
| PCD | — | — | 21,422 | — | — | 21,422 |
| **Ending balance** | $ 36,241 | $ 13,598 | $ 30,870 | $ 17,867 | $ 3,029 | $ 101,605 |
| **December 31, 2022** | | | | | | |
| General | $ 42,979 | $ 2,397 | $ 325 | $ 10,801 | $ 1,208 | $ 57,710 |
| Specific | 6,926 | 4,134 | 1,037 | 3,498 | 1,242 | 16,837 |
| PCD | — | — | 15,972 | — | — | 15,972 |
| **Ending balance** | $ 49,905 | $ 6,531 | $ 17,334 | $ 14,299 | $ 2,450 | $ 90,519 |

The table below presents a summary of the changes in the allowance for loan losses.

| (in thousands) | Bridge | Fixed Rate | Construction | SBA – 7(a) | Other | Total |
|---|---|---|---|---|---|---|
| **Year Ended December 31, 2023** | | | | | | |
| Beginning balance | $ 49,905 | 6,531 | 17,334 | 14,299 | 2,450 | 90,519 |
| Provision for (recoveries of) loan losses | (13,045) | 8,571 | 6,363 | 5,598 | 1,185 | 8,672 |
| PCD (1) | — | — | 32,862 | — | — | 32,862 |
| Charge-offs and sales | (619) | (1,504) | (25,689) | (2,217) | (606) | (30,635) |
| Recoveries | — | — | — | 187 | — | 187 |
| **Ending balance** | $ 36,241 | 13,598 | 30,870 | 17,867 | 3,029 | 101,605 |
| **Year Ended December 31, 2022** | | | | | | |
| Beginning balance | $ 19,519 | 6,861 | — | 12,180 | 6,757 | 45,317 |
| Provision for (recoveries of) loan losses | 31,086 | (240) | 1,362 | 2,971 | (4,225) | 30,954 |
| PCD (2) | — | — | 15,972 | — | — | 15,972 |
| Charge-offs and sales | (700) | (90) | — | (1,536) | (82) | (2,408) |
| Recoveries | — | — | — | 684 | — | 684 |
| **Ending balance** | $ 49,905 | 6,531 | 17,334 | 14,299 | 2,450 | 90,519 |

(1) Includes impact of measurement period adjustment related to the Broadmark Merger. See Note 5 for further details on assets acquired and liabilities assumed in connection with the Broadmark Merger.
(2) Includes impact of measurement period adjustment related to the Mosaic Mergers. See Note 5 for further details on assets acquired and liabilities assumed in connection with the Mosaic Mergers.

### vi.     May 9-10, 2024 – First Quarter 2024 Press Release, Earnings Call, and Form 10-Q.

149.    On May 9, 2024, after market close, Ready Capital filed a Form 8-K that included as exhibits a press release announcing its financial results for the first quarter 2024 ended March 31, 2024 ("1Q 2024") (the "1Q 2024 Press Release") and a presentation titled "Supplemental Financial Data Q1 2024[.]"

150.    The 1Q 2024 Press Release announced highlights for the quarter including Realty Capital's "***DISTRIBUTABLE EARNINGS PER COMMON SHARE OF $0.29***" and "***Net book value of $13.44 per share of common stock as of March 31, 2024.***" (Emphasis added in bold and italicized text).

151.    The 1Q 2024 Press Release also provided Ready Capital's table reconciling its Net Income of "***($74,167)***", or ($74,167,000), to its "Distributable earnings per common share – basic" of "***$0.29***":

58

The table below reconciles Net Income computed in accordance with U.S. GAAP to Distributable Earnings.

| (in thousands) | | Three Months Ended March 31, 2024 |
|---|---|---|
| Net Loss | $ | (74,167) |
| Reconciling items: | | |
| Unrealized gain on joint ventures | | (35) |
| Decrease in CECL reserve | | (32,181) |
| Increase in valuation allowance | | 146,180 |
| Non-recurring REO impairment | | 15,512 |
| Non-cash compensation | | 1,877 |
| Merger transaction costs and other non-recurring expenses | | 1,931 |
| Total reconciling items | $ | 133,284 |
| Income tax adjustments | | (5,141) |
| Distributable earnings | $ | 53,976 |
| Less: Distributable earnings attributable to non-controlling interests | | 1,108 |
| Less: Income attributable to participating shares | | 2,335 |
| Distributable earnings attributable to common stockholders | $ | 50,533 |
| Distributable earnings per common share – basic and diluted | $ | 0.29 |

152.    In the Supplemental Financial Data Q1 2024 presentation, Ready Capital reiterated its statements about Ready Capital's net book value and its distributable earnings, summarizing its later slides on these topics:



59

153.    In the Supplemental Financial Data Q1 2024 presentation, Ready Capital stated that the Mosaic acquired assets consisted of 5 loans with an UPB of $560 million and a "BOOK VALUE" of "*$548M*":

## LMM Commercial Real Estate



| PRODUCT TYPE | LOAN COUNT(1) | UPB | BOOK VALUE(2) | WA LTV(3) | WA COUPON | FIXED/FLOAT(4) | 60+ Days Past Due(8) |
|---|---|---|---|---|---|---|---|
| | 1,935 | $9.3B | $9.1B | 65.6% | 9.1% | 20.1 / 79.9% | 11.2% |
| FIXED RATE | 229 | $1.02B | $1.02B | 60.1% | 5.1% | 100.0 / 0.0% | 4.0% |
| BRIDGE | 453 | $6.59B | $6.48B | 69.5% | 9.2% | 0.2 / 99.8% | 10.4% |
| CONSTRUCTION (RC ORIGINATED) | 6 | $64M | $63M | 49.5% | 8.9% | 53.6 / 46.4% | 0.0% |
| MOSAIC ACQUIRED ASSETS | 5 | $560M | $548M | 76.2% | 14.3% | 17.1 / 82.9% | 10.1% |
| BROADMARK ACQUIRED ASSETS | 97 | $595M | $564M | 81.4% | 10.8% | 91.8 / 8.2% | 43.1% |
| OTHER(5) | 1,145 | $446M | $442M | 36.8% | 6.6% | 34.4 / 65.6% | 0.9% |

| | 1,935 | $9.3B | $9.1B | 65.6% | 9.1% | 20.1 / 79.9% | 11.2% |
|---|---|---|---|---|---|---|---|
| ORIGINATED | 712 | $7.72B | $7.60B | 66.1% | 8.7% | 13.9 / 86.1% | 9.4% |
| ACQUIRED | 1,223 | $1.55B | $1.49B | 62.7% | 10.9% | 51.0 / 49.0% | 20.5% |

### CURRENT QUARTER HIGHLIGHTS

- Liquidation and payoffs of $461 million, including $50 million of assets acquired in the Broadmark Merger

- LMM money up pipeline of $528 million, including $165 million funded in April

- Transfer of $655 million of delinquent loans into held-for-sale

### GROSS LEVERED YIELD

| | Q1 2023 | Q2 2023 | Q3 2023 | Q4 2023 | Q1 2024 |
|---|---|---|---|---|---|
| Income on joint venture investments and gains on loans, held for sale [6] | 0.6% | 1.3% | 1.7% | 0.7% | 0.5% |
| Gross levered yield (ex. gains) [7] | 10.9% | 10.2% | 9.1% | 9.1% | 8.2% |

1. Excludes joint venture investments, loans held for sale, at fair value, and preferred equity investments
2. Gross of general reserves
3. Loan-to-value (LTV) is calculated by dividing the current unpaid principal balance by the most recent collateral value received. The most recent value for performing loans is often the third-party as-is valuation utilized during the original underwriting process
4. 73% of fixed rate loans match funded
5. Loans with the "Other" classification are generally LMM acquired loans that have nonconforming characteristics for the Fixed rate, Bridge, or Construction categories
6. Includes realized and unrealized gains (losses) on loans held for sale and MSR creation
7. Includes interest income, accretion of discount, and servicing income net of interest expense and amortization of deferred financing costs
8. Calculated based on UPB

7

154.    On the morning of May 9, 2024, before market trading hours, at 8:30 a.m. Eastern, Defendants held a conference call with analysts and investors to present Ready Capital's financial and operational results for 1Q 2024 (the "1Q 2024 Earnings Call").

155.    Defendant Capasse began his prepared remarks on the 2Q 2024 Earnings Call discussing the "3 diverging trends" impacting Ready Capital's near-term ROE. Defendant Capasse's second point stressed the significance of Ready Capitals' concentration in lower to middle market loans as a benefit to Ready Capital and highlight that Ready Capital was successful

in "avoiding single asset concentration risk." Specifically, in his opening remarks, Defendant Capasse stated:

> Before we delve into credit metrics, it's important to reiterate that tail risk in our portfolio is mitigated by 3 factors. First, our concentration in multifamily and mixed use at 78% of our portfolio. Although overall market multifamily delinquencies increased in the first quarter, longer-term valuations are supported by demand with the average median of home payment $3,000 exceeding rent by 50%. The current distress in multifamily, particularly transitional loans is a trifecta of higher rates, declining rent growth from oversupply in certain markets, and inflationary increases in OpEx.

*                    *                    *

> ***Second, our concentration in lower to middle market loans. Our $9.4 billion total portfolio includes approximately 1,800 loans with an average balance of $4.4 million, avoiding single asset concentration risk.*** In the broader multifamily sector, the disparity on refinance risk is wide where 95% of loans under $25 million paid off at maturity compared to 55% of loans over $25 million. We've seen this in our originated portfolio where 16% of loans over $25 million are 60 days delinquent compared to 7% of loans under $25 million.

Emphasis added in bold, italicized text.

156.    Defendant Capasse further explained in his third point that Ready Capital had during 1Q 2024 "transferred $655 million of loans into held for sale, taking $146 million valuation allowance against those loans" noting that "[t]he NPV of repositioning of this capital is greater than holding these assets through recovery and absorbing carry cost through the process."

157.    During his prepared remarks on the 1Q 2024 Earnings Call, Defendant Ahlborn discussed Ready Capital's financial performance during the quarter stating "***[q]uarterly GAAP and distributable earnings per common share were a $0.44 loss and $0.29, respectively. Distributable earnings of $54 million equates to an 8.6% return on average stockholders' equity.***" and "***[o]n the balance sheet, book value per share was $13.43 [.]***" (Emphasis added in bold, italicized text).

158.    After prepared remarks, the 1Q 2024 Earnings Call shifted to questions from analysts. In answering a question from an analyst at JMP Securities concerning the transfer of the loans held for sale and related valuation allowance. In his question, the analyst inquired what segments of Realty Capital's loan portfolio Defendants marked as held for sale that corresponded to the $146 million increase in allowance for losses. Defendants Capasse and Zausmer explained that Ready Capital reviewed the originated loans along with the loans acquired through mergers and acquisitions, and based on that essentially identified "the non-core assets and really assets that would ultimately have large carry costs." This selection, however, notably excluded the Portland Project. Specifically, Defendants Capasse and Zausmer stated:

**Steven Cole Delaney** *JMP Securities LLC, Research Division – MD, Director of Mortgage & Real Estate Finance Research & Equity Research Analyst*

Tom and Andrew, you guys have been busy it sounds like. Just a fine point, Andrew, the reserve on the $650 million held for sale, does that work out to about $0.85 per share hit to book value? Andrew?

**Andrew Ahlborn** *Ready Capital Corporation – CFO & Secretary*

Hey, Steve. It was more of an area -- yes, sorry. I was on mute. Yes, that's about right. It was related to a 4.4% decline in the book value. So, doing the math there, it's a little less than the 80s and the mid-60s, yes.

**Steven Cole Delaney** *JMP Securities LLC, Research Division – MD, Director of Mortgage & Real Estate Finance Research & Equity Research Analyst*

And Tom, the held for sale, the $650 million reminds me a little bit about what we used to call, what was it, good bank, bad bank back in RTC days, I guess, or back in the S&L crisis before that. How comprehensive, I mean, in terms of identifying across different segments of the portfolio, is this primarily one group, whether it's bridge loans or is it pretty comprehensive a little bit of everything? <u>And what's your confidence level that you've circled 80%, 90% of the problems you're likely to have</u>? Thank you.

**Thomas Edward Capasse** *Ready Capital Corporation – Chairman, CEO & Chief Investment Officer*

Yes, it makes sense. And in terms of -- and I'll hand it off to Adam, maybe you can kind of give Steve a little bit even more detail in terms of the selection of the population. But what we've done analytically in this quarter is we've separated the gross portfolio into the originated portfolio, which includes the small amount of acquisitions that we've done over the years as well as the M&A portfolio. So, we selected from both of those with the idea to do a net present value analysis where the discount versus book is recaptured via the significant reinvestment opportunities we have, which are 15 to 20 -- low 20s depending upon the either direct lending or acquisitions and supplemented by share repurchases. That's the broader strategy.

So, Adam, maybe you could give a little bit of specific color around the selection of the population.

**Adam Zausmer** *Ready Capital Corporation – Chief Credit Officer*

Yes. Steve, in terms of the selection of the portfolio, certainly office, as Tom highlighted, our office exposure relative to our peers is still fairly low. But I think as we evaluate the net present value of really repositioning our capital, we think that adds greater than holding these office assets through recovery and absorbing legal costs to foreclose and carry costs to operate the property. So, certainly office is a big component of that.

Secondly, I'd say on the Broadmark side, I think the continued high mortgage rates and construction cost have certainly continued to impact our residential land and development portfolio from that merger, especially in secondary and tertiary markets. ***So, it's really the non-core assets and really assets that would ultimately have large carry costs.***

**Steven Cole Delaney** *JMP Securities LLC, Research Division – MD, Director of Mortgage & Real Estate Finance Research & Equity Research Analyst*

And not part of your core ongoing lending programs is what I'm gathering.

**Adam Zausmer** *Ready Capital Corporation – Chief Credit Officer*

That's exactly right. Yes. It's...

**Steven Cole Delaney** *JMP Securities LLC, Research Division – MD, Director of Mortgage & Real Estate Finance Research & Equity Research Analyst*

[indiscernible] transactions not from your own targeting that market and your own underwriting within Ready Cap, yes.

**Adam Zausmer** *Ready Capital Corporation – Chief Credit Officer*

63

That's exactly right, Steve.

***Thomas Edward Capasse*** *Ready Capital Corporation – Chairman, CEO & Chief Investment Officer*

Yes. And so, Steve, it's really more of as we said in the fourth quarter, this was the most impactful in terms of ROE accretion, selling lower -- low-yielding assets with long duration, which is essentially what this portfolio comprising Broadmark. And after this, our office will be down to nearly -- a little over 3%. So, that's how we selected the population.

Emphasis added in bold, italicized text.

159.    After market hours on May 10, 2024, Ready Capital filed its Form 10-Q for 1Q 2024 ("1Q 2024 Form 10-Q"). The 1Q 2024 Form 10-Q was signed by Defendants Capasse and Ahlborn.

160.    The 1Q 2024 Form 10-Q repeated the same statements concerning Ready Capital's 1Q 2024 results for its net book value of "***$13.44***" per share of common stock, distributable earnings per share of "***$0.29***", and net income of (***$77,582,000***):

**Results of Operations**

***Key Financial Measures and Indicators***
As a real estate finance company, we believe the key financial measures and indicators for our business are earnings per share, dividends declared per share, distributable earnings, return on equity, and net book value per share. As further described below, distributable earnings is a measure that is not prepared in accordance with GAAP. We use distributable earnings to evaluate our performance and determine dividends, excluding the effects of certain transactions and GAAP adjustments that we believe are not necessarily indicative of our current loan activity and operations. Refer to "—Non-GAAP Financial Measures" below for a reconciliation of net income to distributable earnings.

The table below sets forth certain information on our operating results.

| | Three Months Ended March 31, | | | |
|---|---|---|---|---|
| *($ in thousands, except share data)* | | 2024 | | 2023 |
| Net Income (loss) from continuing operations | $ | (75,582) | $ | 38,509 |
| Earnings per common share from continuing operations - basic | $ | (0.45) | $ | 0.31 |
| Earnings per common share from continuing operations - diluted | $ | (0.45) | $ | 0.30 |
| Distributable earnings | $ | 53,976 | $ | 38,149 |
| Distributable earnings per common share - basic | $ | 0.29 | $ | 0.31 |
| Distributable earnings per common share - diluted | $ | 0.29 | $ | 0.30 |
| Dividends declared per common share | $ | 0.30 | $ | 0.40 |
| Dividend yield [1] | | 13.1 % | | 15.7 % |
| Return on equity from continuing operations | | (13.3)% | | 9.4 % |
| Distributable return on equity | | 8.6 % | | 8.5 % |
| Book value per common share | $ | 13.44 | $ | 15.07 |

(1) Dividend yield is based on the respective period end closing share price.

161.    In "Note 6. Loans and allowance for credit losses", the 1Q 2024 Form 10-Q detailed Ready Capital's carrying value of its construction loans and its allowance for loan losses.

Specifically, Defendants stated "Construction" loans had a "Carrying Value" of $"**902,301**" or

$900,301,000 and "Allowance for loan losses" for Ready Capital's loan portfolio of $"**(53,939)**"

or $(53,939,000) as represented in the following excerpt:

*Loan portfolio*
The table below summarizes the classification, unpaid principal balance ("UPB"), and carrying value of loans held by the Company including loans of consolidated VIEs.

| (in thousands) | March 31, 2024 | | December 31, 2023 | |
| | Carrying Value | UPB | Carrying Value | UPB |
| --- | --- | --- | --- | --- |
| **Loans** | | | | |
| Bridge | $ 1,180,936 | $ 1,184,751 | $ 1,444,770 | $ 1,448,281 |
| Fixed rate | 192,216 | 190,017 | 247,476 | 241,674 |
| Construction | 902,301 | 904,162 | 1,207,783 | 1,212,526 |
| Freddie Mac | — | — | 9,500 | 9,719 |
| SBA - 7(a) | 1,004,680 | 1,012,504 | 995,974 | 1,003,323 |
| Other | 174,287 | 176,328 | 196,087 | 198,499 |
| **Total Loans, before allowance for loan losses** | **$ 3,454,420** | **$ 3,467,762** | **$ 4,101,590** | **$ 4,114,022** |
| **Allowance for loan losses** | **$ (53,939)** | **$ —** | **$ (81,430)** | **$ —** |
| **Total Loans, net** | **$ 3,400,481** | **$ 3,467,762** | **$ 4,020,160** | **$ 4,114,022** |
| **Loans in consolidated VIEs** | | | | |
| Bridge | 5,118,769 | 5,133,800 | 5,370,251 | 5,389,535 |
| Fixed rate | 784,290 | 783,420 | 790,068 | 790,967 |
| SBA - 7(a) | 208,405 | 221,402 | 213,892 | 227,636 |
| Other | 244,704 | 245,493 | 257,289 | 258,029 |
| **Total Loans, in consolidated VIEs, before allowance for loan losses** | **$ 6,356,168** | **$ 6,384,115** | **$ 6,631,500** | **$ 6,666,167** |
| **Allowance for loan losses on loans in consolidated VIEs** | **$ (13,484)** | **$ —** | **$ (20,175)** | **$ —** |
| **Total Loans, net, in consolidated VIEs** | **$ 6,342,684** | **$ 6,384,115** | **$ 6,611,325** | **$ 6,666,167** |

162.    In the 1Q 2024 Form 10-Q, Ready Capital disclosed that "specific" construction

loans had only **"$690"**, or $690,000, in allowance for credit losses:

*Allowance for credit losses*
The allowance for credit losses consists of the allowance for losses on loans and lending commitments accounted for at amortized cost. Such loans and lending commitments are reviewed quarterly considering credit quality indicators, including probable and historical losses, collateral values, LTV ratios, and economic conditions.

The table below presents the allowance for loan losses by loan product and impairment methodology.

| (in thousands) | Bridge | Fixed Rate | Construction | SBA - 7(a) | Other | Total |
| --- | --- | --- | --- | --- | --- | --- |
| **March 31, 2024** | | | | | | |
| General | $ 10,827 | $ 5,971 | $ 11,886 | $ 14,596 | $ 2,593 | $ 45,873 |
| Specific | 2,354 | 1,293 | 690 | 5,983 | 51 | 10,371 |
| PCD | — | — | 11,179 | — | — | 11,179 |
| **Ending balance** | **$ 13,181** | **$ 7,264** | **$ 23,755** | **$ 20,579** | **$ 2,644** | **$ 67,423** |
| **December 31, 2023** | | | | | | |
| General | $ 17,302 | $ 7,884 | $ 3,722 | $ 12,679 | $ 2,886 | $ 44,473 |
| Specific | 18,939 | 5,714 | 5,726 | 5,188 | 143 | 35,710 |
| PCD | — | — | 21,422 | — | — | 21,422 |
| **Ending balance** | **$ 36,241** | **$ 13,598** | **$ 30,870** | **$ 17,867** | **$ 3,029** | **$ 101,605** |

### vii.    June 4, 2024 – Contingent Equity Right Report – March 2024

163.    In March 2024, Ready Capital created a presentation titled "Contingent Equity

Right Report" that was later published on Ready Capital's investor relations page by at least June

4, 2024.

164.    In the Contingent Equity Right Report, Ready Capital provided a detailed presentation of the "Mosaic Portfolio" and its "Potential Impact Range to CER[.]" Notably, for Asset #15, which is the Portland Project's Construction Loan (as evidenced by the amount and the maturity date of December 31, 2024). Notably, Ready Capital stated that potential CER impact to the Mosaic CER was "*$0.0*" and that "*[r]efinancing of the loan is expected to occur by maturity on December 31, 2024.*" Additionally, this slide also shows that that all of the $90 million cushion provided to the Mosaic portfolio CERs were expected to be depleted by other assets in the Mosaic portfolio:

## Mosaic Portfolio Update (continued)

 READY CAPITAL.

**Current Portfolio Summary (continued)**

| Asset # | Loan Status | Project Update | UPB of RC's Position (in millions) | Potential Impact Range to CER[1] (in millions) |
|---------|-------------|----------------|------------------------------------|------------------------------------------------|
| Asset #13 | Default | RC is currently negotiating a PSA for the sale of its interest in the loan  Expected Timeline: Q3 2024 | $31.8 | $(6.6) to $(6.0) |
| Asset #14 | Default | The asset is currently being marketed for disposition. Expected Timeline: Q2 2024 | $24.8 | $(3.7) to $(3.0) |
| Asset #15 | Current | Loan has been extended. Refinancing of the loan is expected to occur by maturity on 12/31/2024. Expected Timeline: Q4 2024 | $260.0 | $0.0 |
| Asset #16 | Current | Preferred equity investment is the last of four assets in the portfolio. Sponsor has listed the asset for sale. Expected Timeline: Q3 2024 | $0.45 | $0.0 |
| Asset #18 | Current | Preferred equity investment in a multifamily portfolio which is expected to be sold in 2025 or 2026. To improve the investment's return profile, RC is currently developing a strategy for the refinancing of the senior participation by September 2024. Expected Timeline: Q4 2026 | $40.2 | $0 to $4 |
| Asset #19 | N/A | The asset is currently marketed for disposition. The only offer that has been received to date is at a price of $6mm. Expected Timeline: Q2 2025 | $35.4 | $(7.0) |
| | | | $497.8 | $(70.6) to $(63.9) |
| **Total Anticipated CER Impact[2]** | | | | $(99.5) to $(92.8) |
| **Anticipated CER Recovery %[3]** | | | | -11.8% to -4.3% |

(1) Based on projected recovery of unpaid principal balances for the remaining Mosaic portfolio using various payoff scenarios.
(2) Includes net realized losses from liquidated assets and the projected recovery of UPB from the remaining Mosaic portfolio.
(3) Calculated as the total anticipated recoverable amount over the original $89.0 million CER

4

66

165. As the Contingent Equity Right Report shows, there were only four assets where the loan was "current" with two of them, Assets 16 and 18, listed as preferred equity investments as opposed to loans.

F. **THE CONSTRUCTION LOAN HEADS TOWARDS INEVITABLE DEFAULT.**

166. By the third quarter of 2024, Ready Capital, as the controlling entity of the Lender, already started discussing an extension of the Construction Loan's December 31, 2024 maturity date with the mezzanine lender, Broadway.

167. As affirmed by Bradley Sher, the Manager of EB5 Group LLC, which is the Manager of Plaintiff Broadway, in his affirmation filed in the Broadway Action, the discussions to extend the Construction Loan's maturity date had already begun "in the months leading up to the December 31, 2024 maturity date" stating:

> In the months leading up to the December 31, 2024 maturity date of both the Senior Loan and Mezzanine Loan, Senior Lender represented in writing to Mezzanine Lender that a further forbearance and extension of the Senior Loan's maturity date was necessary and would be negotiated to permit completion of the Project. Senior Lender requested, and Mezzanine Lender agreed, that the Mezzanine Loan's maturity date be concomitantly extended consistent with that ultimately approved for the Senior Loan. Accordingly, Mezzanine Lender did not immediately notice a maturity default on the Mezzanine Loan.

168. As Sher stated in his affirmation, on February 7, 2024, Broadway was informed that Construction Loan's maturity date would not be extended and that the BDC Borrowers had offered a deed-in-lieu of foreclosure to transfer the ownership of the Portland Project to Lender (i.e., Ready Capital).

169. Broadway's alleged that "Ready Capital, its affiliates BRMK as Senior Lender and Sutherland as the 'preferred equity' holder, Senior Borrowers, Mezzanine Borrower, Bowen, and his management companies BDC and Bowen Property Management Co., have colluded to

67

improperly squeeze out Mezzanine Lender's interest, after which the Project will continue" and that based on information and belief "in the months leading up to the Senior Loan's maturity date and at all times thereafter including when Mezzanine Lender received written representations that the maturity date was being extended, Senior Lender had no intention of restructuring the Senior Loan or further extending the maturity date."

170.    Sher explained that Broadway believes that Lender continued to disburse Construction Loan funds through December 31, 2024 for the Portland Project and to Lender, for the Construction Loan's interest payments due to Lender/Ready Capital. As Sher detailed, Broadway was not paid its $490,000 interest payments for September, October, November, and December 2024, and despite requests to the Lender, who was controlled by Ready Capital, failed to pay such interest to Broadway.

171.    Sher stated Lender and Sutherland (who are both controlled by Ready Capital) colluded with Bowen and BDC Borrowers and then "did intentionally fail to pay all outstanding interest due and owing on the Mezzanine Loan in an effort to preserve such funds, with knowledge they would pursue the [deed-in-lieu] that seeks to ultimately deprive Mezzanine Lender of these additional amounts due and owing, and any ability to recover same."

172.    Notably, Ready Capital was only permitted to conduct a "reappraisal" if an "Event of Default has occurred" or in the event of the BDC Borrowers met the requirements for the second maturity extension and elected to do such. As BDC Borrowers did not meet the requirements for the maturity extension and in light of the Fifth Amendment, the only way Ready Capital had the right to conduct a reappraisal was in the Event of Default. Per Section 6.15 of the Construction Loan:

> 6.15 Reappraisal Requirements. Borrower agrees that Lender shall have the right to obtain, at Borrower's expense, a re-appraisal of the Property (a "New Appraisal")

prepared by an appraiser selected by and acceptable to Lender and in conformance with governmental regulations applicable to Lender and approved by Lender: *(a) if an Event of Default has occurred hereunder*; or (b) upon Borrower's election to exercise its second extension option in connection with Section 2.8 of this Agreement. In the event that Lender shall elect to obtain such a New Appraisal, *Lender may immediately commission an appraiser acceptable to Lender*, at Borrower's cost and expense, to prepare the New Appraisal and Borrower shall fully cooperate with Lender and the appraiser in obtaining the necessary information to prepare such New Appraisal.

Emphasis added.

173.    Ready Capital sought two appraisals for the Portland Project as late as November 14, 2024. Ready Capital sent an engagement letter dated November 14, 2024, to Cushman & Wakefield, notifying it that Ready Capital, through ReadyCap Commercial, LLC had selected it, subject to its approval, to conduct an appraisal of the Portland Project's office and retail space. Given that the engagement letter was dated just 4 business days following the Friday, November 8, 02024, 3Q 2024 Earnings Call, Ready Capital would have started evaluating and contacting potential appraisers in advance of sending this engagement letter seeking Cushman & Wakefield's acceptance.

174.    The appraisal was completed and dated January 9, 2025 (the "Cushman & Wakefield Appraisal"). A lightly redacted copy of the Cushman & Wakefield Appraisal was filed in the Broadway Action on April 17, 2025.

175.    The Cushman & Wakefield Appraisal determined that as of November 26, 2024, the "Market Value As-Is" for the Portland Project's office space was *$34,200,000 as of November 26, 2024*. It further opined that the "Prospective Market Value Upon Stabilization" in approximately three years o*n December 1, 2027, was $73,100,000.*

176.    The Cushman & Wakefield Appraisal noted that a previous appraisal existed and that prior appraised values were $6,700,000 million less as the value had increased in this appraisal

69

"due to positive leasing activity." However, as a weakness affecting the property, Cushman & Wakefield noted that the "Portland office market [was] still in the midst of a downturn."

177.    The Cushman & Wakefield Appraisal contained numerous analyses including strength and weaknesses, an analysis of the Portland market and local area around the property, an evaluation of market trends, office vacancy rates and trends, asking rents, leasing activity, absorption rates, and demand forecasts. The Cushman & Wakefield Appraisal also conducted vary analyses concerning rental rates, sales prices, and comparative transactions. Based on the contents of the Cushman & Wakefield Appraisal, Defendants would have known of all of the then current elements at the time of the previous appraisal.

178.    Cushman & Wakefield noted "[t]he property is currently 28.02 percent occupied by five tenants at an average contract rent of $41.29 per square foot, net." The stacking pan show that as of November 20, 2024, that three of the six office floors were entirely vacant with a fourth floor only having one smaller footprint tenant. Cushman & Wakefield found the average price for comparable office rents was $34.84 per square foot with the $39 per square foot being the high part of the range. With the average rental rates of $41.29 per square foot for the Portland Project's office space being above the observed rates, Cushman & Wakefield explained that such above market rental rates increases risk to the property as "[p]roperties that are encumbered by leases with average rents that are significantly above market have increased risk in several key areas. When a property has an average rent that is above market, there is increased risk of default, slow payment or lack of payment by those tenants in that category." Cushman & Wakefield estimated it would take 18 months for the market to absorb the Portland Project's vacant office space.

179.    The second appraisal was conducted by HVS on the Ritz-Carlton hotel and residences for ReadyCap Commercial, LLC. This appraisal was ordered at least as early as

70

November 2024 as evidenced by valuation date being as of November 20, 2024. The appraisal was completed and dated January 2, 2025 (the "HVS Appraisal"). A lightly redacted copy of the HVS Appraisal was filed in the Broadway Action on April 17, 2025.

180.    The HVS Appraisal determined that as of November 20, 2024, *the value was $223,000,000.* It further opined that the *prospective value upon stabilization in approximately four years on January 1, 2029, was $279,000,000.* Like the Cushman & Wakefield Appraisal, HVS conducted various market and demand analyses and valuation methods to support is opinions.

181.    According HVS Appraisal, the 132 Ritz-Carlton residences were on the market since mid-2022 with it noting that "by December 2022, the subject property had 32 pending transactions; however, as of November 2023, there were only 10 pending transactions of which only seven transactions took place." The appraisal report confirmed that only "seven of the [132] residences have been sold as of the date of this report and three residences are pending close by year-end 2024" and "two of these units are penthouse units that are not considered arms-lengths transactions." The two-penthouse that were not-arms' length were of the insider sales to Bowen and to Barclay Grayson, a former top executive at BPM Real Estate Group, the developer behind Portland Project.

182.    Thus, the combined fair market value of the Portland Project as of November 2024 was a mere *$257.2 million.* This was a mere 55% of the original $460 million Construction Loan and less than 50% of the $516 million balance of the Construction Loan.

183.    Assuming that Ready Capital is able to achieve the stabilized values forecasted by HVS and Cushman & Wakefield in their appraisals, the total stabilized price is only *$352.1 million or 76.5%* of the original $460 million Construction Loan or *68.2% of the outstanding amount of*

71

*$516 million. Notably, this does not take into account the almost $48 million Preferred Equity Investment.*

184.    In view of the Portland Project's dire financial situation, Ovalle conceded that Ready Capital "determined it would not make financial sense to pursue any further financial restructuring… including by making any refinancing or other loans to the Senior Borrowers or to further forebear on the Senior Loan." Financially speaking, Ready Capital attorneys explained in a court hearing that the building is "completely underwater" and that "[t]here is no money to repay anyone." Thus, Ovalle stated that Ready Capital was pursuing a deed-in-lieu agreement.

G. **AS THE CONSTRUCTION LOAN HEADS TO DEFAULT, READY CAPITAL MANAGEMENT KEEP INVESTORS IN THE DARK.**

i.    **August 7-8, 2024 – Second Quarter 2024 Press Release, Earnings Call, and Form 10-Q.**

185.    Even though the Construction Loan was deteriorating and Ready Capital was moving towards foreclosure on the Portland Project, it continued to withhold the dire state of the project and loan from Ready Capital investors by failing to disclose and account for any impairment or default on the loan, and the consequential negative impact on Ready Capital's net income and dividend.

186.    On August 7, 2024, after market close, Ready Capital filed a Form 8-K that included as exhibits a press release announcing its financial results for the second quarter 2024 ended June 30, 2024 ("2Q 2024") (the "2Q 2024 Press Release") and a presentation titled "Supplemental Financial Data Q2 2024[.]"

187.    The 2Q 2024 Press Release announced highlights for the quarter including Realty Capital's "***DISTRIBUTABLE EARNINGS PER COMMON SHARE OF $0.07***" and "***Net book***

*value of $12.97 per share of common stock as of June 30, 2024.*" (Emphasis added in bold and italicized text). Defendant Capasse was quoted stating "The second quarter results are reflective of our cumulative efforts to cycle out of underperforming assets and into market yielding investments" and that "*[t]hese efforts, along with improving credit metrics across the loan portfolio and record growth in our Small Business Lending business, position the Company to improve earnings moving into year end*." (Emphasis added in bold, italicized text).

188.    The 2Q 2024 Press Release also provided Ready Capital's table reconciling its Net Income of "*$(34,201)*", or $(34,201,000), to its "Distributable earnings per common share – basic" of "*$0.07*":

The table below reconciles Net Income computed in accordance with U.S. GAAP to Distributable Earnings.

| (in thousands) | | Three Months Ended June 30, 2024 |
|---|---|---|
| **Net Loss** | $ | (34,201) |
| **Reconciling items:** | | |
| Unrealized loss on MSR - discontinued operations | | 7,219 |
| Unrealized gain on joint ventures | | (626) |
| Decrease in CECL reserve | | (24,574) |
| Increase in valuation allowance | | 80,987 |
| Non-recurring REO impairment | | 8,474 |
| Non-cash compensation | | 1,891 |
| Merger transaction costs and other non-recurring expenses | | 4,852 |
| Loss on bargain purchase | | 18,306 |
| Realized losses on sale of investments | | 22,355 |
| **Total reconciling items** | $ | 118,884 |
| Income tax adjustments | | (47,799) |
| **Distributable earnings before realized losses** | $ | 36,884 |
| Realized losses on sale of investments, net of tax | | (20,253) |
| **Distributable earnings** | | 16,631 |
| Less: Distributable earnings attributable to non-controlling interests | | 2,206 |
| Less: Income attributable to participating shares | | 2,301 |
| **Distributable earnings attributable to common stockholders** | $ | 12,124 |
| **Distributable earnings before realized losses on investments, net of tax per common share - basic and diluted** | $ | 0.19 |
| **Distributable earnings per common share – basic and diluted** | $ | 0.07 |

189.    In the Supplemental Financial Data Q2 2024 presentation, Ready Capital reiterated its statements about Ready Capital's net book value and its distributable earnings, summarizing its later slides on these topics:

73



## Second Quarter 2024 Results

**Multi-strategy real estate finance company that originates, acquires and services lower-to-middle-market ("LMM") investor and owner occupied commercial real estate loans**

| | |
|---|---|
| **Earnings / Dividends** | • Net loss from continuing operations[1] of $ (31.4) million, or $ (0.21) per common share<br>• Distributable earnings[2] of $16.6 million, or $0.07 per common share<br>• Distributable earnings before realized losses[3] of $36.9 million, or $0.19 per common share<br>• Declared dividend of $0.30 per common share |
| **Returns** | • Return on Equity from continuing operations[4] of (6.1)%<br>• Distributable Return on Equity[5] of 2.6%<br>• Distributable Return on Equity from continuing operations before realized losses[6] of 5.8%<br>• Dividend Yield[7] of 14.7% |
| **Balance Sheet** | • Net book value per share of $12.97 per common share<br>• Total leverage of 3.5x and recourse leverage ratio[8] of 1.0x |
| **Mergers and Acquisitions** | • The Company completed the acquisition of Madison One, a leading originator and servicer of USDA and SBA guaranteed loan products<br>• On July 1, 2024, the Company acquired Funding Circle USA, Inc., an online lending platform that originates and services small business loans |

190.    In the Supplemental Financial Data Q2 2024 presentation, Ready Capital stated that the Mosaic acquired assets consisted of 5 loans with an UPB of $577 million and a "BOOK VALUE" of "*$560M*":

## LMM Commercial Real Estate



| PRODUCT TYPE | LOAN COUNT[1] | UPB | BOOK VALUE[2] | WA LTV[3] | WA COUPON | FIXED/FLOAT[4] | 60+ Days Past Due[8] |
|---|---|---|---|---|---|---|---|
| | 1,878 | $9.0B | $8.7B | 68.4% | 9.1% | 20.6 / 79.4% | 6.3% |
| FIXED RATE | 224 | $997M | $988M | 59.7% | 5.0% | 100.0 / 0.0% | 3.3% |
| BRIDGE | 455 | $6.36B | $6.20B | 70.3% | 9.2% | 1.4 / 98.6% | 5.8% |
| CONSTRUCTION (RC ORIGINATED) | 6 | $89M | $88M | 53.9% | 9.7% | 38.6 / 61.4% | 0.0% |
| MOSAIC ACQUIRED ASSETS | 5 | $577M | $560M | 78.8% | 14.4% | 15.8 / 84.2% | 6.9% |
| BROADMARK ACQUIRED ASSETS | 76 | $537M | $471M | 78.4% | 11.1% | 92.2 / 7.8% | 24.7% |
| OTHER[5] | 1,112 | $431M | $424M | 38.3% | 6.7% | 32.8 / 67.2% | 1.3% |
| | | | | | | | |
| | 1,878 | $9.0B | $8.7B | 68.4% | 9.1% | 20.6 / 79.4% | 6.3% |
| RC ORIGINATED | 1,797 | $7.87B | $7.70B | 67.0% | 8.6% | 16.8 / 83.2% | 5.2% |
| M&A | 81 | $1.11B | $1.03B | 78.6% | 12.8% | 52.7 / 47.3% | 15.0% |

**CURRENT QUARTER HIGHLIGHTS**

- Liquidation and payoffs of $530 million, including $66 million of assets acquired in the Broadmark Merger

- LMM money up pipeline of $545 million, including $121 million funded in July

- Transfer of $74 million of delinquent loans into held-for-sale

**GROSS LEVERED YIELD**

| | Q2 2023 | Q3 2023 | Q4 2023 | Q1 2024 | Q2 2024 |
|---|---|---|---|---|---|
| Income on joint venture investments and gains on loans, held for sale [6] | 1.3% | 1.7% | 0.7% | 0.5% | 0.2% |
| Gross levered yield (ex. gains) [7] | 10.2% | 9.1% | 9.1% | 8.2% | 9.0% |

1. Excludes joint venture investments and preferred equity investments
2. Gross of general reserves and net of valuation allowance
3. Loan-to-value (LTV) is calculated by dividing the current unpaid principal balance by the most recent collateral value received. The most recent value for performing loans is often the third-party as-is valuation utilized during the original underwriting process
4. All fixed rate loans are match funded
5. Loans with the "Other" classification are generally LMM acquired loans that have nonconforming characteristics for the Fixed rate, Bridge, or Construction categories
6. Includes realized and unrealized gains (losses) on loans held for sale and MSR creation
7. Includes interest income, accretion of discount, and servicing income net of interest expense and amortization of deferred financing costs
8. Calculated based on carrying value

7

191.    On the morning of August 8, 2024, before market trading hours, at 8:30 a.m. Eastern, Defendants held a conference call with analysts and investors to present Ready Capital's financial and operational results for 2Q 2024 (the "2Q 2024 Earnings Call").

192.    During his prepared remarks, Defendant Capasse discussed that Defendants "successfully executed several initiatives discussed on our last earnings call" including "reallocation of low-yield assets" and that Ready Capital's was continuing its efforts to "reposition" its M&A portfolio. Notwithstanding, Capasse explained that this non-core M&A loan portfolio had "improving credit performance." Specifically, in his opening remarks, Defendant Capasse stated:

> We continue to reposition our M&A portfolio, which consists of assets acquired in the Mosaic and Broadmark mergers to reallocate the capital into our core businesses. *As of June 30, the loan portfolio totaled $1.1 billion across 81 assets*

*with improving credit performance.* 60-day plus delinquencies improved 910 basis points to 15%. The portfolio has a subpar levered yield at 10.8%. But post completion of our loan sales, we expect this portfolio to total $775 million and levered yields to increase to 11.6%.

Emphasis added in bold, italicized text.

193.    During his prepared remarks on the 2Q 2024 Earnings Call, Defendant Ahlborn discussed Ready Capital's financial performance during the quarter stating "*[q]uarterly GAAP and distributable earnings per common share were a loss of $0.21 and income of $0.07, respectively. Distributable earnings, less realized losses, on asset sales was $0.19 per common share, equating to a 5.8% return on average stockholders' equity.*" Ahlborn noted Ready Capital's book value of *$12.97* and further explained that this value "*is reflective of the clearing levels to execute our portfolio repositioning efforts*":

> *On the balance sheet, book value per share was down 3.5% to $12.97 per share.* The change was primarily due to mark-to-market or realized losses on loans and REO liquidations and an $18.3 million reduction to the bargain purchase gain associated with the Broadmark transaction. *Our expectation is that the book value per share is reflective of the clearing levels to execute our portfolio repositioning efforts.* In the quarter, we repurchased 2.3 million shares at an average price of $8.61. Liquidity remains healthy with $226 million of unrestricted cash and an additional $40 million in committed but undrawn borrowings.

Emphasis added in bold, italicized text.

194.    After market hours on August 9, 2024, Ready Capital filed its Form 10-Q for 2Q 2024 ("2Q 2024 Form 10-Q"). The 2Q 2024 Form 10-Q was signed by Defendants Capasse and Ahlborn.

195.    The 2Q 2024 Form 10-Q repeated the same statements concerning Ready Capital's 2Q 2024 results for its net book value of "*$12.97*" per share of common stock, distributable earnings per share of "*$0.07*", and net income of *$(31,427,000)*:

76

**Results of Operations**

*Key Financial Measures and Indicators*

As a real estate finance company, we believe the key financial measures and indicators for our business are earnings per share, dividends declared per share, distributable earnings, return on equity, and net book value per share. As further described below, distributable earnings is a measure that is not prepared in accordance with GAAP. We use distributable earnings to evaluate our performance and determine dividends, excluding the effects of certain transactions and GAAP adjustments that we believe are not necessarily indicative of our current loan activity and operations. Refer to "—Non-GAAP Financial Measures" below for a reconciliation of net income to distributable earnings.

The table below sets forth certain information on our operating results.

| ($ in thousands, except share data) | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2024 | | 2023 | | 2024 | | 2023 | |
| Net Income (loss) from continuing operations | $ | (31,427) | $ | 244,532 | $ | (107,009) | $ | 283,041 |
| Earnings per common share from continuing operations - basic | $ | (0.21) | $ | 1.80 | $ | (0.67) | $ | 2.24 |
| Earnings per common share from continuing operations - diluted | $ | (0.21) | $ | 1.70 | $ | (0.67) | $ | 2.11 |
| Distributable earnings | $ | 16,631 | $ | 51,283 | $ | 70,607 | $ | 89,432 |
| Distributable earnings per common share - basic | $ | 0.07 | $ | 0.36 | $ | 0.37 | $ | 0.67 |
| Distributable earnings per common share - diluted | $ | 0.07 | $ | 0.35 | $ | 0.37 | $ | 0.65 |
| Dividends declared per common share | $ | 0.30 | $ | 0.40 | $ | 0.60 | $ | 0.80 |
| Dividend yield [(1)] | | 14.7 % | | 14.2 % | | 14.7 % | | 14.2 % |
| Return on equity from continuing operations | | (6.1)% | | 48.7 % | | (9.8)% | | 31.0 % |
| Distributable return on equity | | 2.6 % | | 9.3 % | | 7.4 % | | 8.8 % |
| Book value per common share | $ | 12.97 | $ | 14.52 | $ | 12.97 | $ | 14.52 |

(1) Dividend yield is based on the respective period and closing share price.

196.    In "Note 6. Loans and allowance for credit losses", the 2Q 2024 Form 10-Q detailed Ready Capital's carrying value of its construction loans and its allowance for loan losses. Specifically, Defendants stated "Construction" loans had a "Carrying Value" of $"*841,695*" or $841,695,000 and "Allowance for loan losses" for Ready Capital's loan portfolio of "$*(33,776)*" or $(33,376,000) as represented in the following excerpt:

*Loan portfolio*

The table below summarizes the classification, unpaid principal balance ("UPB"), and carrying value of loans held by the Company including loans of consolidated VIEs.

| (in thousands) | June 30, 2024 | | December 31, 2023 | |
|---|---|---|---|---|
| | Carrying Value | UPB | Carrying Value | UPB |
| **Loans** | | | | |
| Bridge | $ 1,267,122 | $ 1,270,125 | $ 1,444,770 | $ 1,448,281 |
| Fixed rate | 186,857 | 184,707 | 247,476 | 241,674 |
| Construction | 841,695 | 842,854 | 1,207,783 | 1,212,526 |
| Freddie Mac | — | — | 9,500 | 9,719 |
| SBA - 7(a) | 1,020,826 | 1,028,043 | 995,974 | 1,003,323 |
| Other | 162,155 | 164,043 | 196,087 | 198,499 |
| **Total Loans, before allowance for loan losses** | $ 3,478,655 | $ 3,489,772 | $ 4,101,590 | $ 4,114,022 |
| **Allowance for loan losses** | $ (33,776) | — | $ (81,430) | — |
| **Total Loans, net** | $ 3,444,879 | $ 3,489,772 | $ 4,020,160 | $ 4,114,022 |

197.    In the 2Q 2024 Form 10-Q, Ready Capital disclosed that "specific" construction loans had only "*$181*", or $181,000, in allowance for credit losses:

*Allowance for credit losses*

The allowance for credit losses consists of the allowance for losses on loans and lending commitments accounted for at amortized cost. Such loans and lending commitments are reviewed quarterly considering credit quality indicators, including probable and historical losses, collateral values, LTV ratios, and economic conditions.

The table below presents the allowance for loan losses by loan product and impairment methodology.

| (in thousands) | Bridge | | Fixed Rate | | Construction | | SBA - 7(a) | | Other | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **June 30, 2024** | | | | | | | | | | | |
| General | $ | 12,732 | $ | 5,415 | $ | 5,840 | $ | 10,204 | $ | 2,427 | $ | 36,618 |
| Specific | | 1,666 | | 1,065 | | 181 | | 3,362 | | 51 | | 6,325 |
| PCD | | — | | — | | 1,889 | | — | | — | | 1,889 |
| **Ending balance** | **$** | **14,398** | **$** | **6,480** | **$** | **7,910** | **$** | **13,566** | **$** | **2,478** | **$** | **44,832** |
| **December 31, 2023** | | | | | | | | | | | |
| General | $ | 17,302 | $ | 7,884 | $ | 3,722 | $ | 12,679 | $ | 2,886 | $ | 44,473 |
| Specific | | 18,939 | | 5,714 | | 5,726 | | 5,188 | | 143 | | 35,710 |
| PCD | | — | | — | | 21,422 | | — | | — | | 21,422 |
| **Ending balance** | **$** | **36,241** | **$** | **13,598** | **$** | **30,870** | **$** | **17,867** | **$** | **3,029** | **$** | **101,605** |

198.    Defendants' statements above in paragraphs 187 to 197 identified in emphasis with bold, italicized text were false and/or materially misleading and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading because they do not fairly present the financial conditions and financial results of Ready Capital. As detailed herein, Ready Capital overstated the value of its construction loans by overstating the value of the Construction Loan. Defendants were in possession of information of relevant qualitative and quantitative factors that affected the value of the Portland Project Construction Loan that necessitated Ready Capital during the Class Period to increase its allowance for credit losses, or CECLs, and to reduce the value of the Construction Loan on Ready Capital's financial statements. As a result, Defendants statements to investors were false and or misleading as the overstated the value of the Ready Capital's Construction loans, overstated the value of the Mosaic Portfolio, understated the amount of the Allowance for credit losses.

199.    Additionally, as detailed herein, given the issues faced by the Portland Project and the effects this had on the construction and sales of the Portland Project, especially the Ritz-Carlton condominium units, the BDC Borrowers and Bowen were financially distressed. With the financial position of both the Portland Project and BDC Borrowers and Bowen coupled with the Construction Loan's high loan-to-value rate, which was approximately 80%, together with the

events of default both on the Construction Loan and the Mezzanine Loan meant that during the Class Period the Construction Loan was reasonably expected not to be paid off at maturity and as such foreclosure was probable, which in turn necessitated Ready Capital to "remeasure the financial asset at the fair value of the collateral at the reporting date" or to determine the "fair value of the collateral at the reporting date when recording the net carrying amount of the asset and determining the allowance for credit losses for a financial asset for which the repayment is expected to be provided substantially through the operation or sale of the collateral when the borrower is experiencing financial difficulty based on the entity's assessment as of the reporting date." By August 1, 2024, Ready Capital's historical experience with the Construction Loan, its current condition, low occupancy, and unlikelihood of payment in full by its December 31, 2024 maturity date meant that the Construction Loan should have been assessed for expected credit loss and an impairment or reserve of at least $130 million recorded. Accordingly, the expected losses on the Construction Loan were not adequately reserved and therefore the Construction Loan was overvalued on Ready Capital's financial statements throughout the Class Period. As a result thereof, Defendants statements concerning Ready Capital's net income, allowances for reserves, distributable earnings, net book value, carrying values, dividends, and the metrics and amounts calculated therefrom as well as statements concerning the Mosaic portfolio loans being adequately reserved through the approximately $90 million in CERs with no expectation of further reserves or increased allowance for losses were materially false and/or misleading. As a result thereof, Defendants statements concerning the Mosaic portfolio and Ready Capital's net income, distributable income, were also materially false and/or misleading.

79

ii.    **November 7-12, 2024 – Third Quarter 2024 Press Release, Earnings Call, and Form 10-Q.**

200.    On November 7, 2024, after market close, Ready Capital filed a Form 8-K that included as exhibits a press release announcing its financial results for the third quarter 2024 ended September 30, 2024 ("3Q 2024") (the "3Q 2024 Press Release") and a presentation titled "Supplemental Financial Data Q3 2024[.]"

201.    The 3Q 2024 Press Release announced highlights for the quarter including Realty Capital's "***DISTRIBUTABLE EARNINGS PER COMMON SHARE OF $(0.28)***" and "***Net book value of $12.59 per share of common stock as of September 30, 2024.***" (Emphasis added in bold and italicized text).

202.    The 3Q 2024 Press Release also provided Ready Capital's table reconciling its Net Income of "***$(7,279)***", or $(7,279,000), to its "Distributable earnings per common share – basic" of "***$(0.28)***":

The table below reconciles Net Income computed in accordance with U.S. GAAP to Distributable Earnings.

| (in thousands) | | Three Months Ended September 30, 2024 |
|---|---|---|
| **Net Loss** | $ | (7,279) |
| **Reconciling items:** | | |
| Unrealized loss on joint ventures | | 2,173 |
| Increase in CECL reserve | | 52,442 |
| Decrease in valuation allowance | | (71,060) |
| Non-recurring REO impairment | | 525 |
| Non-cash compensation | | 1,916 |
| Merger transaction costs and other non-recurring expenses | | 4,070 |
| Bargain purchase gain | | (32,165) |
| Realized losses on sale of investments | | 109,675 |
| **Total reconciling items** | $ | 67,576 |
| Income tax adjustments | | (13,739) |
| **Distributable earnings before realized losses** | $ | 46,558 |
| Realized losses on sale of investments, net of tax | | (89,072) |
| **Distributable earnings** | $ | (42,514) |
| Less: Distributable earnings attributable to non-controlling interests | | 1,766 |
| Less: Income attributable to participating shares | | 2,241 |
| **Distributable earnings attributable to common stockholders** | $ | (46,521) |
| **Distributable earnings before realized losses on investments, net of tax per common share - basic and diluted** | $ | 0.25 |
| **Distributable earnings per common share - basic and diluted** | $ | (0.28) |

203.    In the Supplemental Financial Data Q3 2024 presentation, Ready Capital reiterated its statements about Ready Capital's net book value and its distributable earnings, summarizing its later slides on these topics:

80

## Third Quarter 2024 Results

 READY CAPITAL.

| Multi-strategy real estate finance company that originates, acquires and services lower-to-middle-market ("LMM") investor and owner occupied commercial real estate loans | |
|---|---|
| Earnings / Dividends | ■ Net loss from continuing operations[1] of $(7.5) million, or $(0.07) per common share<br>■ Distributable earnings[2] of $(42.5) million, or $(0.28) per common share<br>■ Distributable earnings before realized losses[3] of $46.6 million, or $0.25 per common share<br>■ Declared dividend of $0.25 per common share |
| Returns | ■ Return on Equity from continuing operations[4] of (1.8)%<br>■ Distributable Return on Equity[5] of (8.2)%<br>■ Distributable Return on Equity from continuing operations before realized losses[6] of 8.4%<br>■ Dividend Yield[7] of 13.1% |
| Balance Sheet | ■ Net book value per share of $12.59 per common share<br>■ Total leverage of 3.3x and recourse leverage ratio[8] of 1.0x |
| Loan Originations[9] / Acquisitions | ■ Record Small Business Lending loan originations of $440 million, including $355 million of Small Business Administration 7(a) loans<br>■ Strengthened the Small Business Lending platform with the acquisition of Funding Circle USA, Inc. |

204.    In the Supplemental Financial Data Q3 2024 presentation, Ready Capital stated that the Mosaic acquired assets consisted of 4 loans with an UPB of $582 million and a "BOOK VALUE" of "*$529M*":

## LMM Commercial Real Estate

 READY CAPITAL.

| PRODUCT TYPE | LOAN COUNT[1] | UPB | BOOK VALUE[2] | WA LTV[3] | WA COUPON | FIXED/FLOAT[4] | 60+ DAYS PAST DUE[8] |
|---|---|---|---|---|---|---|---|
| | 1,630 | $8.3B | $8.1B | 70.5% | 9.0% | 20.1 / 79.9% | 7.2% |
| FIXED RATE | 203 | $961M | $957M | 60.3% | 5.1% | 100.0 / 0.0% | 4.2% |
| BRIDGE | 290 | $5.91B | $5.78B | 72.1% | 9.2% | 1.4 / 98.6% | 7.0% |
| CONSTRUCTION (RC ORIGINATED) | 6 | $100M | $100M | 62.1% | 11.0% | 26.9 / 73.1% | 0.0% |
| MOSAIC ACQUIRED ASSETS | 4 | $582M | $529M | 81.8% | 13.7% | 17.7 / 82.3% | 4.2% |
| BROADMARK ACQUIRED ASSETS | 47 | $366M | $321M | 85.1% | 11.0% | 94.3 / 5.7% | 34.5% |
| OTHER[5] | 1,080 | $430M | $412M | 45.2% | 7.2% | 37.1 / 62.9% | 1.4% |

| | 1,630 | $8.3B | $8.1B | 70.5% | 9.0% | 20.1 / 79.9% | 7.2% |
|---|---|---|---|---|---|---|---|
| RC ORIGINATED | 1,579 | $7.40B | $7.25B | 68.5% | 8.6% | 16.7 / 83.3% | 6.2% |
| M&A | 51 | $0.95B | $0.85B | 83.1% | 12.7% | 47.3 / 52.7% | 15.6% |

### CURRENT QUARTER HIGHLIGHTS

- Liquidation and payoffs of $809 million, including $169 million of assets acquired in the Broadmark Merger

- LMM money up pipeline of $730 million, including $67 million funded in October

### GROSS LEVERED YIELD



1. Excludes joint venture investments and preferred equity investments
2. Gross of general reserves and net of valuation allowance
3. Loan-to-value (LTV) is calculated by dividing the current unpaid principal balance by the most recent collateral value received. The most recent value for performing loans is often the third-party as-is valuation utilized during the original underwriting process
4. All fixed rate loans are match funded
5. Loans with the "Other" classification are generally LMM acquired loans that have nonconforming characteristics for the Fixed rate, Bridge, or Construction categories
6. Includes realized and unrealized gains (losses) on loans held for sale and MSR creation
7. Includes interest income, accretion of discount, and servicing income net of interest expense and amortization of deferred financing costs
8. Calculated based on carrying value

7

205.    On the morning of August 8, 2024, before market trading hours, at 8:30 a.m. Eastern, Defendants held a conference call with analysts and investors to present Ready Capital's financial and operational results for 3Q 2024 (the "3Q 2024 Earnings Call").

206.    During his prepared remarks on the 3Q 2024 Earnings Call, Defendant Ahlborn discussed Ready Capital's financial performance during the quarter stating "***[t]hird quarter GAAP losses per common share were $0.07, while distributable earnings showed a loss of $0.28.***" Ahlborn noted Ready Capital's book value of ***$12.59***.

207.    Defendant Ahlborn continued to state "[q]uarterly interest income was 73% cash and 27% accrued or paid in time. This equates to a cash yield in the portfolio of 6.6%. Of the 27%, 50% related to ***construction assets acquired in the Mosaic transaction, of which 74% are expected to be repaid at the end of the year***."

82

208.   During the question and answer portion of the 3Q 2024 Earnings Call, Defendant Ahlborn represented that Defendants' "**expectation is that a large portion**" of the construction loans in the Mosaic portfolio **"clear out in the fourth quarter and turn to actually sort of cash paying investments**":

> **Crispin Elliot Love** *Piper Sandler & Co., Research Division – Director & Senior Research Analyst*
>
> Okay. I appreciate that, Andrew. And then just in the third quarter, can you disclose how much interest income was from PIK and just expectations from PIK over the next few quarters?
>
> **Andrew Ahlborn** *Ready Capital Corporation – CFO & Secretary*
>
> Yes. As Tom said in his comments, a little over 20% was either PIK or accrued. ***When you break those 2 components down, the component is coming from construction loans acquired in the Mosaic transaction. The expectation is that a large portion of those pushing 75% clear out in the fourth quarter and turn to actually sort of cash paying investments.*** The other subset relates to the modified loans. As Tom also mentioned his roughly 66% of that is cash paying with the component being accrued if the ultimate recoverability is supportable. So that's the breakdown.
>
> **Crispin Elliot Love** *Piper Sandler & Co., Research Division – Director & Senior Research Analyst*
>
> Okay. Great. And then sorry, but is that 20% of interest income or net interest income?
>
> **Andrew Ahlborn** *Ready Capital Corporation – CFO & Secretary*
>
> It's on the top line.

Emphasis added in bold, italicized text.

209.   Later during the call, another analyst inquire whether there is "any risk of write-down or impairment" of the "other assets" section of the financial statement notes which includes a line item for "accrued interest" and worked to get clarifications about these potential write-downs and the changes in accrued/PIK interest and what asset categories the were attributable. In

response, Defendant Ahlborn stated that Ready Capital was "*only accruing interest that we believe to be recoverable*" and that the amount and increase in accruing/PIK interest was from construction loans acquired in the Mosaic transaction which "*the expectation is that 77% of that balance pays off at quarter end or is rolled into a cash-linked loan at quarter end. So, I think that number is going to come down.*" Furthermore, when faced with a direct question whether the Mosaic construction loans if they were "going to pay off at par and there won't be issues, credit issues", Defendants Ahlborn and Capasse sidestepped the question rather explaining how Ready Capital may approach these loans generally. Specifically, Defendant Ahlborn and Defendant Capasse stated:

> **Jade Joseph Rahmani** *Keefe, Bruyette, & Woods, Inc., Research Division – Managing Director*
>
> Other assets is a category I've been tracking and the large components include deferred loan fees and accrued interest, about 25% goodwill and intangibles, similar ratio and then deferred tax assets. <u>Is there any risk of write-down or impairment of any of these categories as you sell nonperforming loans?</u> <u>Since presumably some portion of the deferred loan fees, accrued interest relates to that and potentially some of the goodwill relates to the Mosaic and Broadmark acquisitions.</u>
>
> **Andrew Ahlborn** *Ready Capital Corporation – CFO & Secretary*
>
> So, I'll take them in the components. So, the deferred tax asset gets evaluated regularly and impaired based on profitability expectations down at the TRS. So, we don't expect any impairment issues there based on the trajectory of those businesses. ***On the accrued interest, we are only accruing interest that we believe to be recoverable.*** With that being said, there are certain circumstances where the asset management staff may recommend something like a DPO. And in that case, the accrued interest would be part of the write-off, though, although we believe the effects of that to be fairly minimal. Goodwill also gets evaluated regularly. At this time, we don't see any impairment on the goodwill.
>
> **Jade Joseph Rahmani** *Keefe, Bruyette, & Woods, Inc., Research Division – Managing Director*
>
> And does any of the goodwill relate to Broadmark or Mosaic?
>
> **Andrew Ahlborn** *Ready Capital Corporation – CFO & Secretary*

84

Both of those were bargain purchase gains.

**Jade Joseph Rahmani Keefe**, *Bruyette, & Woods, Inc., Research Division – Managing Director*

So, is that a no?

**Andrew Ahlborn** *Ready Capital Corporation – CFO & Secretary*

Yes. So, the goodwill -- you can't have goodwill if you have a bargain purchase gain. So no, they do not really trade.

**Jade Joseph Rahmani Keefe**, *Bruyette, & Woods, Inc., Research Division – Managing Director*

Okay. And then just the -- in your mind, the balance because I know there's a lot of moving parts across the portfolio. Some of the nonperforming loans and REO were inherited through M&A. And clearly, you anticipated some of that. But what's the balance today of nonperforming loans and REO?

**Andrew Ahlborn** *Ready Capital Corporation – CFO & Secretary*

Yes. And do you want to touch on that in the context of the -- Jade, the way we bifurcate the portfolio is the originated portfolio of $7.3 billion. And the M&A portfolio now is down to, what is it, answer's only 10% of our total, $800 million. So maybe the answer to that question in the context of those 2 portfolios.

**Thomas Edward Capasse** *Ready Capital Corporation – Chairman, CEO & Chief Investment Officer*

Yes, Adam, do you want to touch on the bifurcation there?

**Adam Zausmer** *Ready Capital Corporation – Chief Credit Officer*

Yes. So, from a dollar perspective, pardon me, I just do the math here. So, the originated has delinquency of about $400 million, just north of $400 million. And then on the acquired portfolio, the M&A piece, it is $150 million.

**Jade Joseph Rahmani Keefe**, *Bruyette, & Woods, Inc., Research Division – Managing Director*

And the balance of REO?

**Adam Zausmer** *Ready Capital Corporation – Chief Credit Officer*

85

The REO is $160 million in a sale process today.

**Jade Joseph Rahmani Keefe**, *Bruyette, & Woods, Inc., Research Division – Managing Director*

Okay. Could you give the dollar value of modifications were completed in the quarter? The 20% PIK is a really high number. It implies $45 million of PIK interest in the quarter, which I think was up from, you said last quarter, $21 million. So, it basically doubled. If you could just give the dollar value of modifications and correct me if any of those numbers are not right.

**Adam Zausmer** *Ready Capital Corporation – Chief Credit Officer*

Yes. So, the modifications on the bridge book were about $250 million in the quarter. Previous quarter, it was approximately $700 million. So, across the entire bridge portfolio, the modifications are roughly $1 billion across 32 assets. And the vast majority of those sit within CLOs.

**Jade Joseph Rahmani Keefe**, *Bruyette, & Woods, Inc., Research Division – Managing Director*

Okay. But it is around $45 million of interest income. Do you think the $45 million increases or stay stable, decreases?

**Andrew Ahlborn** *Ready Capital Corporation – CFO & Secretary*

Jade, as I said earlier, a good chunk of that is coming from those construction loans acquired in the Mosaic transaction. *And the expectation is that 77% of that balance pays off at quarter end or is rolled into a cash-linked loan at quarter end. So, I think that number is going to come down.*

**Jade Joseph Rahmani** *Keefe, Bruyette, & Woods, Inc., Research Division – Managing Director*

Okay. And when those pay off, do you think they're going to pay off at par and there won't be issues, credit issues there?

**Andrew Ahlborn** *Ready Capital Corporation – CFO & Secretary*

Well, the takeout of those loans can take a variety of forms. Part of the platform we built is staying involved in the economics of these projects through the life cycle. And so, the payoff could come in, in the form of an actual payoff via refi somewhere else or movement into a cash flow bridge loan on our balance sheet. So, it could take a variety of different forms.

***Thomas Edward Capasse*** *Ready Capital Corporation – Chairman, CEO & Chief Investment Officer*

Yes, that's an important differentiation, Jade. Well, our business model now is to the whole life cycle. So, you start with ground-up construction. And once the project is near stabilization, it slipped into a bridge loan. And ultimately, if it's multifamily, we'll do a multi-PSE loan. But we're looking to stay with these sponsors across the project life cycle.

Emphasis added in bold, italicized text for Defendants. Emphasis added with underlined text for analyst.

210.    In another analyst question, Defendants were asked about the $0.25 distributable earnings excluding losses and whether it would be able to cover the $0.25 dividend or whether there were "onetime items in that number that we need to think about?" Defendant Zausmer replied that "***I think the $0.25 level is a good baseline***" and reassured the market that ***"[t]here are no onetime items that I'm aware of"*** excepting certain loans already held for sale. Specifically, Defendant Zausmer stated:

***Stephen Albert Laws*** *Raymond James & Associates, Inc., Research Division – Managing Director*

Okay. Great. Appreciate some color there. <u>As we think about the distributable earnings number, ex losses, $0.25. As we think about sequential change moving into Q4, what are the onetime items in that number that we need to think about? Or do you feel comfortable that distributable earnings ex losses can continue to cover the $0.25 dividend</u>?

***Adam Zausmer*** *Ready Capital Corporation – Chief Credit Officer*

***Yes. I think the $0.25 level is a good baseline.*** When I think about go-forward earnings, I think there are a few things that are important. The first is the contribution of the small business lending platform, given all the growth and capital investments we've made over the last couple of quarters and years, is now substantial to the totality of the company, contributing over 350 basis points of return to the overall platform. And that is a level we expect is sustainable and grows as some of the businesses we've purchased come online. And so when you think about how that affects go-forward earnings, as the CRE portion of our business, which accounts for the majority of the equity, rebounds and migrates back to historical return levels as the portfolio turns over and the M&A portfolio is

87

repositioned, migrates back to that 600 to 800 basis point return level, we get closer to our original thesis of building the business this way, which is having that small business lending platform provide a premium to sort of competitive commercial real estate returns.

And so, I think there is a growth path from these levels. ***There are no onetime items that I'm aware of with the exception of there's still a bucket of loans held for sale where you are going to have the impact of realized losses flow through the distributable earnings cal***. But absent those losses, I think there's a growth path headed into 2025.

Emphasis added in bold, italicized text for Defendants. Emphasis added with underlined text for analyst.

211.    After market hours on November 12, 2024, Ready Capital filed its Form 10-Q for 3Q 2024 ("3Q 2024 Form 10-Q"). The 3Q 2024 Form 10-Q was signed by Defendants Capasse and Ahlborn.

212.    The 3Q 2024 Form 10-Q repeated the same statements concerning Ready Capital's 3Q 2024 results for its net book value of "***$12.59***" per share of common stock, distributable earnings per share of "***$0.28***", and net income of ***$(7,473,000)***:

**Results of Operations**

***Key Financial Measures and Indicators***

As a real estate finance company, we believe the key financial measures and indicators for our business are earnings per share, dividends declared per share, distributable earnings, return on equity, and net book value per share. As further described below, distributable earnings is a measure that is not prepared in accordance with GAAP. We use distributable earnings to evaluate our performance and determine dividends, excluding the effects of certain transactions and GAAP adjustments that we believe are not necessarily indicative of our current loan activity and operations. Refer to "—Non-GAAP Financial Measures" below for a reconciliation of net income to distributable earnings.

The table below sets forth certain information on our operating results.

| ($ in thousands, except share data) | | Three Months Ended September 30, | | | Nine Months Ended September 30, | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | 2024 | | 2023 | | 2024 | 2023 |
| Net Income (loss) from continuing operations | $ | (7,473) | $ | 43,521 | $ (114,482) | $ | 326,562 |
| Earnings per common share from continuing operations - basic | $ | (0.07) | $ | 0.23 | $ (0.74) | $ | 2.25 |
| Earnings per common share from continuing operations - diluted | $ | (0.07) | $ | 0.23 | $ (0.74) | $ | 2.22 |
| Distributable earnings before realized losses | $ | 46,558 | $ | 52,164 | $ 137,418 | $ | 141,596 |
| Distributable earnings before realized losses per common share - basic | $ | 0.25 | $ | 0.28 | $ 0.74 | $ | 0.93 |
| Distributable earnings before realized losses per common share - diluted | $ | 0.25 | $ | 0.28 | $ 0.74 | $ | 0.93 |
| Distributable earnings | $ | (42,514) | $ | 52,164 | $ 28,093 | $ | 141,596 |
| Distributable earnings per common share - basic | $ | (0.28) | $ | 0.28 | $ 0.10 | $ | 0.93 |
| Distributable earnings per common share - diluted | $ | (0.28) | $ | 0.28 | $ 0.10 | $ | 0.92 |
| Dividends declared per common share | $ | 0.25 | $ | 0.36 | $ 0.85 | $ | 1.16 |
| Dividend yield [1] | | 13.1 % | | 14.2 % | 13.1 % | | 14.2 % |
| Return on equity from continuing operations | | (1.8)% | | 7.0 % | (7.2)% | | 21.7 % |
| Distributable return on equity before realized losses | | 8.4 % | | 8.0 % | 7.6 % | | 8.6 % |
| Distributable return on equity | | (8.2)% | | 8.0 % | 1.3 % | | 8.6 % |
| Book value per common share | $ | 12.59 | $ | 14.42 | $ 12.59 | $ | 14.42 |

(1) Dividend yield is based on the respective period end closing share price.

213.    In "Note 6. Loans and allowance for credit losses", the 3Q 2024 Form 10-Q detailed Ready Capital's carrying value of its construction loans and its allowance for loan losses. Specifically, Defendants stated "Construction" loans had a "Carrying Value" of $"**865,946**" or $865,946,000 and "Allowance for loan losses" for Ready Capital's loan portfolio of $"***(83,459)***" or $83,459,000 as represented in the following excerpt:

*Loan portfolio*

The table below summarizes the classification, unpaid principal balance ("UPB"), and carrying value of loans held by the Company including loans of consolidated VIEs.

| (in thousands) | | September 30, 2024 | | | December 31, 2023 | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | Carrying Value | | UPB | | Carrying Value | UPB |
| **Loans** | | | | | | | |
| Bridge | $ | 1,339,346 | $ | 1,338,814 | $ | 1,444,770 | $ 1,448,281 |
| Fixed rate | | 214,963 | | 211,122 | | 247,476 | 241,674 |
| Construction | | 865,946 | | 866,837 | | 1,207,783 | 1,212,526 |
| Freddie Mac | | — | | — | | 9,500 | 9,719 |
| SBA - 7(a) | | 1,056,455 | | 1,065,402 | | 995,974 | 1,003,323 |
| Other | | 162,677 | | 179,745 | | 196,087 | 198,499 |
| **Total Loans, before allowance for loan losses** | $ | 3,639,387 | $ | 3,661,920 | $ | 4,101,590 | $ 4,114,022 |
| **Allowance for loan losses** | $ | (83,459) | $ | — | $ | (81,430) | $ — |
| **Total Loans, net** | $ | 3,555,928 | $ | 3,661,920 | $ | 4,020,160 | $ 4,114,022 |

214.    In the 3Q 2024 Form 10-Q, Ready Capital disclosed that "specific" construction loans had only **"$45,432"**, or $45,432,000, in allowance for credit losses:

*Allowance for credit losses*

The allowance for credit losses consists of the allowance for losses on loans and lending commitments accounted for at amortized cost. Such loans and lending commitments are reviewed quarterly considering credit quality indicators, including probable and historical losses, collateral values, LTV ratios, and economic conditions.

The table below presents the allowance for loan losses by loan product and impairment methodology.

| (in thousands) | Bridge | Fixed rate | Construction | SBA - 7(a) | Other | Total |
|---|---|---|---|---|---|---|
| **September 30, 2024** | | | | | | |
| General | $ 12,536 | $ 3,525 | $ 1,842 | $ 12,085 | $ 1,262 | $ 31,250 |
| Specific | 10,300 | 2,769 | 45,432 | 4,961 | 641 | 64,103 |
| PCD | — | — | 1,889 | — | — | 1,889 |
| **Ending balance** | $ 22,836 | $ 6,294 | $ 49,163 | $ 17,046 | $ 1,903 | $ 97,242 |
| **December 31, 2023** | | | | | | |
| General | $ 17,302 | $ 7,884 | $ 3,722 | $ 12,679 | $ 2,886 | $ 44,473 |
| Specific | 18,939 | 5,714 | 5,726 | 5,188 | 143 | 35,710 |
| PCD | — | — | 21,422 | — | — | 21,422 |
| **Ending balance** | $ 36,241 | $ 13,598 | $ 30,870 | $ 17,867 | $ 3,029 | $ 101,605 |

215.    Defendants' statements above in paragraphs 201 to 214 identified in emphasis with bold, italicized text were false and/or materially misleading and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading because they do not fairly present the financial conditions and financial results of Ready Capital. As detailed herein, Ready Capital overstated the value of its construction loans by overstating the value of the Construction Loan. Defendants were in possession of information of relevant qualitative and quantitative factors that affected the value of the Portland Project Construction Loan that necessitated Ready Capital during the Class Period to increase its allowance for credit losses, or CECLs, and to reduce the value of the Construction Loan on Ready Capital's financial statements. As a result, Defendants statements to investors were false and or misleading as the overstated the value of the Ready Capital's Construction loans, overstated the value of the Mosaic Portfolio, understated the amount of the Allowance for credit losses

216.    Additionally, as detailed herein, given the issues faced by the Portland Project and the effects this had on the construction and sales of the Portland Project, especially the Ritz-Carlton condominium units, the BDC Borrowers and Bowen were financially distressed. With the financial position of both the Portland Project and BDC Borrowers and Bowen coupled with the

90

Construction Loan's high loan-to-value rate, which was approximately 80%, together with the events of default both on the Construction Loan and the Mezzanine Loan meant that during the Class Period the Construction Loan was reasonably expected not to be paid off at maturity and as such foreclosure was probable, which in turn necessitated Ready Capital to "remeasure the financial asset at the fair value of the collateral at the reporting date" or to determine the "fair value of the collateral at the reporting date when recording the net carrying amount of the asset and determining the allowance for credit losses for a financial asset for which the repayment is expected to be provided substantially through the operation or sale of the collateral when the borrower is experiencing financial difficulty based on the entity's assessment as of the reporting date." By November 1, 2024, Ready Capital's historical experience with the Construction Loan, its current condition, low occupancy, and unlikelihood of payment in full by its December 31, 2024 maturity date meant that the Construction Loan should have been assessed for expected credit loss and an impairment or reserve of at least $130 million recorded. Accordingly, the expected losses on the Construction Loan were not adequately reserved and therefore the Construction Loan was overvalued on Ready Capital's financial statements throughout the Class Period. As a result thereof, Defendants statements concerning Ready Capital's net income, allowances for reserves, distributable earnings, net book value, carrying values, dividends, and the metrics and amounts calculated therefrom as well as statements concerning the Mosaic portfolio loans being adequately reserved through the approximately $90 million in CERs with no expectation of further reserves or increased allowance for losses were materially false and/or misleading. As a result thereof, Defendants statements concerning the Mosaic portfolio and Ready Capital's net income, distributable income, were also materially false and/or misleading.

217.    Furthermore, as to the statements made during the 3Q2024 Earnings Call concerning the expected payoff of a large portion of the Mosaic construction loans, i.e. the Construction Loan at the end of 4Q 2024 when the Construction Loan matured, and that there were "*no onetime items*" and that Defendants' "*expectation . . . that a large portion of those [construction loans acquired in the Mosaic transaction] pushing 75% clear out in the fourth quarter and turn to actually sort of cash paying investments.*" as detailed in paragraphs 206 to 210,were further materially false and/or misleading at the time because, as detailed below, Ready Capital was already purporting to be extending the maturity of the Construction Loan while it was also concurrently seeking the fair market value of the Portland Project through appraisals as Ready Capital was preparing to foreclose on the Construction Loan or acquire the underlying Portland Project collateral through a deed-in-lieu when the Construction Loan was not paid off on maturity on or before December 31, 2024. As detailed below, the Lender, which is controlled by Ready Capital, only had rights to seek under the applicable terms of the Construction Loan to conduct a reappraisal of the Portland Project in the event of default. Alternatively, Ready Capital was also required under GAAP to "remeasure" the "fair value" when it determined "foreclosure was probable" and/or determine the assets "fair value" when "repayment is expected to be provided substantially through the operation or sale of the collateral when the borrower is experiencing financial difficulty." As such, at the time these statements were made the Construction Loan was already in default and/or Ready Capital was already taking steps to remeasure the "fair value" by seeking appraisals on the Portland Project as "foreclosure was probable" and/or to determine the assets "fair value" because "repayment is expected to be provided substantially through the operation or sale of the collateral when the borrower is experiencing financial difficulty." Therefore, Defendants did not "expect" that the Construction Loan would "clear out" with the

92

accrued but unpaid interest being paid at the end of the 4Q 2024 and was aware that a "onetime items" that would affect Ready Capital's $0.25 per share distributable income as a result of the loss of the interest from the Construction Loan and the increased carrying costs that Ready Capital would incur from taking possession of the Portland Project.

H. **MARCH 3-4, 2025 – DEFENDANTS REVEAL THE TRUTH WITH READY CAPITAL'S FOURTH QUARTER AND FULL YEAR 2024 RESULTS**

218.    On March 3, 2024, before market open, Ready Capital filed a Form 8-K that included as exhibits a press release announcing its financial results for the fourth quarter 2024 ended December 31, 2024 ("4Q 2024") (the "4Q 2024 Press Release") and a presentation titled "Supplemental Financial Data Q4 2024[.]"

219.    The 4Q 2024 Press Release announced highlights for the quarter including Realty Capital's "DISTRIBUTABLE LOSS PER COMMON SHARE OF $(0.03)" and "Net book value of $10.61 per share of common stock as of December 31, 2024." In the 4Q 2024 Press Release, Defendant Capasse was quoted saying:

> Entering 2025, we have taken decisive actions to stabilize and better position our balance sheet going forward by fully reserving for all of our non-performing loans in our CRE portfolio. While this reduces our book value per share in the short term, we believe it provides a path to recovery in our net interest margin through the accelerated resolution of our non-performing loans to generate liquidity for reinvestment in higher-yielding new originations. Additionally, we have adjusted our dividend to $0.125 per share to align with anticipated cash earnings to preserve capital for reinvestment and share repurchases with potential upward bias co-incident with the recovery in earnings. We believe these actions will enable the Company to resume growth in both book value per share and the dividend as we move forward.

220.    The 4Q 2024 Press Release also announced that it was declaring a new dividend stating: "*DECLARED A QUARTERLY CASH DIVIDEND OF $0.125 PER SHARE OF COMMON STOCK.*" This dividend was a 50% cut of Ready Capital previous dividend of $0.25.

93

221.    The 4Q 2024 Press Release also provided Ready Capital's table reconciling its Net Income of **"$(314,751)"**, or ($314,751,000), to its "Distributable earnings per common share – basic" of "**$(0.03)**" which included $277,277,000 increase in CECL reserves:

The table below reconciles Net Income computed in accordance with U.S. GAAP to Distributable Earnings.

| (in thousands) | | Three Months Ended December 31, 2024 |
|---|---|---|
| Net Loss | $ | (314,751) $ |
| Reconciling items: | | |
| Unrealized loss on MSR - discontinued operations | | 33,175 |
| Unrealized gain on joint ventures | | (5,015) |
| Increase in CECL reserve | | 277,277 |
| Increase (decrease) in valuation allowance | | (31,229) |
| Non-recurring REO impairment | | 31,175 |
| Non-cash compensation | | 2,826 |
| Unrealized loss on preferred equity, at fair value | | 15,613 |
| Merger transaction costs and other non-recurring expenses | | 6,579 |
| Bargain purchase gain | | — |
| Realized losses on sale of investments | | 51,688 |
| Total reconciling items | $ | 382,089 $ |
| Income tax adjustments | | (22,825) |
| Distributable earnings before realized losses | $ | 44,513 $ |
| Realized losses on sale of investments, net of tax | | (44,246) |
| Distributable earnings | $ | 267 $ |
| Less: Distributable earnings attributable to non-controlling interests | | 3,113 |
| Less: Income attributable to participating shares | | 2,248 |
| Distributable earnings attributable to common stockholders | $ | (5,094) $ |
| Distributable earnings before realized losses on investments, net of tax per common share - basic and diluted | $ | 0.23 $ |
| Distributable earnings per common share - basic and diluted | $ | (0.03) $ |

222.    In the Supplemental Financial Data Q4 2024 presentation, Ready Capital included a slide highlighting and discussing the Portland Project, as opposed to the Mosaic portfolio, detailing some selected dates concerning the project, admitting that Ready Capital acquired the Construction Loan in the Mosaic Merger **"which became distressed due to the pandemic impact on the Portland economy and Sponsor's inability to fund cost overruns"** which contrasted Defendants statements during the Class Period. The slide further detailed that Ready Capital's strategy was to exit the Portland Project over the **next 3 years** once the Portland Project was "stabilized." Specifically, Ready Capital stated:

94



## Portland OR, Mixed-Use



- *2019*: Mosaic Real Estate Credit (Mosaic) originated a $460MM senior mortgage for the construction of The Ritz-Carlton, Portland

- *March 2022*: RC acquires loan through its merger with Mosaic which became distressed due to the pandemic impact on the Portland economy and Sponsor's inability to fund cost overruns

- *3Q24*: Construction is 100% complete and all components of the property have been delivered; hotel opened in October 2023

- *12/31/24*: Loan matured; RC is expeditiously working on an amicable solution with the Borrower:
  - Current senior UPB is $503MM (13% syndicated)
  - Ownership is best net present value outcome for RC

- The 35-story mixed-use tower consists of three components:
  - Hotel: 251-key Ritz-Carlton (achieved average RevPAR of $188 in 2024)
  - Resi Condo: 132-unit Ritz-Carlton (8% of inventory sold at average $1,105/SF)
  - Commercial:
    - 159k square feet of class-A office (23% leased)
    - 11k square feet of retail (100% occupied)

- RC's Asset Management strategy – sequentially exit the 3 components once stabilized:
  - Commercial: 2 years
  - Hotel: 2 years
  - Resi Condo: 3-year linear sell-out period





223.    On the morning of March 3, 2025, before market trading hours, at 8:30 a.m. Eastern, Defendants held a conference call with analysts and investors to present Ready Capital's financial and operational results for 4Q 2024 (the "2024 Earnings Call").

224.    Defendant Capasse began his prepared remarks on the 4Q 2024 Earnings Call by revealing that Defendants were "entering 2025" with an "aggressive reserving on problem loans" and "a rightsizing of the dividend to current cash earnings" which included "2 aggressive actions to reset the balance sheet and go-forward earnings profile." Defendant Capasse disclosed that the first was a "$284 million combined CECL and valuation allowances which marks 100% of our nonperforming loans to current values. He continued to explain that the result was a material "14%

reduction in book value per share to $10.61" but also highlighted that this action resulted in "ring-fencing 100% of the problem loans in REO [which] sets the bottom" for these "problem loans."

225.    Defendant Capasse continued to explain that Ready Capital was "splitting the CRE portfolio into 2 buckets" including its "core assets designated as hold to maturity with strong credit metrics that generate competitive returns; and second, non-core assets, both originated and M&A." He explained that under this new classification system that "[a]t year-end, the CRE loan portfolio totaled $7.2 billion, split 83% core and 17% non-core" with the "non-core $1.2 billion portfolio is split into 59% RC originated loans, 8% M&A loans and 33% in a high-quality Portland, Oregon mixed-use asset."

226.    Importantly, Defendants began to speak directly about the Portland Project rather than refer to the Mosaic portfolio. Defendant Capasse announced that Ready Capital was finally reducing the carrying value of the Portland Project on its books as it was increasing its allowance for credits losses as it "reserved $130 million of our original exposure to mark the asset to its as-is value, based on the current appraisal." Capasse further explained that as a result Defendants were also cutting Ready Capital's dividend in half to $0.125 per share from $0.25 per share.

227.    Notably, the dividend reduction from $0.25 to $0.125 per share was directly tied to the loss in revenue from the Portland Project as Capasse explained that "*[t]he immediate impact to earnings is a quarterly reduction of $0.11 per share or 350 basis points on ROE*" which Defendants' hoped to offset in future quarters.

228.    In contrast to previous statements about the Mosaic portfolio, Defendants disclosed was an outlier loan in which had an outsize impact Ready Capital's total loan portfolio Defendant Capasse stating the Portland Project was "an idiosyncratic position in our otherwise granular lower

middle market CRE loan portfolio with the remaining top 10 loan positions representing only 9% of the gross portfolio" at this time.

229.    Additionally, Defendants announced a material decrease of 16% to Ready Capital's net book value from $12.59 per share in 3Q 2024 to $10.61 per share, that was driven by the increased reserves on the Portland Project's Construction Loan. Thus, Capasse explained the dividend reduction was necessary to "better align the dividend with projected cash earnings in the short term and to preserve book value."

230.    Specifically, in his opening remarks, Defendant Capasse stated:

***Thomas Edward Capasse*** *Ready Capital Corporation – Chairman, CEO & Chief Investment Officer*

Thanks, Andrew. Good morning, everyone, and thank you for joining the call today. The fourth quarter concludes a year of mixed results in our business. In 2024, we and the broader CREIT sector continue to be impacted by the later innings of this cycle in our transitional CRE lending business.

However, entering 2025, aggressive reserving on problem loans, a rightsizing of the dividend to current cash earnings and an improving multifamily market will accelerate the path to recovery. In contrast, our small business lending operations experienced significant origination growth of 1.7x, harvesting capital investments made over the preceding years.

To begin, we have undertaken 2 aggressive actions to reset the balance sheet and go-forward earnings profile. The first, a $284 million combined CECL and valuation allowances, which marks 100% of our nonperforming loans to current values. This reserve resulted in a 14% reduction in book value per share to $10.61, ***but by ring-fencing 100% of the problem loans in REO sets the bottom.*** This action lowers our basis in nonperforming loans, providing asset managers with more options for accelerated resolutions, generating liquidity for reinvestment in higher-yield new originations and in turn, a recovery in our net interest margin or NIM.

The second, a reduction of the dividend to $0.125 per share for the first quarter to ***better align the dividend with projected cash earnings in the short term and to preserve book value.*** It will be our expectation to grow the dividend from this new level with improved earnings in future periods. We also set it at this level to preserve capital for reinvestment in our core portfolio and to allow for more aggressive utilization of the recently announced $150 million share repurchase program.

*To be clear, we believe these actions will establish the bottom for both book value per share and the dividend. In this context, to better frame the evaluation of future earnings and book value per share and further enhance transparency, our late-cycle portfolio asset management strategy involves splitting the CRE portfolio into 2 buckets. First, core assets designated as hold to maturity with strong credit metrics that generate competitive returns; and second, non-core assets, both originated and M&A.*

This bifurcation provides additional transparency to track our primary asset management strategy, aggressive liquidation of the 3.1% cash yield non-core book and reinvestment of liquidity into 15% plus ROE core loans, providing a path to recovery in NIM.

With the M&A portfolio successfully reduced to under 10% of the total year-end CRE portfolio, the prior classification of originated and M&A is no longer relevant. *At year-end, the CRE loan portfolio totaled $7.2 billion, split 83% core and 17% non-core.* Our $6 billion core portfolio across approximately 1,500 loans evidences strong credit metric and yield metrics, providing a solid foundation for net interest margin to recover in 2025, a contractual yield of 8% with a 93% pay rate.

*          *          *

*Our non-core $1.2 billion portfolio is split into 59% RC originated loans, 8% M&A loans and 33% in a high-quality Portland, Oregon mixed-use asset.* Excluding the Portland asset, the non-core portfolio assets are tagged with aggressive liquidation strategies and have the following credit profile: cash yield of 3.1%; 60-day delinquencies of 36%; risk ratings comprised 24% 5 rated, 13% 4 rated and 63% with a 3 or better rating; and 8% is concentrated in office and land. Based on our asset management plans, full liquidation of this portfolio will take approximately 7 to 10 quarters with 9 assets currently under contract expected to generate approximately $20 million of liquidity.

*The Portland mixed use asset is a $600 million construction project acquired in the 2022 Mosaic transaction, where RC holds a $503 million senior loan and a $62 million preferred equity position.* As discussed in our last earnings call, construction was completed on the mixed-use property in the fourth quarter with the Ritz-Carlton hotel opening in October 2023. The property features the premier hospitality, retail, office and residential offerings in Portland with each component now moving to stabilization.

*Currently, the hospitality RevPAR is $188. The office and retail are leased 23% and 100% respectively, and 8% of the condos are sold. While the original strategy was to refinance the construction into a bridge loan, the current appraisal and other factors favored ownership and serial asset disposition on the components as the best net present value outcome. The immediate impact to earnings is a*

98

*quarterly reduction of $0.11 per share or 350 basis points on ROE.* However, we expect to offset these changes by more immediate reinvestment of proceeds received upon bringing the financing of the property to market advance rates and for reinvestment of proceeds from asset sales coincident with stabilization.

*We have reserved $130 million of our original exposure to mark the asset to its as-is value, based on the current appraisal.* We also expect to recover our current senior loan basis over the next 10 quarters as we stabilize the property. Of note, the *Mosaic loan represents an idiosyncratic position in our otherwise granular lower middle market CRE loan portfolio with the remaining top 10 loan positions representing only 9% of the gross portfolio.*

Emphasis added in bold, italicized text.

231.    In his prepared remarks, Defendant Ahlborn further detailed the impact of the increased reserves on the Construction Loan on Ready Capital's balance sheet. Notably, Defendant Ahlborn explained that the decrease in Ready Capital's net book value would have been even more significant if it had not been for an $0.18 increase to the net book value from Ready Capital's share repurchases during 4Q 2024:

*Andrew Ahlborn* Ready Capital Corporation – CFO & Secretary

*Moving on, the combined provision for loan loss and valuation allowance increased $253.8 million. The additional $242.7 million in CECL reserves was primarily due to an increase of reserves on non-core assets.* The reduction in the valuation allowance is due to a $64.5 million recovery from loan sales and foreclosures, offset by a $5.9 million increase on loans remaining on the balance sheet at quarter end. The release of the valuation allowances relates to the settlement of $116 million of loan sales.

*       *       *

*On the balance sheet, book value per share is now $10.61 per share versus $12.59 per share last quarter. The book value change was due to an increase in the combined CECL and valuation allowance and a $0.43 shortfall on dividend coverage from earnings, absent the increase in combined allowance. These changes were offset by an $0.18 per share increase due to share repurchases, which totaled 5.8 million shares at an average price of $7.35 per sha*re.

Emphasis added in bold, italicized text.

232.    After prepared remarks, the 4Q 2024 Earnings Call shifted to questions from analysts. In answering a question from a Piper Sandler & Co. about the dividend cut announced during the call the analyst inquired whether Ready Capital expects its cash earnings to cover the $0.125 dividend. Defendant Ahlborn explained that as the non-core loans, including the Construction Loan shifted to "non-accrual" status, that this was going to have a continuing impact on Ready Capital's financial results:

> So, the first quarter is definitely going to be the lowest quarter of the year, ***primarily impacted by the fact that the majority of the non-core bucket will go on non-accrual*** and be booked on a cash basis given the liquidation strategy. ***So the effect -- the cumulative effect of that, including the rest is roughly a $0.14 drawdown from where those assets were in '24.*** So, the expectation is over the course of the year that we cover the dividend approximately 1.5x. But the earnings profile will ramp up to further coverage as we move along in the year. . . .

Emphasis added in bold, italicized text.

233.    In a further question by UBS, the analyst inquired the risk related to the non-ring fenced assets and ensurances that there will not be additional significant reserving actions. In response, Capasse and Zausmer, Ready Capital's Chief Credit Officer, explained the process by which Ready Capital's loan portfolio was bifurcated into "core" and "non-core" assets. Notably, as they explained essentially all of the loans that had previous modifications or were construction related, which included both the Mosaic assets, were moved into "non-core" assets. Capasse further explained that projects that were strong who had "good sponsors, liquidity, mark-to-market LTVs . . . in the upper 70s" would be able to refinance by qualifying for a bridge loan but, stated that those projects which did not have these elements were on average being discounted by 18% and prepared for liquidation, indicating that these loans would not be able to be refinanced or at least Ready Capital was unwilling to refinance them. During the call, UBS and Defendants stated:

***Douglas Michael Harter*** *UBS Investment Bank, Research Division – Analyst*

Okay. And then you mentioned kind of the reserve actions this quarter looking to ring-fence the known problem assets. How do you think about the remaining assets and the risk of kind of additional problems, and how should we take comfort that there won't be needs for additional significant reserving actions?

***Thomas Edward Capasse*** *Ready Capital Corporation – Chairman, CEO & Chief Investment Officer*

Yes. Adam, do you want to touch on the methodology under which we bifurcated the portfolio with -- Doug, I think the specific reference is to potential negative migration from the core portfolio, where the risk rating is only 2?

***Douglas Michael Harter*** *UBS Investment Bank, Research Division – Analyst*

Correct.

***Thomas Edward Capasse*** *Ready Capital Corporation – Chairman, CEO & Chief Investment Officer*

So, Adam, maybe to discuss the methodology under which ***we bifurcated the existing portfolio a****nd **then from there, the – we'll call it, if you will, the potential higher risk elements of the otherwise strong credit core portfolio, particularly the modified loans that were previously modified.***

***Adam Zausmer*** *Ready Capital Corporation – Chief Credit Officer*

Yes, sure. Doug, yes, ***the core portfolio, which is 83% of the overall portfolio, these are really assets that we deem to be long-term holds where you have healthy credit metrics that generate good returns. We have minimal future losses expected on those -- the majority of those are, call it, 86% is multifamily and industrial****.* The average maturity of that portfolio is 20 months. The mods within the core portfolio, the majority are cash flowing with healthier debt yields. We bifurcated into core where sponsors have equity that they put into these new mods. And the collateral is really closer to executing on the business plan. So we feel that the probability of takeout at maturity is significantly higher versus the non-core.

***On the non-core, this is really the bucket of more challenging loans that we've deemed, this represents 17% of the portfolio.*** These are where we're going to have short-term holdings, and the primary asset management strategy, as Tom mentioned, is really an expeditious liquidation. These assets have lower yields, less viable path to stabilization and takeout, on the multifamily specifically, agency takeout, little or no fresh equity from the borrowers inside of those modifications. And we feel that ultimately, if we don't liquidate specifically on the loan side, there will be a higher probability of foreclosure.

*So, we really bifurcated the 2 where we are laser beam focused on the noncore, on the expeditious liquidations that we expect to execute over the next 7 to 10 quarters.*

**Thomas Edward Capasse** *Ready Capital Corporation – Chairman, CEO & Chief Investment Officer*

Yes. And I want to just add to that, Doug. *I think this is systemic to the industry, especially on the multifamily side, where you look to bridge to – I'm sorry, to loans that have been made it through the rate hike period. And 2025, there was an old saying, a year ago, stay alive to '25, while rates didn't go down. So, what you're now seeing is loans that were previously modified split into 2 buckets.*

*One is strong projects, good sponsors, liquidity, mark-to-market LTVs and that kind of where we are here in this portfolio in the upper 70s, and those will qualify -- highly likely to qualify for either a bridge to bridge or stabilized takeout with the Freddie, Fannie loan.*

And I'd point out that the metric there is the debt yield on the core portfolio is 9.7%. And Adam, what's the current debt yield required for refi in the current market?

**Adam Zausmer** *Ready Capital Corporation – Chief Credit Officer*

Yes. Call it average 8% to 9% debt yield. Yes.

**Thomas Edward Capasse** *Ready Capital Corporation – Chairman, CEO & Chief Investment Officer*

You have almost 200 basis point premium on that book versus the non-core, which is a significantly lower debt yield. So that I think -- and again, the other thing about our -- Ready is that our CRE CLOs are static. So there's no hiding, if you will, maybe a strong word, but no ability to not disclose the nature of the -- status of the bridge loans. So, what we're doing here is we're taking a very conservative approach to bifurcating the loans that we think are best suited for accelerated resolution strategies.

*That's about -- of the non-core, it's about $1 billion marked at $0.82 and then highlight the non-core book. And then going forward, we're able -- from a transparency perspective, investors are able to track the migration from liquidation of the core and the credit performance of the core portfolio.*

Emphasis added in bold, italicized text.

234.    Thereafter, an analyst from Bruyette, & Woods, Inc. questioned the reasoning of another merger that Ready Capital was undertaking with United Development Funding IV. During

the conversation, Bruyette, & Woods, Inc. questioned the underlying purpose of this merger and also questioned the rationale of the Mosaic and Broadmark mergers was to gain access to their unleveraged balance sheet. Notably, the analyst insinuated that the driving reason for the mergers was not the quality of the assets, but rather that the assets were unlevered and allowed Ready Capital to issue additional unsecured debt. In response, acknowledged this was an additional benefit:

> ***Jade Joseph Rahmani Keefe***, *Bruyette, & Woods, Inc., Research Division – Managing Director*
>
> Regarding the 2026 maturities, whats the plan to address those? I think it's -- I estimate it around $760 million.
>
> ***Thomas Edward Capasse*** *Ready Capital Corporation – Chairman, CEO & Chief Investment Officer*
>
> So, we started to address some of it with our -- the senior secured notes we issued last week. A portion of the proceeds, as we said in the prepared remarks, are going to retire those. So when we look out, there are a handful of maturities in the beginning part of the year. So there's $158 million due in February, $90 million due in July. We -- for those 2 maturities, certainly, the projected cash flow and liquidity profile of the business supports taking those out in cash, but our preference will be to access the markets as we move into the summer months.
>
> And then, looking out further into '26, there's a senior secured note, $350 million that comes due in October and a smaller issuance that comes due in November, which is roughly $100 million. Our plan is to continue to position the business over the course of this year such that the financial profile allows us to start thinking about some of the larger debt markets to handle those securities, those debt issuances. But we continue to believe we've proven access to a variety of corporate markets. We will continue to lean into those markets.
>
> And then the only other thing I'd point out, Jade, is that the asset maturity ladder aligns very closely with the liability ladder. So, those are the various paths we'll undertake to take care of those.
>
> ***Jade Joseph Rahmani Keefe***, *Bruyette, & Woods, Inc., Research Division – Managing Director*
>
> On the UDF IV merger, is the rationale that you see compelling value in the assets an upside to the basis at which you're acquiring the assets? ***Or alternatively, are***

*you looking to replenish the unencumbered asset pool that the company has in order to maintain unsecured access? I mean that really would explain the logic behind the Broadmark and Mosaic mergers because those unencumbered assets allow you to issue debt.* And so, this kind of a deal is somewhat necessary in order to replenish that pool of unencumbered assets.

**Thomas Edward Capasse** *Ready Capital Corporation – Chairman, CEO & Chief Investment Officer*

Andrew, you could comment on it, Jade. But I'd say the raison d'etre for the transaction is 95% number one, it's highly accretive on an EPS basis unlevered, and that's how we view the transaction. ***The icing on the cake, if you will, is the ability to create leverage given the fact that it is unlevered.*** But we evaluated it at the Board and the management team evaluated this based on, again, a 10-year relationship with the company.

We'll view it as one of our non-bridge strategies going forward in terms of the whole residential lot loan market. So that just -- to answer your question, I think that's how we viewed the transaction. Less the -- again, the leverage was not really considered. It was really more the accretion to EPS from the actual asset yield itself. I don't know Adam -- Andrew, if you'd add anything to that.

**Andrew Ahlborn** *Ready Capital Corporation – CFO & Secretary*

***No, I think that's right. I think, Jade, there's an incremental benefit, as you alluded to, of bringing on unlevered equity and it improves the leverage ratios.*** It will improve the unencumbered asset pool so that the financial profile of the balance sheet from a debt metric standpoint improves post-merger, which will allow us, should we choose to pull debt out of that equity over time. But the main driver of this transaction was the earnings profile.

**Jade Joseph Rahmani Keefe**, *Bruyette, & Woods, Inc., Research Division – Managing Director*

Okay. Fair enough. ***I mean, I find that somewhat surprising because we're in the middle of a credit cycle. There's so many uncertainties. So taking on additional problem assets to work out adds further stress to the business model and it might not be the right time for that, but I understand what you're saying about the potential for accretion.***

Emphasis added in bold, italicized text.

235.    After the question and answer portion of the 2024 Earnings Call, Defendant

Capasse concluded stating:

104

So, with the dividend cut and the CECL reserves, we expect that these actions were ***critical to accelerate the recovery in net interest margin and ROE over the succeeding year***, and we fully look -- we are fully -- highly confident in terms of our ability to develop those goals and look forward to the next quarter's earnings call. Thank you. Thanks, everybody, and have a good day.

Emphasis added in bold, italicized text.

236. After market hours on March 3, 2024, Ready Capital filed its 2024 Form 10-K. The 2024 Form 10-K was signed by Defendants Capasse and Ahlborn.

237. The 2024 Form 10-Q repeated the same statements concerning Ready Capital's 4Q 2024 results for its net book value of "***$10.67***" per share of common stock, distributable earnings per share of "***$(0.03)***", and net income of (***$297,517,000***):

### *Key Financial Measures and Indicators*

As a real estate finance company, we believe the key financial measures and indicators for our business are earnings per share, dividends declared per share, distributable earnings, return on equity, and net book value per share. As further described below, distributable earnings is a measure that is not prepared in accordance with GAAP. We use distributable earnings to evaluate our performance and determine dividends, excluding the effects of certain transactions and GAAP adjustments that we believe are not necessarily indicative of our current loan activity and operations. Refer to "—Non-GAAP Financial Measures" below for a reconciliation of net income to distributable earnings.

The table below sets forth certain information on our operating results.

| | | Three Months Ended December 31, | | Year Ended December 31, | | |
|---|---|---|---|---|---|---|
| *($ in thousands, except share data)* | | 2024 | | 2024 | | 2023 |
| Net Income (loss) from continuing operations | $ | (297,517) | $ | (411,999) | $ | 351,245 |
| Earnings per common share from continuing operations - basic | $ | (1.80) | $ | (2.52) | $ | 2.27 |
| Earnings per common share from continuing operations - diluted | $ | (1.80) | $ | (2.52) | $ | 2.24 |
| Distributable earnings before realized losses | $ | 44,513 | $ | 181,931 | $ | 190,120 |
| Distributable earnings before realized losses per common share - basic | $ | 0.23 | $ | 0.97 | $ | 1.18 |
| Distributable earnings before realized losses per common share - diluted | $ | 0.23 | $ | 0.97 | $ | 1.17 |
| Distributable earnings | $ | 267 | $ | 28,360 | $ | 190,120 |
| Distributable earnings per common share - basic | $ | (0.03) | $ | 0.07 | $ | 1.18 |
| Distributable earnings per common share - diluted | $ | (0.03) | $ | 0.07 | $ | 1.17 |
| Dividends declared per common share | $ | 0.25 | $ | 1.10 | $ | 1.46 |
| Dividend yield [(1)] | | 14.7 % | | 14.7 % | | 13.5 % |
| Return on equity from continuing operations | | (60.3)% | | (19.6)% | | 17.2 % |
| Distributable return on equity before realized losses | | 7.1 % | | 7.5 % | | 8.6 % |
| Distributable return on equity | | (0.3)% | | 0.9 % | | 8.6 % |
| Book value per common share | $ | 10.61 | $ | 10.61 | $ | 14.10 |

(1) Dividend yield is based on the respective period end closing share price.

238. In "Note 6. Loans and allowance for credit losses", the 2Q 2024 Form 10-Q detailed the amount of the allowance for credit losses, that "specific" construction loans now had

*"$137,815"*, or $137,812,000, in allowance for credit losses as in increased this provision as a result of increasing its reserves on the Portland Project's Construction Loan:

### Allowance for credit losses

The allowance for credit losses consists of the allowance for losses on loans and lending commitments accounted for at amortized cost. Such loans and lending commitments are reviewed quarterly considering credit quality indicators, including probable and historical losses, collateral values, LTV ratios, and economic conditions.

The table below presents the allowance for loan losses by loan product and impairment methodology.

| (in thousands) | Bridge | Fixed rate | Construction | SBA - 7(a) | Other | Total |
|---|---|---|---|---|---|---|
| **December 31, 2024** | | | | | | |
| General | $ 126,471 | $ 3,156 | $ 493 | $ 18,825 | $ 1,523 | $ 150,468 |
| Specific | 43,974 | 1,958 | 137,812 | 3,262 | 631 | 187,637 |
| PCD | — | — | 1,834 | — | — | 1,834 |
| **Ending balance** | $ 170,445 | $ 5,114 | $ 140,139 | $ 22,087 | $ 2,154 | $ 339,939 |
| **December 31, 2023** | | | | | | |
| General | $ 17,302 | $ 7,884 | $ 3,722 | $ 12,679 | $ 2,886 | $ 44,473 |
| Specific | 18,939 | 5,714 | 5,726 | 5,188 | 143 | 35,710 |
| PCD | — | — | 21,422 | — | — | 21,422 |
| **Ending balance** | $ 36,241 | $ 13,598 | $ 30,870 | $ 17,867 | $ 3,029 | $ 101,605 |

The table below presents a summary of the changes in the allowance for loan losses.

| (in thousands) | Bridge | Fixed rate | Construction | SBA - 7(a) | Other | Total |
|---|---|---|---|---|---|---|
| **Year Ended December 31, 2024** | | | | | | |
| Beginning balance | $ 36,241 | $ 13,598 | $ 30,870 | $ 17,867 | $ 3,029 | 101,605 |
| Provision for (recoveries of) loan losses | 134,300 | (4,364) | 114,069 | 8,959 | (809) | 252,155 |
| Charge-offs and sales | (96) | (4,120) | (4,800) | (5,511) | (66) | (14,593) |
| Recoveries | | | | 772 | | 772 |
| **Ending balance** | $ 170,445 | $ 5,114 | $ 140,139 | $ 22,087 | $ 2,154 | $ 339,939 |
| **Year Ended December 31, 2023** | | | | | | |
| Beginning balance | $ 49,905 | $ 6,531 | $ 17,334 | $ 14,299 | $ 2,450 | 90,519 |
| Provision for (recoveries of) loan losses | (13,045) | 8,571 | 6,363 | 5,598 | 1,185 | 8,672 |
| PCD[1] | — | — | 32,862 | — | — | 32,862 |
| Charge-offs and sales | (619) | (1,504) | (25,689) | (2,217) | (606) | (30,635) |
| Recoveries | — | — | — | 187 | — | 187 |
| **Ending balance** | $ 36,241 | $ 13,598 | $ 30,870 | $ 17,867 | $ 3,029 | 101,605 |

(1) Includes impact of measurement period adjustment related to the Broadmark Merger. Refer to Note 5 for further details on assets acquired and liabilities assumed in connection with the Broadmark Merger.

239.    Prior to this date, Ready Capital had classified its loans as originated or M&A, However, with the announcements of the $285 million increase in CECL reserves and a 50% reduction in dividend, Ready Capital no longer found this distinction meaningful and instead shifted its strategy to classify its loans into "core" versus "non-core" assets as part of its overall portfolio management strategy. Prior to this, Ready Capital had not used this nomenclature. The 2024 Form 10-K describes Ready Capital's LMM asset management strategy immediately after the end of the Class Period as:

***LMM Asset Management Strategy.*** Originated LMM loans held in our portfolio had a UPB of $6.8 billion and carrying value of $6.7 billion as of December 31, 2024. Such loans represented approximately 76% of the UPB and 78% of the carrying value of our total loan portfolio. Acquired LMM loans held in our portfolio had a UPB of $0.8 billion and carrying value of $0.7 billion as of December 31, 2024. Such loans represented approximately 9% of the UPB and 9% of the carrying value of our total loan portfolio.

***When monitoring and assessing the credit quality of our loan portfolio, we bifurcate the loan portfolio into two categories (i) Core and (ii) Non-Core. The Core portfolio generally consists of loans which we expect to hold to maturity and generate a competitive return. The Non-Core portfolio generally consists of loans where the primary focus is near-term liquidation and reinvestment of the equity into core assets.*** Core LMM loans held in our portfolio had a UPB of $6.1 billion and a carrying value of $6.0 billion as of December 31, 2024. Such loans represented approximately 67% of the UPB and 70% of the carrying value of our total loan portfolio. Non-Core LMM loans held in our portfolio had a UPB of $1.6 billion and a carrying value of $1.3 billion as of December 31, 2024. Such loans represented approximately 18% of the UPB and 15% of the carrying value of our total loan portfolio. ***We seek to maximize the value of Non-Core non-performing LMM loans through through the use of property sales, note sales or foreclosure sales.***

Emphasis added with bold, italicized text.

## I.    MARCH 3-4, 2025 – THE MARKET AND ANALYSTS REACT TO DEFENDANTS' MARCH 3-4, 2025 DISCLOSURES

240.    In response to the news entering the market on March 3, 2025, investors and analysts reacted immediately to Defendants' revelations with Ready Capital's stock price responding quickly and decisively as Ready Capital's common stock fell $1.86 per share, or 26.84%, from $6.93 at market close on February 28, 2025, the prior trading day, to close at $5.07 on March 3, 2025, on abnormally high volume of over 22.96 million shares. On an adjusted close basis, this equated to a $1.7628 per share decrease from the adjusted closing price of $6.568 on February 28, 2025, to close at the adjusted closing price of $4.8052 on March 3, 2025.

241.    The following day, Ready Capital's common stock continued to fall an additional $0.12 per share, from $5.07 at market close on March 3, 2025 to close at $4.95 on March 4, 2025,

on abnormally high volume of almost 6.3 million shares. On an adjusted close basis, this equated

to a $0.1137 per share decrease from the adjusted closing price of $4.0852 on March 3, 2025, to

close at the adjusted closing price of $4.6915 on March 4, 2025.

242.    Analysts reacted quickly to the news of March 3, 2025, with initial reports being

issued the same day and additional reports being issued in the following days as analysts reported

on the FY 2024 results with the benefit of Defendants' statements during the FY 2024 Earnings

Call.

243.    On March 3, 2025, before market open, Raymond James issued a company brief

titled: "4Q First Blush: Reserve Build Impacts GAAP EPS & BV; Cuts 1Q Dividend[,]" In the

brief, Raymond James summarized its core takeaways from Ready Capital's financial results in

advance of the 4Q 2024 Earnings Call stating:

> ***4Q results were negatively impacted by a large reserve build and real estate
> impairments, which resulted in earnings materially below our estimate and book
> value decreasing 16% sequentially.*** The reserve build was driven by RC fully
> reserving for all of the nonperforming CRE assets. In addition to 1Q results, RC
> also reduced the 1Q dividend by 50% to $0.125 per share, with the new dividend
> level expected to align with cash earnings.

Emphasis added in bold, italicized text.

244.    On March 3, 2025, Citizens issued a report discussing Defendants' March 3, 2025

disclosures titled: "4Q24 Highlights: Lowering to Market Perform after Significant Portfolio

Valuation Reset[.]" In its report, Citizens lowered its rating to Market Perform and reduced its

price target by $2.57, or 27%, from $9.50 to $6.93 per share as a result of Ready Capital's

disclosures on March 3, 2025. Citizens explained that not only did Realty Capital's 4Q 2024 results

miss the consensus of nine (9) analysts, but also that Ready Capital's $285 million increase in

CECL reserves drove a 16% reduction in Ready Capital's book value from $12.59 to $10.61.

Citizens additionally discussed Ready Capital's 50% reduction of its future quarterly dividends.

Specifically, Citizens wrote:

- **We lower our rating on Ready Capital Corporation (RC) to Market Perform** from Market Outperform ($9.50 prior price target) following the release of fourth quarter results.

  Before the market open on March 3, the company reported a GAAP loss of $1.80 per share and a distributable loss of $0.03 per share, ***below consensus of $0.21 from nine analysts and our lower estimate of $0.16***. ***GAAP earnings were negatively impacted by a $285M, or $1.69 per share, increase to CECL loan loss reserves*** and a $29.8M, or $0.18 per share, impairment of real estate assets. Distributable earnings were negatively impacted by $44.2M, or $0.26 per share, of realized loan losses. ***The quarterly dividend was reduced by 50% to $0.125 from $0.25 per share in order to preserve liquidity***. ***4Q24 distributable earnings did not cover the new dividend of $0.125 per share, but distributable earnings excluding the $44.2M of realized losses would have been $0.23, which would have solidly covered the newly lowered dividend. Adjusted book value was $10.61, a significant decrease of about 16% from $12.59 at September 30, primarily due to the increase in CECL reserves.*** Distributable ROE prior to the realized loss was 7.1% for the fourth quarter, and the company targets a forward ROE of 10% as problem loans are resolved and capital is redeployed into new earnings assets. ***Given the now larger than previously expected headwinds to earnings in the near term from nonperforming loans as the company works through its disposition strategy, we are lowering our investment rating to Market Perform and with shares trading at 0.65x 12/31 BV of $10.61 compared to the peer median multiple of 0.84x, we believe shares are fairly valued at current levels.***

Emphasis added in bold, italicized text.

245.    Citizens also discussed Ready Capital's recent bifurcation of its loan portfolio into Core and Non-Core assets nothing that:

The company has now bifurcated its loan portfolio into core and noncore assets with a plan to sell ~50% of the now noncore assets in 2025. ***Post 2025, the remaining noncore assets will primarily be comprised of a $560M mixed-use asset in Portland that is expected to be sold over the next 2-3 years.***

Emphasis added in bold, italicized text.

246.    Citizens further discussed Ready Capital's credit quality was being impacted by the delinquencies in the Mosaic portfolio, including the related recordation of $285 million, or $1.69 per share, increase to Ready Capital's CECL reserves. In its report, Citizens wrote:

- **Credit quality.** Loans that are delinquent 60+ days across the portfolio now total 5.9%, ***with the bulk of this stress resulting from the acquired*** Broadmark and ***Mosaic portfolios (12.3% delinquent)***. ***During the quarter, the company recorded a $285M, or $1.69 per share, increase to its CECL reserves, which essentially marks the problem loan portfolio to current market values.*** Management provided a timeline for expected non-core dispositions with 51% of non-core assets planned to be sold during 2025.

Emphasis added in bold, italicized text.

247.    On March 3, 2025, Piper Sandler issued a report discussing Defendants' March 3, 2025 disclosures titled: "Cuts Dividend and Records Meaningful Allowances; Uncertainty Remains into 2025[.]" In its report, Piper Sandler attributed the 35% plus tock decrease to the missed earnings and the 50% dividend cut. As Piper Sandler noted this was Ready Capital's *fourth dividend cut since 3Q 2023.* In response to the CECL and valuation and resulting book value effects and expectations for 2025, Piper Sandler cut is target by $2.50, or over 31%, from $8.00 to $5.50. In its concluding remarks, Piper Sandler wrote:

**CONCLUSION**

***Shares were down 25%+ following RC's results and 50% dividend cut.*** RC reported GAAP and distributable losses, but a slight core beat after excluding realized losses for loans held for sale. In addition, the company cut its 1Q25 dividend to $0.125 and this ***marks the fourth dividend cut since 3Q23***. The company continued to take significant actions including loan sales which generated ***$52M in realized losses and $276M in CECL and valuation allowances***. 2024 was an extremely challenging year and we continue to expect a tough backdrop as rates remain elevated and RC works through its non-core assets. ***We are decreasing our 2025 and 2026 core estimates to $0.56 and $0.84 from $1.09 and $1.22. We are decreasing our price target to $5.50 from $8, which is based on ~50% (~65% prev.) of 4Q25E book value***. The lower multiple is due to uncertainty related to its disposition of non-core assets.

Emphasis added in bold, italicized text.

110

248.    On March 3, 2025, Ladenburg Thalmann issued a report discussing Defendants'

March 3, 2025 disclosures titled: "4Q24: $0.23 Distrib. EPS Loss as Commercial RE Earnings

Drag Increases[.]" In its report, Ladenburg Thalmann, highlighted that the earnings miss which

was driven by the $285 million loan loss provision from the Mosaic and Broadmark mergers noting

that Ready Capital was also reducing its dividend to $0.125 per share. Ladenburg Thalmann further

noted that Ready Capital's recent merger announcement with UDF IV had striking similarities to

the acquisitions of Mosaic and Broadmark for the underlevered portfolios which it specifically

pointed out were the problem and "non-core" loans driving loan loss provisions. Laden Thalmann

also explained that "42% of non-core loans were construction", which as previously detailed

Ready Capital first entered into this space through the Mosaic Merger, with the half of them that

did not include the Portland Project to be liquidated in 2025. These announcements were of

obvious importance to Ladenburg Thalmann as explained in their report that they "value RC shares

on a price/book and dividend yield basis." Specifically, Ladenburg Thalmann wrote:

> **It was another very noisy and messy quarter for RC**. 4Q24 GAAP EPS loss was $1.90/sh, which included $0.10/shr from discontinued operations. ***The loss stems from RC's commercial real estate (CRE business) with the major drivers for the quarterly loss being a $285M loan loss provision (vs. $53M provision in 3Q24) which fully reserved 100% of RC's non-performing CRE loans***. ***These totaled 7.8% of total CRE loans in 4Q24 (vs. 4.7% in 3Q24)***. Further, there was $29.9M in real estate impairment charges, $17.2M net loss from discontinued operations partially offset by $31M decrease in the valuation allowance. 4Q24 reported distributable EPS (before $33.2M on realized losses) loss of $0.03 (vs EPS loss of $0.28 in 3Q24). ***Excluding realized losses, RC reported operating distributable EPS were a profit of $0.23, below our $0.26/share profit estimate.***
>
> Systemic CRE headwinds (and blowback from past acquisitions) blunt 4Q24 earnings performance. By fully reserving non-performing CRE loans in 4Q24, reducing the quarterly dividend to $0.125/sh starting in 1Q25 (vs $0.25/sh in 4Q24), RC management is doing what is necessary in a down-CRE cycle. We give less credence to the announced $150M share repurchase program (RC shares are trading at 65% of 4Q24 book value/sh of $10.61) as preserving balance sheet capital is likely to take priority over accretive share repurchases in coming quarters. We are

111

also cautious on RC's pending acquisition of United Development Funding IV (UDF IV) which we view more as a source of incremental debt leverage to RC given UDF IV under-levered balance sheet. In this respect, it is not dissimilar to some of RC's past CRE-centered acquisitions which have later driven CRE non-performing loans (and loan loss provision charges) higher. RC's loans acquired in M&A have a 15.1% non-accrual rate in 4Q24 (vs. 7.1% for RC originated loans). While RC management indicates the UDF IV deal is expected to be immediately accretive to EPS (and slightly dilutive to tangible book value), we are not convinced that expectation fully takes into account incremental reserving requirements given we are in early stages of a CRE down cycle and the historic relative credit performance of RC's other acquired CRE assets.

**Lower 2025 EPS estimates, remain Neutral**; *We are lowering our 2025 EPS estimate to $0.70 from $1.10* and introducing our 2026 EPS estimate of $0.80. *We are modeling for the new $0.125/sh quarterly dividend to continue through 2026.* While RC management is hoping to recover to its 10% distributable ROE target (vs. -0.3% in 4Q24 and -8.2% in 3Q24), and outlined steps to achieve that over 8-10 quarters on the 4Q24 earnings call. We maintain our Neutral rating on RC shares.

**Commercial real estate (CRE)** is driver of earnings loss. The total CRE segment now reported a pre-tax earnings loss of $304.3M or 97% of RC's consolidated pretax GAAP loss of $314.8M (vs. CRE pre-tax loss of $46.7M or 294% of RC's consolidated pre-tax loss of $15.9M in 3Q24). *Beginning in 4Q24, RC bifurcated its CRE business to 'core' (mostly RC originated CRE investments), and 'non-core' (CRE assets acquired via M&A). At 4Q24, 42% of non-core loans were construction and half the total noncore loans are expected to be exited in 2025.*

Emphasis added in bold, italicized text.

249.    On March 3, 2025, UBS issued its report discussing Defendants' March 3, 2025 disclosures titled: "4Q Earnings: Book Value Weaker Than Expected, Dividend Reduced[.]" In its report, UBS discussed that the 4Q 2024 results were below their expectations with Ready Capital's "book value was down $1.98 (-16%) Q/Q to $10.61 vs our estimate of down 0.9%" and Ready Capital's distributable EPS coming in at -$0.03 per share as compared to UBS' expectations of +$0.20 per share and the Factset consensus of +$0.19 per share. UBS also noted that Ready Capital's repurchase of $10.3 million shares was accretive to book value by $0.18 per share. Without this offsetting effect, Ready Capital would have suffered a $2.16 per share decrease in book value as opposed the $1.98 per share decrease.

250.    On March 4, 2025, Wedbush issued a report discussing Defendants' March 3, 2025 disclosures titled: "F4Q24 Recap: Portfolio Marks Reduced Book Value Sequentially[.]" In its report, Wedbush slashed its price targets by 35% from $8.00 to $6.00 and explained that the "main driver of the [distributable earnings] loss was a loan loss allowance totaling $284 million pretax" as Wedbush highlighted that Ready Capital's -$0.03 distributable earnings were well below Wedbush's own $0.22 per share estimate. Specifically, Wedbush wrote:

- **F4Q24 Recap.** RC posted F4Q24 Earnings Available for Distribution (EAD) of ($0.03) versus our $0.22 estimate and EAD of $0.26 in F4Q23. R*C's F4Q24 pretax net interest income of $50.0 million was below our $55.0 million forecast, but the main driver of the EAD loss was a loan loss allowance totaling $284 million pretax.* Per management, the $284 million was a combined CECL and valuation allowance to mark 100% of the non-performing loan book to fair market value. RC sees 83% of the total loan portfolio as core holdings with cash flowing properties and stable performance. The other 17% of the portfolio is at risk for multiple reasons, and RC is looking to aggressively liquidate and/or resolve those loans with disposition expected to take 8 to 10 quarters. As a result of these catalysts, RC's GAAP book value per share declined to $10.61 at F4Q24 from $12.59 at F3Q24.

- **Dividend Reduced.** In addition to the loan marks, RC reduced the quarterly dividend to 12 1/2 cents per share from $0.25/share previously.

Emphasis added in bold, italicized text.

### J.  MAY 9, 2025 - JULY 22, 2025 – POST-CLASS PERIOD EVENTS

#### i.      May 9, 2025 – Realty Capital's First Quarter 2025 Earnings Call

251.    On the morning of May 9, 2025, before market trading hours, at 8:30 a.m. Eastern, Defendants held a conference call with analysts and investors to present Ready Capital's financial and operational results for first quarter 2025 ended March 31, 2025 (the "1Q 2025 Earnings Call").

252.    During his prepared remarks, Defendant Capasse discussed the significant impact that the Portland Project was having on Ready Capital as it moved the Portland Project loans from 4Q 2024 to a non-accruing loan during 1Q 2025 (i.e. no longer accruing interest). As a result of

this shift, Capasse highlight that this resulted in a $0.13 cents per share reduction in Ready Capital's earnings and that the cost of carrying the loan (i.e. the cost of Ready Capital's money lent) was also negatively impacting Ready Capital's bottom line by an additional $0.05 cents per share. Specifically, Capasse stated:

> **Thomas Edward Capasse** Ready Capital Corporation – Chairman, CEO & Chief Investment Officer
>
> We have provided additional transparency to aid in evaluating the recovery in our net interest margin or NIM. To this point, we have bifurcated our $7.1 billion total CRE loan portfolio into a $5.9 billion core higher-yield, better credit bridge loans and **$1.2 billion noncore comprising 2 segments: $740 million of low-yield distressed credit bridge loans and our $430 million Portland, Oregon mixed-use asset segment.**
>
> *          *          *
>
> **In our noncore bridge loan portfolio, largely comprised of assets where the net present value of sale exceeds on-balance sheet management strategies,** we surpassed first quarter liquidation targets by close to 2x. We liquidated $51 million at a 102% premium to our mark, generating $28 million of liquidity and reducing the noncore portfolio by 6% to $740 million.
>
> In the second quarter, we expect to additionally reduce the noncore portfolio to approximately $270 million via an additional $470 million of liquidations. The target for year-end 2025 is a further reduction to $210 million through in-place asset management strategies. The cumulative go-forward earnings impact from these sales will be $0.24 per share, 70% from a reduction in negative carry and 30% from the reinvestment of sale proceeds.
>
> **Our noncore portfolio includes the Portland mixed-use asset, a construction project completed in October 2023, where Ready Capital held a $516 million senior loan.** The property features premier hospitality, retail, office and residential offerings in Portland with each component now moving to stabilization. **In the fourth quarter, the position was marked down to $426 million, and we are currently working to obtain title, after which we intend to move aggressively to stabilize the asset and generate upside from our current mark.**
>
> **In the quarter, RevPAR in the hotel improved 11% to $209. Leasing of the combined office and retail remain at 28% and additional 2 condos were sold. The financial effect of the asset moving from performing construction loan to nonaccrual was a quarter-over-quarter $0.13 per share reduction in earnings with a current carry expense in the quarter of $0.05 per share**. We expect to

114

sequentially exit the 3 components as they stabilize and remain fully committed to support the project, both financially and operationally.

Emphasis added in bold, italicized text.

253.    Defendant Ahlborn continued to explain the impact of shifting the Portland Project

to non-accrual status:

> **Andrew Ahlborn** *Ready Capital Corporation – CFO & Secretary*
>
> Thanks, Tom. First quarter GAAP earnings per common share were $0.47, while distributable earnings were a loss of $0.09 per common share and $0.00 excluding realized losses on asset sales.
>
> The following factors impacted our quarter earnings. ***First, as expected, net interest income declined to $14.6 million in the quarter. The reduction was primarily due to the movement of noncore assets to nonaccrual status, which generated a cash yield of 1.3%.*** In the core portfolio, the interest yield was 8.4% and the cash yield was 6.7%. In the quarter, $7.5 million of interest income recorded was noncash and primarily relates to loans acquired in the UDF merger and certain modified loans.

Emphasis added in bold, italicized text.

254.    During the question and answer portion of the call, Defendant Ahlborn further

discussed the planned stabilization of the Portland Project over the next two to three years and

acknowledged that the interest rate environment was continuing to have an impact on the sales of

the Ritz-Carlton condominiums:

> **Jade Joseph Rahmani Keefe**, *Bruyette, & Woods, Inc., Research Division – Managing Director*
>
> ***On the Portland asset, will the position be held unlevered? And is there any contemplation of exiting the position? What's the decision behind holding it? It seems like it's going to be a big earnings drag.***
>
> **Adam Zausmer** *Ready Capital Corporation – Chief Credit Officer*
>
> Jade, this is Adam. So the position is levered today, and it will remain levered once we obtain title to the project. And then secondly, our decision to obviously pursue title here is that from – it's really the best economic outcome for the firm will be -- for a public REIT to get the keys to this asset. We'll give confidence to prospective

115

condo buyers, prospective office tenants where there's tenant improvement dollars that are needed at the project.

And the plan is to -- as we work to stabilize the 3 components of the assets, would be sequentially exit those 3 components. So specifically, as the hospitality stabilizes, the office stabilizes, we'll look to the market to see and really have like a pricing discovery and see where we can exit those assets. But it's certainly going to require some time for us to hold it, operate it.

We are certainly committed from a capital perspective and from an operational perspective to see this asset through. It's a trophy asset in the Portland market, certainly very important for the city and members of the community. And the plan is really for Ready Cap take title and see this asset through and get this thing to a much better position than it's in today.

***Jade Joseph Rahmani Keefe**, Bruyette, & Woods, Inc., Research Division – Managing Director*

***And I guess, how much dollars are needed? And over what time period are we looking? I mean there were 2 condo sales in the quarter. I'm assuming this is all going to take years, we're talking.***

***Adam Zausmer** Ready Capital Corporation – Chief Credit Officer*

***Yes, it will take -- to reach stabilization, certainly, the office and the hospitality will be stabilization first with the condos taking -- I think to fully sell those condo units, we're pegging anywhere from 2 to 3 years. Clearly, the interest rate environment is causing stress on that sector.*** But the city of Portland has certainly shown tremendous signs of improvement. So we feel good there.

***Thomas Edward Capasse** Ready Capital Corporation – Chairman, CEO & Chief Investment Officer*

I think, Adam, it's important to point out the basis in the most liquid components, The Ritz Hotel and the office is what as a percentage of the total?

***Adam Zausmer** Ready Capital Corporation – Chief Credit Officer*

Yes, Tom, it's around 70%.

***Thomas Edward Capasse** Ready Capital Corporation – Chairman, CEO & Chief Investment Officer*

Yes. So Jade, the large -- the 2 largest slugs will have a shorter fuse in terms of stabilization. And obviously, they're relatively liquid markets for that scaled Ritz and as well as most of the office tenants in that -- it's really A+ office in that sector.

So we got some law firms, et cetera, for tenants. So we're -- we expect the front-loaded exit of the -- those 2 components with a linear sale of the condos, which tends to pick up once the hotel stabilize as well, if you're familiar with the Ritz residence concept.

Emphasis added in bold, italicized text.

### ii.    July 22, 2025 – Ready Capital Takes Ownership of Block 216

255.    On July 22, 2025, Ready Capital announced that it acquired the Portland Project including its 251-key Ritz-Carlton hotel, a 132-unit Ritz-Carlton Residences, 159,000 square-feet of Class-A office space, and 11,000 square-feet of retail space. The press release detailed that Ready Capital was able to acquire the Portland Project through a "consensual deed-in-lieu arrangement" as opposed to a foreclosure.

### iii.    August 8, 2025 – Realty Capital's Second Quarter 2025 Earnings Call

256.    On August 8, 2025, Defendants held an earnings call to discuss the financial results of the second quarter 2025 for the quarter ended June 30, 2025. During the call, Defendants discussed the ongoing impact of the Portland Project on Ready Capital following taking possession of it through the deed-in-lieu transaction.

257.    During his prepared remarks, Capasse identified "3 primary items that we expect to contribute to earnings improvement" which included as point 2, the "*stabilization of the Portland mixed-use asset, important for both reducing the current negative financial drag* and to facilitate liquidation of the hospitality, office and residential components." As highlighted in his remarks, the cost of owning the Portland Project over the income it generates, or "*the negative carry from the [Portland Project] was $5.3 million or $0.03 per share for the quarter.*"

258.    During the question and answer portion of the call, an analyst asked Defendant Ahlborn about the EPS to Ready Capital's dividend coverage asking if the Portland Project was included in that calculation. Ahlborn responded that the $5.3 million or $0.03 per share negative

117

carry was included and agreed that this contributed to a two or three quarter delay before Ready Capital expected its earnings could cover its dividend of $0.125.

## V.    ADDITIONAL SCIENTER ALLEGATIONS.

### A.    The Individual Defendants Had Actual Knowledge of Undisclosed Material Information.

259.    Capasse and Ahlborn, because of their positions with Ready Capital, possessed the power and authority to control the contents of Ready Capital's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market. Each Individual Defendant was provided with copies of Ready Capital's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

260.    As set forth herein, the Individual Defendants regularly tracked market data concerning Ready Capital's loans, its loans performances, and its borrowers' ability to perform under the loans, including the information they were receiving from the BDC Borrowers and Bowen under the Construction Loan.

118

261.    The Construction Loan was particularly monitored by Individual Defendants as it was identified by them as one of Ready Capital's largest loans in its loan portfolio and confirmed to be Ready Capital's largest loan by a former employee of Waterfall, CW1.

262.    During the Q2 2023 Earnings Call, Defendant Capasse stated that "[t]he top 10 loans in the portfolio totaled only 10% of the loan book and excluding the loans from the '22 Mosaic merger, only 7%" evidencing that the Construction Loan was at that time at least 3% of Ready Capital's total loan portfolio value.

263.    Notably, CW1 confirmed that the Construction Loan was Ready Capital's largest asset stating that it was "the biggest asset we had" and stressed that its significance to Ready Capital made it subject to close scrutiny. Given this significance, CW1 confirmed that Defendant Ahlborn and the asset management teams reviewed the Portland Project and that it was discussed at the board level.

264.    The significance of the Construction Loan was also later confirmed by Defendant Capasse during the 4Q 2024 Earnings Call where he stated while discussing the loan reserves on Construction Loan that "[o]f note, the Mosaic loan represents an idiosyncratic position in our otherwise granular lower middle market CRE loan portfolio with the remaining top 10 loan positions representing only 9% of the gross portfolio."

265.    Furthermore, Defendants knew of the importance of the Construction Loan to Ready Capital's "key financial measures and indicators of our business", which included earnings per share, distributable earnings, dividends declared per share, and return on equity.

266.    During the 4Q2024 Earnings Call, Defendant Capasse recognized this impact stating that "[t]he immediate impact to earnings is a quarterly reduction of $0.11 per share or 350 basis points on ROE."

119

267. Later during the 1Q 2025 Earnings Call, Capasse further acknowledged the significant impact of the Construction Loan moving from a performing to non-accruing status stating "[t]he financial effect of the asset moving from performing construction loan to nonaccrual was a quarter-over-quarter $0.13 per share reduction in earnings with a current carry expense in the quarter of $0.05 per share."

268. Given the material contributions the Construction Loan contributed to Ready Capital's financials, the change in status of the Construction Loan directly impacted Ready Capital's distributable earnings and dividends rate per share which was consequently reflected in Ready Capital's dividend rate with Defendants announcing as part of the 4Q 2024 results that Ready Capital was cutting its dividend rate by 50% from $0.25 to $0.125 per share starting in 1Q 2025.

269. Therefore, given the Construction Loan being Ready Capital's largest loan and its related impact on Ready Capital's key financial measures, the Individual Defendants, as part of their responsibilities, would have closely monitored the Construction Loan, the value of the underlying collateral, and the likelihood the Construction Loan would be paid off or refinanced at or before maturity, as well as the factors that would affect the foregoing, including the Portland real estate market, the performance of the Ritz-Carlton hotel, the sales of the Ritz-Carlton condominiums, and the financial strength and weaknesses of the borrower/sponsor.

270. Accordingly, the Individual Defendants knew the true extent of the issues facing the Portland Project and Construction Loan at the time Defendant Zausmer signed the Fifth Amendment to the Construction Loan on behalf of Lenders (i.e. Ready Capital). Defendants were receiving regular updates on the Portland Project's weak sales, leasing, and knew the impact that these financial difficulties would have on the BDC Borrowers and the Portland Project in general

given the terms of the Construction Loan (including all related documents and amendments), the budgets, draw schedules, and construction schedules.

271.    Additionally, Defendants knew the issues that BDC Borrower and Bowen had financially. Not only because of the issues leading up to the Fifth Amendment, but also the regular financial statements and certifications Defendants were receiving from them under the terms of the Construction Loans. As a sophisticated REIT and Manager, Defendants spoke and disclosed specific information concerning geographical markets and market segmentations, such as office or multifamily, and related statistics and trends affecting Realty Capital's loans.

272.    Given the way in which Defendants structured the Fifth Amendment to the Portland Project's Construction Loan, specifically the Preferred Equity Position, in light of the lack of meaningful condominium sales, the delayed construction and completion schedule, the minimal leasing of the office space, and Defendants' knowledge of the Portland market, Defendants knew or recklessly disregarded that the foreclosure of the collateral was probable at maturity and/or it would be taking ownership and operating the Portland Project.

273.    At minimum, Defendants knew or recklessly disregarded that given the foregoing that the financial difficulties facing the borrower, BPM, required additional allowances for credit losses beyond the mere $111,000 that was added for the "18 months added to the weighted average life of the loans" when the Fifth Amendment extended the Construction's Loan maturity to December 31, 2024.

274.    Furthermore, Defendants knew and spoke about the issues that borrowers were facing when seeking "bridge" loans like the one that Ready Capital stated was the original strategy for exiting the Construction Loan. As noted by Defendant Capasse during the 4Q 2024 Earnings Call, the type of borrowers who would qualify for such type of bridge loans is "[o]ne is strong

121

projects, good sponsors, liquidity, mark-to-market LTVs and that kind of where we are here in this portfolio in the upper 70s, and those will qualify -- highly likely to qualify for either a bridge to bridge or stabilized takeout with the Freddie, Fannie loan."

275.    Given the weaknesses of the Portland Project, the liquidity and financial issues of BDC Borrowers and Bowen as the developer/sponsor, and what Defendants knew about the market for bridge loans leading up to December 31, 2024, Defendants knew that significant risks existed about the ability of the BDC Borrowers and Bowen to refinance the Construction Loan by the December 31, 2024, maturity date while they were making their misstatements to investors during the Class Period. This is further evidenced by and collaborated by Sher's statements in the Broadway Action detailing the actions that Ready Capital undertook, including the representations that Ready Capital was seeking to extend the maturity date.

276.    Likewise, Defendants knew that each of these factors, collectively and individually, evidenced the BDC Borrowers' inability to pay off the Portland Project's Construction Loan when it came due, including the impact this would have on Ready Capital's net book value, distributable earnings, and future dividends yet withheld this material information from investors while repeatedly addressing these topics in their public statements.

277.    Ready Capital disclosed to investors the very specific procedures that it undertook to evaluate CECL reserves, i.e. Allowance for Credit Losses, each quarter, "at the individual loan" and uses "relevant loan-specific qualitative factors." Thus, given the information in the possession of the Defendants, Defendants either knew that the values of the Portland Project's loans recorded on Ready Capital's financial statements were false and/or they recklessly disregarded them by intentionally disregarding the information in their possession and incorporating into the very

122

procedures Defendants disclosed to investors that they undertook in evaluating such loans on a quarterly basis.

278.   Ready Capital is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

279.   The scienter of the Individual Defendants, and other employees and agents of Ready Capital are similarly imputed to Ready Capital under respondeat superior and agency principles.

B.   **Ready Capital's was Managed By Waterfall and a Small Core Group of Waterfall Employees.**

280.   Unlike other companies, Ready Capital was externally managed by its "Manager", Waterfall. As stated in Ready Capital's 2025 Proxy, "We rely on our Manager to provide or obtain, on our behalf, the personnel, and services necessary for us to conduct our business" and as such "Pursuant to the terms of our Management Agreement, our Manager and its affiliates provide us with our management team, including our Chief Executive Officer and Chief Investment Officer, Chief Financial Officer, Chief Operating Officer, and Chief Credit Officer, along with appropriate support personnel."

281.   Thus, Ready Capital's management decisions were centralized into the few key executives at Ready Capital who were also all employees of Waterfall: Defendant Capasse (CEO and Chief Investment Officer); Defendant Ahlborn (CFO); Defendant Zausmer (CCO); Gary Taylor (Chief Operating Officer). Each of the Individual Defendants spoke knowingly of all

123

aspects of Ready Capital's business during Ready Capital's earnings calls, specifically as to the Mosaic portfolio

282.    Notably, key documents concerning the Portland Project loans following the Mosaic Merger were signed by Defendant Zausmer, including the Fifth Amendment to the Portland Project's Construction Loan on May 5, 2023, and the related documents, including the related documents to the Fifth Amendment, such as the Recognition Agreement and the Third Amended and Restated Operating Agreement of BDC/WASHINGTON STREET, LLC where he signed on behalf of Sutherland Asset I, LLC.

## VI.    **RELIANCE**

283.    At all relevant times, the markets for Ready Capital common stock was efficient for the following reasons, among others:

   a.    as a regulated issuer, Ready Capital filed periodic public reports with the SEC;

   b.    Ready Capital regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

   c.    Ready Capital was followed by several securities analysts employed by major brokerage firm(s), including, amongst others, UBS, Wedbush, Ladenburg Thalmann, Raymond James, and Citizens, who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

124

    d.  Ready Capital common stock was actively traded in an efficient market, namely the New York Stock Exchange, under the ticker symbol "RC".

284.    At all material times, Plaintiff and the Class relied on the misleading statements and omissions by Defendants.

285.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

    a.  Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

    b.  the omissions and misrepresentations were material;

    c.  Ready Capital common stock traded in an efficient market;

    d.  the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Ready Capital common stock; and

286.    Plaintiff and other members of the Class purchased Ready Capital securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

287.    As a result of the foregoing, the market for Ready Capital common stock promptly digested current information regarding Ready Capital from publicly available sources and reflected such information in Ready Capital common stock. Under these circumstances, all purchasers of common stock securities during the Class Period suffered similar injury through their purchase of common stock at artificially inflated prices and the presumption of reliance applies.

## VII.   <u>LOSS CAUSATION</u>

288.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated and/or maintained the price of

Ready Capital's common stock, and operated as a fraud or deceit on Class Period purchasers of Ready Capital's common stock by failing to disclose and misrepresenting the facts detailed herein.

289. When Defendants' prior misrepresentations, omissions, and fraudulent conduct were disclosed on March 3 and 4, 2025, the price of Ready Capital's stock declined significantly as the prior artificial inflation came out of its stock price.

290. As a result of their purchases of Ready Capital's common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.* damages, under the federal securities laws.

291. By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Ready Capital's business, financial performance, and financial results. When the truth about and risks associated with Defendants' misstatements were disclosed on March 3 and 4, 2025, the price of Ready Capital's common stock declined significantly. These declines removed the inflation from the price of Ready Capital common stock, causing real economic loss to investors who had purchased Ready Capital common stock during the Class Period.

292. The economic loss, *i.e.* damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate and/or maintain the price of Ready Capital common stock and the subsequent decline in the value of the common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

293. Furthermore, as alleged herein, during the Class Period, Defendants engaged in practices intended to mislead investors by artificially affecting the prices of Ready Capital common stock. Defendants employed devices, schemes, and artifices to defraud, and/or engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Ready Capital common stock during the Class Period.

294.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Ready Capital common stock during the Class Period.

## VIII.    **CLASS ALLEGATIONS**

295.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased or otherwise acquired Ready Capital common stock between August 8, 2024 and March 2, 2025, inclusive, and were damaged thereby (the "Class Period"). Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of Ready Capital, and the directors and officers of Ready Capital and their families and affiliates at all relevant times.

296.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

297.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    Whether the Exchange Act was violated by Defendants;

(b)    Whether Defendants omitted and/or misrepresented material facts;

(c)    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     Whether members of the Class are presumed to rely on material representations or omissions by Defendants when purchasing Ready Capital common stock during the Class Period;

(f)     Whether the prices of Ready Capital common stock was artificially inflated during the Class Period; and

(g)     The extent of damage sustained by Class members and the appropriate measure of damages.

298.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

299.    Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in securities class action litigation. Plaintiff has no interests that conflict with those of the Class.

300.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## IX.    NO STATUTORY SAFE HARBOR

301.    The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pled in this Amended Complaint for Violations of the Federal Securities Laws.

302.    Either the statements complained of herein were not forward-looking statements, but rather were historical statements or statements of purportedly current facts and conditions at the time the statements were made, or to the extent there were any forward-looking statements, Ready Capital's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

128

303.    To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

304.    To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, Defendants are liable for those false or misleading statements because, at the time each such statement was made, the speaker knew the forward-looking statement was false or misleading, and the forward-looking statement was authorized and/or approved by an executive officer of Ready Capital who knew that the forward-looking statement was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## X.    COUNTS

**COUNT ONE**
**For Violation of Section 10(b) of the Exchange Act**
**and Rule 10b-5(b)**
**(Against All Defendants)**

305.    Plaintiff repeats and re-alleges the above paragraphs as though fully set forth herein.

306.    During the Class Period, the Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing other members of the Class to purchase Ready Capital's common stock at artificially inflated

129

prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

307.    The Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Ready Capital's common stock in an effort to maintain artificially high market prices for Ready Capital's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

308.    The Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Ready Capital's financial well-being and prospects, as specified herein.

309.    The Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Ready Capital's financial value and performance, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Ready Capital and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Ready Capital common stock during the Class Period.

310. Defendants employed devices, schemes and artifices to defraud intentionally or knowingly. Alternatively, Defendants acted with an extreme departure from the standards of ordinary care, which presented a danger of misleading buyers or sellers of Ready Capital common stock that was either known to Defendants or is so obvious Defendants must have been aware of it or Defendants failed to review or check information that they had a duty to monitor, or Defendants ignored obvious signs of fraud.

311. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Ready Capital's common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of Ready Capital's common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by the Defendants, but not disclosed in public statements by them during the Class Period, Plaintiff and the other members of the Class acquired Ready Capital's common stock during the Class Period at artificially high prices and were damaged thereby.

312. At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Ready Capital was experiencing, which were not disclosed by the Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Ready Capital's common stock, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

313.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

314.    During the Class Period, Defendants made, had authority over, or controlled the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading, in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

315.    Defendants made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading

316.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Ready Capital common stock. Plaintiff and the Class would not have purchased Ready Capital common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the Defendants' misleading statements.

317.    As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff and the other members of the Exchange Act Class suffered damages in connection with their purchases of Ready Capital common stock during the Class Period.

**COUNT TWO**
**Violation of Section 20(a) of the Exchange Act**
**(Against the Individual Defendants)**

318.    Plaintiff repeats and re-allege the above paragraphs as though fully set forth herein.

319.    As set forth above, Ready Capital (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business

132

which operated as a fraud and deceit upon the purchasers of Ready Capital's common stock in an effort to maintain artificially high market prices for Ready Capital's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5

320.   The Individual Defendants acted as controlling persons of Ready Capital within the meaning of Section 20(a) of the Exchange Act as alleged herein. Capasse and Ahlborn, because of their positions with Ready Capital, possessed the power and authority to control the contents of Ready Capital's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market. Each Individual Defendant was provided with copies of Ready Capital's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. By reason of their positions as officers of Ready Capital and their culpable participation, as alleged above, the Defendants had the power and authority to cause Ready Capital to engage in the wrongful conduct complained of herein.

321.   By reason of such conduct, the Defendants are liable pursuant to Section 20(a) of the Exchange Act for damages caused by Ready Capital's violations of Section 10(b) of the Exchange Act.

## XI.   <u>PRAYER FOR RELIEF</u>

322.   WHEREFORE, Plaintiff prays that the Court enter judgment on their behalf and on behalf of the Classes herein, adjudging and decreeing that:

133

323.    This action may proceed as a class action, with Plaintiff as the designated Class representative and Plaintiff's counsel designated as Class Counsel;

324.    Plaintiff and the members of the Class recover damages sustained by them, as provided by law, and that a judgment in favor of Plaintiff and the Class be entered against the Defendants, jointly and severally, in an amount permitted pursuant to such law;

325.    Plaintiff and members of the Class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

326.    Plaintiff and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

327.    Plaintiff and members of the Class receive such other and further relief as may be just and proper.

## XII.    DEMAND FOR A JURY TRIAL

328.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all of the claims asserted in this Amended Complaint so triable.

Dated: September 8, 2025

Respectfully submitted,

**LEVI & KORSINSKY, LLP**

/ s / *Nicholas Porritt*
Nicholas I. Porritt
33 Whitehall Street, 27th Floor
New York, NY 10004
Tel: (202) 363-7500
Fax: (212) 363-7171
Email: nporritt@zlk.com

Alexander A. Krot III (*pro hac vice* application forthcoming)
1101 Vermont Ave, NW Suite 800
Washington, DC 20005
Tel: (202) 524-4290
Fax: (212) 363-7171
Email: akrot@zlk.com

*Counsel for Lead Plaintiff Allan T. Parr Jr. and Lead Counsel for the Class*