UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE READY CAPITAL CORPORATION SECURITIES LITIGATION | 25 Civ. 1883 (PAE)<br><br>OPINION & ORDER |

PAUL A. ENGELMAYER, District Judge:

This decision resolves a motion to dismiss a putative securities class action against Ready Capital Corporation and three of its executives, Thomas E. Capasse, Andrew Ahlborn, and Adam Zausmer. Defendants move, under Federal Rules of Civil Procedure 12(b)(6) and 9(b), to dismiss the Consolidated Amended Complaint ("CAC"), on multiple grounds. *See* Dkt. 43 ("Mot."). For the following reasons, the Court grants the motion to dismiss in full.

## I. Background

### A. Factual Background[1]

#### 1. The Parties

Ready Capital is a real estate investment trust that originates, acquires, finances, and services lower-to-middle-market commercial real estate loans, small business administration

[1] These facts are drawn primarily from the Consolidated Amended Complaint ("CAC"). Dkt. 39. For the purpose of resolving the motion to dismiss, the Court assumes all well-pled facts to be true and draws all reasonable inferences in favor of the lead plaintiff. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). The Court has also considered the documents attached to the declaration of Elizabeth Clark in support of the motion to dismiss. Dkt. 43-1 ("Clark Decl."). Because these documents were incorporated into the CAC by reference, *see* Dkt. 43 ("Mot.") at 4 n.1, they are properly considered on a motion to dismiss. *See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 179 (2d Cir. 2014) (in resolving a motion to dismiss, the court may consider, *inter alia*, "any statements or documents incorporated in it by reference"). The Court considered these documents "not for the truth of the matters asserted therein," but only "for the fact that the statements were made." *Clark v. Kitt*, No. 12

loans, and other real estate investments. CAC ¶ 22. It is incorporated in Maryland and has its principal place of business in New York. *Id.* ¶ 16. Ready Capital's common stock trades on NASDAQ under the ticker "RC." *Id.*

The individual defendants are members of Ready Capital's management team. Capasse has been Ready Capital's president and chief executive officer since October 2016 and its chief investment officer since November 2022. *Id.* ¶ 17. He is the co-founder and manager of Waterfall Asset Management, LLC ("Waterfall"), Ready Capital's investment manager. *Id.* Ahlborn has been Ready Capital's executive vice president and chief financial officer since March 2019. *Id.* ¶ 18. He was Ready Capital's controller between 2015 and 2019. *Id.* Zausmer has been Ready Capital's chief credit officer since July 2021. *Id.* ¶ 19.

**2. The Mosaic Merger**

In March 2022, Ready Capital completed a merger (the "Mosaic merger") with Mosaic Real Estate Credit, LLC ("Mosaic") and affiliates. *Id.* ¶¶ 65, 68. Ready Capital thereby acquired a number of privately held, real-estate-related funds, which focused on construction lending. *Id.* ¶ 61. When Ready Capital announced the merger in November 2021, the implied value of its shares being transferred to Mosaic investors as consideration in the merger was approximately $471 million, which represented a $98.9 million discount from the book value of the Mosaic assets Ready Capital acquired. *Id.* ¶¶ 61–62.

**3. The Portland Project Loan**

Among the assets Ready Capital acquired in the Mosaic merger was a $460 million construction loan for a mixed-use development in Portland, Oregon (the "Portland Project loan").

---

Civ. 8061, 2014 WL 4054284, at *7 (S.D.N.Y. Aug. 15, 2014); *see also, e.g.*, *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 425 (2d Cir. 2008) ("[I]t is proper to take judicial notice of the fact that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents." (emphasis omitted)).

*Id.* ¶ 51. The Portland Project loan was secured by a 35-story building comprised of a 251-room Ritz-Carlton hotel, 132 Ritz-Carlton residential condominiums, 158,000 square feet of office space, and 11,000 square feet of retail space (the "Portland Project"). *Id.* ¶¶ 50–51. Soon after construction on the Portland Project began, it experienced setbacks, due to factors including the Covid-19 pandemic and civil unrest in downtown Portland. *Id.* ¶ 58. By March 2023, the Portland Project had become "out-of-balance"—*i.e.*, the funds allocated to the construction budget were insufficient to support its completion. *Id.* ¶ 77. Accordingly, in May 2023, the parties to the loan agreement executed the Fifth Amendment to Loan Agreement and Other Loan Documents (the "Fifth Amendment"). *Id.* ¶ 78. The Fifth Amendment provided that Ready Capital would advance about $48 million through its subsidiary in exchange for a preferred equity investment and an extension of the loan's maturity date to December 31, 2024, from June 29, 2023. *Id.* By the end of 2024, construction on the Portland Project was substantially complete. *Id.* ¶ 222.

In November 2024, Ready Capital ordered new appraisals of the Portland Project. *Id.* ¶¶ 173, 179. These were delivered in January 2025. *Id.* ¶¶ 174, 179. The appraisals showed a 28.02% occupancy rate among the offices, *id.* ¶ 178, and 10 pending or consummated condominium sales as of November 20, 2024, *id.* ¶ 181. They assessed the "as-is" market value of the office space at $34.2 million, *id.* ¶ 175, and of the residences and hotel at $223 million, *id.* ¶ 180. Together, the appraisals found the fair market value of the Portland Project to be $257.2 million—*i.e.*, 55% of the original $460 million loan value, and less than half of the loan's $516 million balance. *Id.* ¶ 182.

In response to the appraisals, Ready Capital wrote down the value of the Portland Project loan by approximately $130 million and increased its loan loss reserves commensurately. *Id.*

¶ 226. Ready Capital disclosed the write-down on March 3, 2025, in an earnings call before the market opened, in which management addressed the Portland Project at length. *Id.* ¶¶ 218, 222. Management stated in substance, that, although the company's "original strategy" had been to refinance the construction into a bridge loan upon completion, factors including the Portland Property's "current appraisal" favored its continued ownership, coupled with "serial asset disposition," while the property "stabilized." *Id.* ¶ 230 ("We also expect to recover our current senior loan basis over the next 10 quarters as we stabilize the property."). After the market closed that day, Ready Capital filed its Form 10-K, which, as pertinent here, quantified the company's increased allowance for credit losses. *Id.* ¶¶ 236–238. The Form 10-K explained a new methodology the company planned to use in classifying its real-estate loans, under which these would be sorted into "core" versus "non-core" assets. *Id.* ¶ 239.

As a result of the write-down, Ready Capital management cut its dividend by 50%, to $0.125 per share from $0.25 per share. *Id.* ¶ 226.

On March 3, 2025, the company's share price fell, in heavy trading, to $5.07 at market close, from $6.93 at market close on February 28, 2025. *Id.* ¶ 240. The drop of $1.86 per share equated to a 26.84% drop. *Id.* The following day, the stock price dropped another $0.12 per share, closing at $4.95/share. *Id.* ¶ 241.

#### 4. Challenged Statements During the Class Period

The CAC alleges that various statements that Ready Capital's management made, and metrics it issued, concerning the company's loan valuations in the second and third quarters of 2024—*i.e.*, preceding the write-down—were materially false and misleading. *Id.* ¶¶ 198–199, 215–217. It centrally alleges that during the "class period"—between August 8, 2024 and March 2, 2025—defendants knew of the "qualitative and quantitative factors" and financial conditions that Ready Capital later cited in writing down the value of the Portland Project loan and

increasing its allowance for credit losses, but did not disclose them. *Id*. ¶¶ 198, 215. As a result, the CAC alleges, statements made by Ready Capital and its management during the class period did not "fairly present [Ready Capital's] financial conditions and financial results," as they did not acknowledge or account for the Portland Project's distress. *Id*. ¶¶ 187–199, 201–217.

The CAC broadly alleges three categories of actionable statements by Ready Capital and its management.

***Allowance for credit losses***: First, and predominantly, the CAC faults Ready Capital for not earlier increasing its allowance for credit losses and reducing the value of the Portland Project loan. It challenges as false or misleading Ready Capital's statements to investors concerning its loan loss reserves and loan valuations. These include the following statements on Forms 10-Q: (1) for 2Q 2024, that: (i) the carrying value of its construction loans was $841,695,000, *id*. ¶ 196; (ii) its allowance for loan losses was $33,776,000, *id*.; and (iii) its allowance for credit losses on "specific" construction loans was $181,000, *id*. ¶ 197; and (2) for 3Q 2024, that: (i) the carrying value of its construction loans was $865,946,000, *id*. ¶ 213; (ii) its allowance for loan losses was $83,459,000, *id*.; and (iii) its allowance for credit losses on "specific" construction loans was $45,432,000, *id*. ¶ 214.

Consistent with its allegation that Ready Capital was tardy in writing down the Portland Project loan, the CAC challenges other statements during the class period embedding the loan's valuation. Those are: (1) Capasse's statement in an August 8, 2024 earnings call with investors that Ready Capital's mergers-and-acquisitions portfolio totaled $1.1 billion across 81 assets as of June 30, 2024, *id*. ¶ 192; (2) statements in press releases, earnings calls, and Forms 10-Q that net book value per common share was $12.97 in 2Q, *id*. ¶¶ 187, 193, 195, and $12.59 in 3Q, *id*.

¶¶ 201, 206, 212; and (3) statements in presentations to investors that the book value of Mosaic-acquired assets was $560 million in 2Q, *id*. ¶ 190, and $529 million in 3Q, *id*. ¶ 204.

***Income, earnings, and dividends***: Second, the CAC challenges Ready Capital's statements to investors reporting its net income, distributable earnings, dividends, and the "metrics and amounts calculated therefrom" in 2Q and 3Q. *Id*. ¶¶ 199 (2Q), 216 (3Q). These include statements in earnings calls, press releases, and Forms 10-Q that: (1) distributable earnings per common share were $0.07 in 2Q, *id*. ¶¶ 187–188, 193, 195, and showed a loss of $0.28 in 3Q, *id*. ¶¶ 201–202, 206, 212; (2) net income loss was $34,201,000, *id*. ¶ 188 (press release), or $31,427,000, *id*. ¶ 195 (Form 10-Q), in 2Q, and $7,279,000, *id*. ¶ 202 (press release), or $7,473,000, *id*. ¶ 212 (Form 10-Q), in 3Q; and (3) with respect to 2Q only, (i) GAAP losses per common share were $0.21, *id*. ¶ 193; and (ii) distributable earnings, less realized losses, on asset sales were $0.19 per common share, representing a 5.8% return on average stockholders' equity, *id*.

***Performance and expectations***: Third, the CAC challenges defendants' characterizations of Ready Capital's credit performance, the status of the Mosaic portfolio and construction loans, and their expectations regarding the same. These include:

- Capasse's statement in a press release that Ready Capital's "efforts to cycle out of underperforming assets and into market yielding investments," "along with improving credit metrics across the loan portfolio and record growth in our Small Business Lending business, position the Company to improve earnings moving into year end." *Id*. ¶ 187.

- Capasse's statements in a 2Q earnings call that Ready Capital's mergers-and-acquisitions portfolio (i) totaled $1.1 billion across 81 assets, and (ii) reflected "improving credit performance." *Id.* ¶ 192.
- Ahlborn's statement on the same call that "[o]ur expectation is that" Ready Capital's 2Q book value of $12.97 per share "is reflective of the clearing levels to execute our portfolio repositioning efforts." *Id.* ¶ 193.
- Ahlborn's statement in a 3Q earnings call that "74%" of the "construction assets acquired in the Mosaic transaction . . . are expected to be repaid at the end of the year." *Id.* ¶ 207.
- Ahlborn's statement on the same call that defendants' "expectation is that a large portion" of the construction loans in the Mosaic portfolio "clear out in the fourth quarter and turn to actually sort of cash paying investments." *Id.* ¶ 208.
- Ahlborn's statement on the same call that Ready Capital was "only accruing interest that we believe to be recoverable." *Id.* ¶ 209.
- Ahlborn's statement on the same call that "the expectation is that 77% of that balance [of loans acquired in the Mosaic transaction] pays off at quarter end or is rolled into a cash-linked loan at quarter end. So, I think that number is going to come down." *Id.*
- Zausmer's[2] statement on the same call, when asked about the $0.25 distributable earnings excluding losses and whether it could cover the $0.25 dividend, that "I think the $0.25 level is a good baseline." *Id.* ¶ 210.

---

[2] The parties disagree about whether Zausmer made the challenged statements. *Compare* CAC ¶ 210, *with* Mot. at 22 (stating that Ahlborn, not Zausmer, made these statements). Defendants cite a transcript of the call, which attributes the statements to Ahlborn. *See* Dkt. 43-9 at 13.

- Zausmer's statement on the same call, when asked whether there were "onetime items in [the $0.25] number that we need to think about," that "[t]here are no onetime items that I'm aware of with the exception of there's still a bucket of loans held for sale." *Id*.

**5. Procedural History**

On March 6, 2025, original plaintiff Jerry Quinn filed this putative class action on behalf of all persons who purchased common shares of Ready Capital stock between November 7, 2024, and March 2, 2025 (the "class period"). Dkt. 1 ¶ 1.

On July 8, 2025, the Court granted a motion by Allan T. Parr to consolidate the action with *Goebel v. Ready Capital Corp. et al.*, No. 25 Civ. 3373 (S.D.N.Y.); appoint Parr lead plaintiff; and approve Parr's selection of Levi & Korinsky, LLP as lead counsel. Dkt. 35. On July 16, 2025, the Court set a schedule for the filing of an amended complaint and briefing of defendants' anticipated motion to dismiss. Dkt. 38. On September 8, 2025, plaintiff filed the CAC, the operative pleading today. Dkt. 39 (the "CAC"). On November 10, 2025, defendants moved to dismiss the CAC, Dkt. 42, attaching a memorandum of law in support, Dkt. 43 ("Mot."). On January 9, 2026, plaintiff opposed. Dkt. 45 ("Opp."). On February 9, 2026, defendants replied. Dkt. 47.

## II. Applicable Legal Standards

### A. Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S.

---

Plaintiff offers a competing transcript, which attributes them to Zausmer. *See* Opp. at 17–18; Dkt. 45-2 at 11. At the pleadings stage, the Court must credit the CAC's well-pled allegation. *See Oscar Prods., Inc. v. Zacharius*, 893 F. Supp. 250, 257 (S.D.N.Y. 1995).

544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. Although the Court must accept all well-pled factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor, *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014), that tenet is "inapplicable to legal conclusions," *Iqbal*, 556 U.S. at 678.

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321–23 (2007).

First, a complaint alleging securities fraud must meet the requirements of Federal Rule of Civil Procedure 9(b). *See ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) ("*ECA*"). Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI Commc'ns*, 493 F.3d at 99.

Second, the Private Securities Litigation Reform Act ("PSLRA") imposes "[e]xacting pleading requirements" on plaintiffs asserting securities fraud claims. *Tellabs*, 551 U.S. at 313 (citing 15 U.S.C. §§ 78u-4(b)(1), (2)). In particular, where a plaintiff's claims depend upon allegations that the defendant has made an untrue statement of material fact or that the defendant omitted a material fact necessary to make a statement not misleading, the plaintiff "shall specify

each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Thus, to plead a claim of securities fraud, plaintiffs "must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004). In addition, a plaintiff must, "with respect to each act or omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

**B. Elements of the CAC's Claims**

The CAC brings claims under §§ 10(b) and 20(a) of the Exchange Act, and Rule 10b–5. CAC ¶¶ 305–321.

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). The SEC's implementing rule, Rule 10b–5, provides that it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b).

To state a claim under § 10(b) of the Exchange Act, a complaint must adequately plead "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011) (citation omitted). A complaint must ultimately allege conduct involving manipulation or deception; § 10(b) does not cover "instances

of corporate mismanagement . . . in which the essence of the complaint is that shareholders were treated unfairly by a fiduciary." *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477 (1977).

Section 20 extends liability to persons who "control" entities alleged to have violated § 10. To state a claim under § 20(a) of the Exchange Act, "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (quoting *ATSI Commc'ns*, 493 F.3d at 108). If a plaintiff has not adequately alleged a primary violation—*i.e.*, a viable claim under another provision of the Exchange Act—then any § 20(a) claim must be dismissed. *See id*.

## III. Discussion

Defendants raise a host of challenges to the CAC. They argue that it does not adequately plead falsity; that its allegations fail to raise a strong inference of scienter; that it fails to plead loss causation; and, as to its control-person claims, that it does not plead a primary violation by Ready Capital. The Court addresses these in turn.

### A. Falsity

#### 1. Applicable Law

##### *a. False or Misleading Statements or Omissions*

To survive a motion to dismiss, a complaint alleging fraud in the form of false or misleading statements or omissions must adequately plead "that the defendant made a statement that was 'misleading as to a material fact.'" *Matrixx Initiatives*, 563 U.S. at 38 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988) (emphasis omitted)). "Disclosure of . . . information is not required . . . simply because it may be relevant or of interest to a reasonable investor." *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002). An omission of information not

affirmatively required to be disclosed is actionable only when disclosure of such information is "necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives*, 563 U.S. at 44 (quoting 17 C.F.R. § 240.10b–5(b)); *see also Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 264 (2024).

The materiality requirement is satisfied where there exists "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Matrixx Initiatives*, 563 U.S. at 38 (quoting *Basic*, 485 U.S. at 231–32). Because the materiality inquiry is fact-intensive, the Court may not dismiss a complaint "on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *ECA*, 553 F.3d at 197 (citation omitted).

*b. Statements of Opinion*

Like objective statements of material fact, subjective statements of opinion can be actionable as fraud. Opinion statements can give rise to liability in either of two ways.

First, "liability for making a false statement of opinion may lie if either 'the speaker did not hold the belief she professed' or 'the supporting facts she supplied were untrue.'" *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (quoting *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185–86 (2015)). "It is not sufficient for these purposes to allege that an opinion was unreasonable, irrational, excessively optimistic, [or] not borne out by subsequent events." *In re Salomon Analyst Level 3 Litig.*, 350 F. Supp. 2d 477, 489 (S.D.N.Y. 2004). "The Second Circuit has firmly rejected this 'fraud by hindsight' approach."

*Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 156 (S.D.N.Y. 2004) (citing *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 85 (2d Cir. 1999)).

Second, "opinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor." *Sanofi*, 816 F.3d at 210 (citing *Omnicare*, 575 U.S. at 194). To allege adequately that an opinion statement was misleading by virtue of its omission of material information, "[t]he investor must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id*. at 209 (quoting *Omnicare*, 575 U.S. at 194). As the Second Circuit has explained, "a reasonable investor, upon hearing a statement of opinion from an issuer, 'expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at a time.'" *Id*. at 210 (quoting *Omnicare*, 575 U.S. at 188–89). Accordingly, "[t]he core inquiry is whether the omitted facts would 'conflict with what a reasonable investor would take from the statement itself.'" *Id*. (quoting *Omnicare*, 575 U.S. at 189).

The Supreme Court has instructed that this second theory of liability for opinions, based on omissions of material facts that may render a statement of opinion actionable, should not be given "an overly expansive reading"; rather, establishing liability on such a theory "is no small task for an investor." *Id*. (quoting *Omnicare*, 575 U.S. at 194). "Reasonable investors understand that opinions sometimes rest on a weighing of competing facts, . . . [and do] not expect that every fact known to an issuer supports its opinion statement." *Id*. (emphasis omitted) (quoting

*Omnicare*, 575 U.S. at 189–90). "[A] statement of opinion 'is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way.'" *Id.* (quoting *Omnicare*, 575 U.S. at 189).

*c. The PSLRA Safe Harbor for Forward-Looking Statements*

The PSLRA amended the Exchange Act to provide a safe harbor for forward-looking statements. *See* 15 U.S.C. § 78u–5(c). Forward-looking statements are those containing, *inter alia*, "a projection of revenues, income, [or] earnings," "plans and objectives of management for future operations," or "a statement of future economic performance." *Id.* § 78u–5(i)(1). Because the PSLRA is written in the disjunctive, statements are protected as forward-looking if they fit any one of these three categories. *Id.* A forward-looking statement is not actionable if it "is identified and accompanied by meaningful cautionary language or is immaterial or the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010) (emphasis omitted). Materiality is defined above; the other two categories are defined as follows:

***Meaningful cautionary language:*** To qualify as "meaningful," cautionary language "must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statements." *Id.* at 771 (quoting H.R. Conf. Rep. 104–369, at 43 (1995)). Language that is "vague" or "mere boilerplate" does not suffice. *Id.* at 772. "To determine whether cautionary language is meaningful, courts must first 'identify the allegedly undisclosed risk' and then 'read the allegedly fraudulent materials—including the cautionary language—to determine if a reasonable investor could have been misled into thinking that the risk that materialized and resulted in his loss did not actually exist.'" *In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 333 (S.D.N.Y. 2014) (quoting *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002)). A plaintiff may establish that

cautionary language is not meaningful "by showing, for example, that the cautionary language did not expressly warn of or did not directly relate to the risk that brought about plaintiffs' loss." *Halperin*, 295 F.3d at 359.

***Actual knowledge:*** The scienter requirement for forward-looking statements—actual knowledge—is "stricter than for statements of current fact. Whereas liability for the latter requires a showing of either knowing falsity or recklessness, liability for the former attaches only upon proof of knowing falsity," *Slayton*, 604 F.3d at 773 (quoting *Inst. Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 274 (3d Cir. 2009)), pled with the required particularity, *see* 15 U.S.C. § 78u–4(b)(2).

### 2. Application

#### *a. Particularity*

Defendants challenge the CAC for failure to plead falsity with particularity. That challenge is meritorious.

Failure to satisfy Rule 9(b)'s and the PSLRA's pleading requirements is alone a sufficient basis to dismiss a complaint. *See, e.g.*, *Plumbers & Steamfitters Loc. 773 Pension Fund v. Danske Bank*, No. 19 Civ. 235, 2020 WL 4937461, at *3 (S.D.N.Y. Aug. 24, 2020), *aff'd sub nom. Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90 (2d Cir. 2021); *In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, No. 16 Civ. 3495, 2017 WL 4049253, at *5 (S.D.N.Y. June 28, 2017), *aff'd sub nom. Sfiraiala v. Deutsche Bank Aktiengesellschaft*, 729 F. App'x 55 (2d Cir. 2018). Pleading falsity through "boilerplate paragraph[s]" that are repeated after reciting each alleged misstatement does not satisfy that requirement. *Nandkumar v. Astra-Zeneca PLC*, 2023 WL 3477164, at *2 (2d Cir. May 16, 2023); *see also, e.g.*, *Police & Fire Ret. Sys. City of Detroit v. Argo Grp. Int'l Holdings, Ltd.*, No. 22 Civ. 8971, 2024 WL 5089970, at *9 (S.D.N.Y. Dec. 12, 2024) (particularity not satisfied by "a boilerplate paragraph

after each alleged misstatement," relying on "the same formulaic response as to why the statements are false" and "repeat[ing] this formula nearly verbatim for each of the . . . statements they challenge") (quoting *Nandkumar*, 2023 WL 3477164, at *2; *Plymouth Cnty. Ret. Ass'n v. Array Techs., Inc.*, No. 21 Civ. 4390, 2023 WL 3569068, at *9 (S.D.N.Y. May 19, 2023); *In re Farfetch Ltd. Sec. Litig.*, 802 F. Supp. 3d 652, 675–76 (S.D.N.Y. 2025) (same); *Born v. Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 478–79 (S.D.N.Y. 2021) (same). In dismissing complaints on this basis, district courts in this Circuit sometimes refer to the practice as "puzzle pleading." *See, e.g.*, *Kempen Int'l Funds v. Syneos Health, Inc.*, No. 23 Civ. 8848, 2024 WL 1805011, at *1–2 (S.D.N.Y. Apr. 25, 2024); *Born*, 521 F. Supp. 3d at 478; *In re FuboTV Inc. Sec. Litig*, 2023 WL 2711826, at *11; *see also Constr. Laborers Pension Tr. for S. California v. CBS Corp.*, 433 F. Supp. 3d 515, 530 (S.D.N.Y. 2020) (describing puzzle pleading as a complaint "marked by lengthy block quotes followed by pro forma reasons why the statements quoted are allegedly false").

On this basis, the Second Circuit has affirmed the dismissal of a complaint that "consist[ed] in large part of large block quotations with italicized text, followed by a passage that reads '[t]he statements referenced in [the preceding paragraphs] were each materially false and misleading when made for the reasons set forth in [a preceding paragraph] and the factual detail contained throughout this Complaint." *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 37–38 (2d Cir. 2012) (summary order). Based on that and similar decisions, "[p]laintiffs in this circuit have long been on notice that a complaint predominantly marked by lengthy block quotes followed by pro forma reasons why the statements quoted are allegedly false . . . fails to state a claim because it is insufficiently particular under the PSLRA."

*In re FuboTV Inc. Sec. Litig.*, 2023 WL 2711826, at *11 (quoting *Born*, 521 F. Supp. 3d at 477–78).

The CAC, however, presents its core falsity allegations in just this fashion. It alleges falsity in only three distinct paragraphs. *See* CAC ¶¶ 198–199, 217 (*see also id.* ¶¶ 215–216 (repeating verbatim the allegations at *id.* ¶¶ 198–199). Each broadly alleges that statements in about a dozen preceding paragraphs, emphasized in bold and italics, were false or misleading "because they do not fairly present the financial conditions and financial results of Ready Capital," principally for reasons "detailed herein." *See id.* ¶¶ 198–199 (citing *id.* ¶¶ 187–197), 215–217 (citing *id.* ¶¶ 201–214).

That regrettable approach "basically leav[es] the District Court to . . . determine on its own initiative how and why the statements were false and how other facts might show a strong inference of scienter." *Boca Raton Firefighters & Police Pension Fund*, 506 F. App'x at 38; *see also Kempen Int'l Funds*, 2024 WL 1805011, at *2. The CAC "comes dangerously close to 'puzzle pleading,'" *In re Athenex, Inc. Sec. Litig.*, No. 21 Civ. 337, 2024 WL 2725609, at *11 n.13 (S.D.N.Y. May 28, 2024), enough on its own to warrant dismissal.

In the interest of completeness, the Court nonetheless undertakes the task—made needlessly difficult by the CAC's mode of pleading—of appraising the three categories of statements that the CAC terms false or misleading.

*b. The CAC's basis for alleging falsity*

The CAC repeats the same factual allegations as ostensibly supporting the falsity of each challenged statement. These consist of five factual allegations, in support of which it cites the testimony of four CWs. The factual allegations are:

- That defendants knew of "qualitative and quantitative factors," such as cost overruns, weak condo sales, and construction delays, impacting progress on the Portland Project. *Id.* ¶¶ 198, 215.
- That Ready Capital attempted to acquire the Portland Project through a deed in lieu of foreclosure on February 5, 2025. CAC ¶¶ 168, 217; *see also* Opp. at 2 (correcting operative date to such). Two Ready Capital affiliate entities had, at an unspecified time, "knowledge they would pursue the [deed-in-lieu]." CAC ¶ 171.
- That the loan's borrowers were experiencing "financial distress," "given the issues faced by the Portland Project" and the effect of such on sales. *Id.* ¶¶ 199, 216 (cleaned up). One borrower "failed to meet lesser financial obligations in December 2023 on a different hotel project," as "reported by local news in December 2024." *Id.* ¶ 55. This borrower's "financial struggles" "would have been reflected in his periodic finances reporting to Ready Capital." *Id.* ¶ 55.
- That, "based on the contents of" a January 2025 appraisal of the Portland Project's retail and office space, defendants "would have known of all of the then current elements at the time of [a] previous appraisal" to which the January 2025 appraisal alluded, and which had valued the retail and office segments $6.7 million lower. *Id.* ¶¶ 176–177.
- An "event of default" occurred before or in November 2024. This allegation is based on the fact that Ready Capital sought reappraisal of the Portland Project loan in November 2024. *Id.* ¶ 217. The operative loan agreement provides that "Lender shall have the right to obtain, at Borrower's expense, a re-appraisal of the [Portland Project] . . . if an Event of Default has occurred." *Id.* ¶ 172. The CAC

construes that provision to mean that Ready Capital "only had rights to seek . . . a reappraisal of the Portland Project in the event of default," *Id.* ¶ 217.[3]

The statements attributed to CWs are:

- CW1 stated that the Portland Project loan was "the biggest asset we had" and that Ahlborn and the asset management teams discussed the Portland Project at the board level. *Id.* ¶ 82. The loan was subject to quarterly valuations processed through a third party, whose assessments "management generally accepted . . . at face value." *Id.* ¶ 84. The loan was also subject to a "highly formalized" quarterly and annual review process, "at each stage" of which management "reviewed and approved" loan-by-loan data. *Id.* ¶ 85. The "issues" surrounding the loan, such as "slow condo sales" and "Portland market challenges," were "known internally" and "documented." *Id.* ¶ 86. Through the point at which CW1 left Waterfall, the loan was classified as "performing," as "cash was still flowing." *Id.* ¶ 83.
- CW2 stated that the project was "challenging . . . from the get-go." *Id.* ¶ 88. CW2 "heard" from "industry peers" and employees of Broadmark—another company merged into Ready Capital—that the Portland Project was struggling, and from Broadmark sales executives that the Portland Project loan had defaulted. *Id.* (cleaned up).
- CW3 stated that at a national sales meeting in September 2023, management presented a review of all company mergers, including Mosaic. *Id.* ¶ 89. CW3

[3] Defendants deny that such default occurred. They explain that, under the agreement, "an event of default merely triggered the borrower's obligation to pay for the appraisal." Mot. at 8.

reported that it was "widely understood in Portland real estate circles" that the Portland Project "had struggled from the start," and that this was a "commonly shared view in the real estate community." *Id.* ¶¶ 89–90. CW3 stated that Portland had a previously vibrant downtown, including the site of the Portland Project, which was "once one of Portland's most desirable neighborhoods" and considered "the 'place to live.'" *Id.* ¶ 90. But beginning in the Covid-19 era, "visible homelessness, open drug use, and public safety concerns" frustrated sales. *Id.* CW3 surmised that "local real estate dynamics and company-level priorities suggested that Ready Capital would abandon large construction lending." *Id.*

- CW4 prepared monthly and quarterly reports for Ready Capital's accounting department that "included information such as loans currently in default, unpaid principal balance, [] cost to complete, interest," and supporting documentation for these. *Id.* ¶ 92. Such reports "contributed to the inputs used" in loan loss reporting. *Id.*

c. *Assessment of the CAC's claims based on Ready Capital's opinion statements about loan valuations and loss reserves*

In its central claim of falsity, the CAC alleges that the Portland Project loan should have been written down earlier, and that defendants' failure to do so made false and misleading their statements that did not reflect such a write-down. These include defendants' statements, *see supra* pp. 5–6, about the valuation of the Portland Project loan and the adequacy of Ready Capital's loan loss reserves.

As the Second Circuit has held, statements about loss reserves and their adequacy are statements of opinion. *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011); *see also In*

*re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 312 (S.D.N.Y. 2013). As the Circuit has explained, because loan loss reserves "reflect management's opinion or judgment about what, if any, portion of amounts due on the loans ultimately might not be collectible," their adequacy "is not a matter of objective fact." *Id.* at 113. Rather, a determination as to adequate reserve levels "is inherently subjective," and estimates will necessarily "vary depending on a variety of predictable and unpredictable factors." *Id.*; *see also, e.g.*, *Woolgar v. Kingstone Companies, Inc.*, 477 F. Supp. 3d 193, 228 n.15 (S.D.N.Y. 2020) ("[L]oss reserves are inherently subjective statements of opinions."); *Martin v. Arbor Realty Tr., Inc.,* No. 24 Civ. 5347, 2026 WL 878343, at *14 (E.D.N.Y. Mar. 31, 2026) ("Loan loss reserves eschew objective standards."); *In re Deutsche Bank AG Sec. Litig.*, No. 9 Civ. 1714, 2016 WL 4083429, at *16 (S.D.N.Y. July 25, 2016) (there is "no objective standard for measuring . . . loan loss reserves, and thus any estimate would be inherently subjective"); *Chapman v. Mueller Water Prods., Inc.*, 466 F. Supp. 3d 382, 398 (S.D.N.Y. 2020) (an allegedly inadequate warranty reserve, and statements of expenses and liabilities premised thereon, were subjective statements of opinion).

Loan valuation, similarly, presents a question of judgment and opinion—at least where the pleading does not identify an objective standard of value for the asset, such as a trading price on the New York Stock Exchange reflecting fair market value. *Fait v. Regions Fin. Corp.*, 712 F. Supp. 2d 117, 122 (S.D.N.Y. 2010), *aff'd*, 655 F.3d 105 (2d Cir. 2011). As a result, in the context of loss reserves, "a judgment that a property's value supports a particular loan amount" is "a subjective opinion based on the particular methods and assumptions the appraiser uses." *Tsereteli v. Residential Asset Securitization Tr. 2006-A8*, 692 F. Supp. 2d 387, 393 (S.D.N.Y. 2010), *adhered to sub nom. Tsereteli v. Residential Asset Securitization Tr. 1006-A8*, 697 F. Supp. 2d 546 (S.D.N.Y. 2010). In contrast to statements of objective fact, "valuation models

depend so heavily on the discretionary choices of the modeler" that their predictions "can only fairly be characterized as subjective opinions." *In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d 248, 251 (S.D.N.Y. 2005). Accordingly, "asset valuations and write-downs are statements of subjective opinion and judgement." *In re Barclays Bank PLC Sec. Litig.,* No. 9 Civ. 1989, 2017 WL 4082305, at *10 (S.D.N.Y. Sept. 13, 2017).

That such subjective assessments constitute statements of opinion, not hard fact, is all the more true in the challenging context of a valuation of real estate. That undertaking "involve[s] uncertainty and depend[s] on the information, assumptions, and methodology used by the appraiser." *In re Wade Park Land Holdings, LLC*, No. 23-591, 2024 WL 3024648, at *5 (2d Cir. June 17, 2024); *see also Fed. Hous. Fin. Agency v. UBS Americas, Inc.*, 858 F. Supp. 2d 306, 326 (S.D.N.Y. 2012) (valuations assigned to underlying properties "are, of course, the subjective judgments of the appraisers"), *aff'd*, 712 F.3d 136 (2d Cir. 2013); *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 362 (S.D.N.Y. 2007) ("[A] statement as to the value of a [collateralized mortgage obligation] . . . may be considerably more a statement of opinion than a report of an objectively determinable fact.").

As a result, defendants' statements about the value of the Portland Project loan and Ready Capital's corresponding loan loss reserves are actionable only if they are subjectively false (*i.e.*, "the speaker did not hold the belief [the speaker] professed") or objectively false (*i.e.*, the opinion "embedded statements of [untrue] facts" or omitted facts whose omission made the statement "misleading to an ordinary investor"). *Omnicare*, 575 U.S. at 186–87. The CAC, however, fails to plausibly plead either.

As to subjective falsity, the CAC does not allege facts tending to show that any defendant "held anything other than an 'honest belief'" that its valuations were accurate and its reserves

were adequately stated. *Chapman*, 466 F. Supp. 3d at 398. It does not plausibly plead that any defendant, in real time, "knew that the . . . evidence on which they relied" would necessitate a write-down of the loan or adjustment of reserves. *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d at 314. Its allegations to that effect instead are collective and conclusory. *See, e.g.*, CAC ¶¶ 198 ("Defendants were in possession of information of relevant qualitative and quantitative factors that affected the value of the" loan), 199 ("Ready Capital's historical experience with the [loan], its current condition, low occupancy, and unlikelihood of payment in full by its [] maturity date meant that [it] should have been assessed for expected credit loss"), 269 ("Defendants, as part of their responsibilities, would have closely monitored" the loan and "the factors that would affect" the "value of the underlying collateral, and the likelihood [it] would be paid off or refinanced at or before maturity").

The CAC notably does not plead, for example, that defendants "understood that the publicly reported numbers were at odds with [any] internal analyses," *In re Converium Holding AG Sec. Litig.*, No. 4 Civ. 7897, 2006 WL 3804619, at *13 (S.D.N.Y. Dec. 28, 2006), or "internally predicting losses exceeding their set reserves," *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 362 (S.D.N.Y. 2011). Nor does the CAC identify "reports or statements" that ostensibly contradicted defendants' valuations and reserves, let alone "specific instances in which Defendants received information that was contrary to their public declarations." *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Com.*, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010) (quoting *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000)).

The one document to which the CAC points is an appraisal of unstated provenance, which the CAC alleges was referenced in the January 2025 appraisal of the Portland Project's office and retail space that catalyzed the write-down. The CAC states that the 2025 appraisal

"noted that a previous appraisal" had valued the office and retail space lower by $6.7 million. CAC ¶ 176. The 2025 appraisal attributed its higher valuation to "positive leasing activity." *Id.* The CAC does not cite any information in the prior appraisal. But it concludes that, "[b]ased on the contents of the" 2025 appraisal, "Defendants would have known of all of the then current elements at the time of the previous appraisal." *Id.* ¶ 177.

To the extent the CAC portrays the earlier appraisal as putting Ready Capital officers on notice of the falsity of the existing valuations, and thus requiring the company, then and there, to reduce its valuation of the Project, that claim does not logically follow. Ready Capital did just that after the 2025 appraisal, whose bottom line was somewhat more favorable. The CAC describes the 2025 appraisal as "contain[ing] numerous analyses" concerning "strengths and weaknesses," "the Portland market and local area," "market trends, office vacancy rates and trends, asking rents, leasing activity, absorption rates, and demand forecasts," as well as "analyses concerning rental rates, sales prices, and comparative transactions." *Id.* ¶¶ 177, 230. But it does not plead that the contents of the earlier appraisal contained comparably thorough or dispositive data. Without more, it does not follow that the lower valuation in the earlier appraisal made a write-down unavoidable and obligatory at that time. And the write-down in 2025 was based not only on the 2025 appraisal, but also on another, concerning the project's residential and hotel components. *Id.* ¶¶ 179–180, 183. Viewed in the most favorable light, the CAC, on this point, does no more than allege that the earlier appraisal foreshadowed the bracing bottom line of the 2025 appraisal, including on the basis of similar assessments of the retail and office components of the Portland Project. *See id.* ¶ 177. But that falls short of plausibly pleading that defendants possessed information that made their extant opinion statements about valuation knowingly false or misleading. *See, e.g.*, *San Leandro Emergency Med. Grp. Profit Sharing*

*Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 812–13 (2d Cir. 1996) ("Plaintiffs' unsupported general claim of the existence of confidential company sales reports that revealed the larger decline in sales is insufficient to survive a motion to dismiss.") (citing *Arazie v. Mullane*, 2 F.3d 1456, 1467 (7th Cir. 1993) ("[R]eferences to unreleased or internal information that allegedly contradict[s defendants'] public statements" should indicate "who prepared the projected figures, when they were prepared, how firm the numbers were, or which [company] officers reviewed them.")).

The accounts of the CWs also fall far from plausibly pleading the subjective awareness of any defendant that the company's loss reserves or loan valuations were inaccurate, *i.e.*, outside the realm of defensible accounting judgments. As a threshold matter, none of the CWs worked for Ready Capital during the class period. *See Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323, 335 (S.D.N.Y. 2009) (rejecting statements of CWs who "left the company before the Class Period"); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d at 352 n.17 ("[A]llegations of a CW who was not employed by [the company] at the time of the alleged misstatement . . . do not help the . . . Plaintiffs' case for Section 10(b) liability."). Of them, only CW1 is alleged to have had any involvement with the Portland Project loan.

And, fairly analyzed, none of the statements attributed to the CWs put defendants on notice that Ready Capital's reserving and valuation of the Portland Project loan was false or misleading. CWs 1 and 4 primarily state, in general terms, that Ready Capital sought and synthesized quarterly loan data. *See* CAC ¶¶ 84, 92. And CW 1 states that issues about the project's "slow condo sales" were "known internally" and that "the delays, weak condo sales, Portland market challenges, and the sponsor's financial weakness were known and documented." *See id.* ¶ 86. But neither CW sets out concrete data about the project that contradicts Ready

Capital's extant accounting treatment of the loan, let alone identifies concrete information known to defendants that contradicted that treatment. To the contrary, CW1 is quoted as stating that that project was "structurally sound," *id*. ¶ 83, and that, as of his departure, the loan was "classified as performing as the cash was still flowing." *Id*. (cleaned up).

As for CWs 2 and 3, they are not alleged to have had any connection to, or contact with, the individual defendants. *See id*. ¶¶ 88–90. Nor do they report relevant personal knowledge about the Portland Project loan, let alone information that put Ready Capital on notice that its reserves for, or valuation of, the loan were unjustifiable. CW2 is quoted as describing the project as "challenging from the get-go," an assessment based on CW2's "background as a realtor in Portland," and as having heard from "industry peers" that the project was "struggling" and from a sales executive that the loan had "defaulted" in 2023. *Id*. ¶ 88. CW3 is quoted as describing the project as having "struggled from the start" and as stating that it was a "commonly shared view in the real estate community" that it would be impossible for the project to meet its sales targets. *Id*. ¶ 89. But these statements are conclusory, unspecified, and secondhand, and they do not speak to the specific knowledge base of the individual defendants (or other executives). *See Woolgar*, 477 F. Supp. 3d at 219–20 ("generic and conclusory allegations based upon rumor or conjecture are undisputedly insufficient to satisfy the heightened pleading standard of" the PSLRA); *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 591 (S.D.N.Y. 2011) (conclusory statements by CWs that defendants "were aware" of certain information or "would have" or "should have" had certain knowledge are insufficient to support inference of knowing falsity).

To be sure, the CAC pleads that defendants were aware of persistent difficulties dogging the Portland Project loan, including its disappointingly low occupancy rates. To this effect, it cites the existence of monthly condo sales reports, CAC ¶ 86; monthly and quarterly reports that

incorporated information about defaulting loans, unpaid principal balance, and cost to complete, *id*. ¶ 92; and "periodic financial reports and certifications" from the loan's borrowers, *id*. ¶ 95. And CW1, CW2, and CW4 each broadly state that there was general awareness within the company of these challenges. *See id*. ¶¶ 86, 88, 93. But the existence of these difficulties does not establish that any defendant subjectively appreciated in real time that, under accounting standards, the stated reserves were inadequate or the loan was improperly valued, so as to require an earlier write-down than defendants ultimately took. *See Chapman*, 466 F. Supp. 3d at 400. And the CAC does not pinpoint with specificity the factual basis on which any individual defendant ostensibly earlier reached the conclusion that a write-down was necessary. It does not attribute any statement, written or oral, to any defendant from which his real-time appreciation of an errant valuation could be inferred. Its conclusory and generalized allegations to this effect, *see, e.g.*, CAC ¶¶ 198–199, 215–217, 259, "fail to specify what caused the Defendants to know" that the loan was overvalued or that loss reserves were insufficient, such that defendants did not believe their own statements. *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d at 361.

The CAC instead highlights the fact of the loan's eventual write-down. *See* CAC ¶¶ 9, 226, 229, 246; *see also id*. ¶¶ 199, 216 (emphasizing amount of write-down). But that fact does not support that such a write-down was necessary earlier, let alone that defendants subjectively appreciated this in real time. *See In re Turquoise Hill Res. Ltd. Sec. Litig.*, No. 13 Civ. 8846, 2014 WL 7176187, at *7 (S.D.N.Y. Dec. 16, 2014) ("The fact of an error, even a large error, does not suggest knowledge or intent to misstate when the financial results were originally published, particularly when the error was a matter of judgment."); *In re Plug Power, Inc. Sec. Litig.*, No. 21 Civ. 2004, 2022 WL 4631892, at *17 (S.D.N.Y. Sept. 29, 2022) (same); *In re Iconix Brand Grp., Inc.*, No. 15 Civ. 4860, 2017 WL 4898228, at *17 (S.D.N.Y. Oct. 25, 2017)

(same); *Pirnik v. Fiat Chrysler Automobiles, N.V.*, No. 15 Civ. 7199, 2016 WL 5818590, at *9 (S.D.N.Y. Oct. 5, 2016) (same).

As to objective falsity—the narrower route under *Omnicare* through which a statement of opinion can be held actionable—the CAC does not identify embedded untrue facts or omitted true facts that made Ready Capital's opinion statements misleading. Fatally on this point, the CAC does not identify which facts *were* and *were not* reflected in the challenged valuations. The CAC repeatedly alleges that the project suffered "catastrophic" setbacks "from the beginning." *See* CAC ¶¶ 6, 73–74. Throughout its factual allegations and the statements of all four CWs, the CAC paints a picture of a project that was "challenging [] from the get-go," "doomed from the beginning," and beset at every stage with "known and documented" problems. *Id.* ¶¶ 86, 88, 90. But it does not specify which of those issues were, or were not, incorporated into Ready Capital's earlier loan valuations. And "[w]ithout identifying what negative factors and assumptions Defendants already incorporated into their . . . valuations, Plaintiff cannot demonstrate that Defendants were aware of additional facts and circumstances that would have indicated that the fair value of the [Portland Project loan] may be less than [its] carrying amount." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 619 (9th Cir. 2017) (internal quotation marks omitted); *see also Chapman*, 466 F. Supp. 3d 382, 403 (falsity inadequately pled where complaints did not allege the manner in which defendant's financial estimates "failed to account for" issues "such that [its] reserves could be said to be false").

And the eventual write-down, to which the CAC repeatedly returns, *see, e.g.*, CAC ¶¶ 9, 226, 229, 246, also does not establish the objective falsity of Ready Capital's earlier assessments. *See, e.g.*, *NECA-IBEW Pension Tr. Fund v. Bank of Am. Corp.*, No. 10 Civ. 440, 2012 WL

3191860, at *10 (S.D.N.Y. Feb. 9, 2012) ("[T]he mere fact that [] predicted loss reserves turned out to be insufficient some time after they were made does not render those figures false at the time that they were publicly filed."); *Woolgar*, 477 F. Supp. 3d at 225–26 (same); *Oklahoma Firefighters Pension & Ret. Sys. v. Student Loan Corp.*, 951 F. Supp. 2d 479, 498 (S.D.N.Y. 2013) (same); *In re Fannie Mae 2008 Sec. Litig.*, 525 F. App'x 16, 19 (2d Cir. 2013) (summary order) (same).

Finally, although not necessary for defendants to prevail on this point, the CAC's claim that Ready Capital's opinion statements about its reserves and loan valuations were actionably false or misleading—subjectively or objectively—is undermined by the real-time assessments of its independent auditor, Deloitte.[4] Deloitte "issued unqualified opinions" to the effect that Ready Capital's financial statements—in which the ostensibly actionable statements appeared—"present[ed] fairly, in all material respects, the financial position of the Company" and that the company maintained "effective internal controls" over financial reporting. *See* Dkt. 43-2 ("2024 Form 10-K") at 101, 103. There is no allegation that the defendants hid material data from Deloitte. And Deloitte is not alleged to have required a restatement of any earlier financial statement. Subjectively, the auditor's real-time agreement with Ready Capital's statements makes it less likely that defendants did not believe these statements; objectively, the auditor's agreement makes it less likely that these statements were false because they omitted facts without which they were misleading. *See, e.g.*, *Woolgar*, 477 F. Supp. 3d at 228 ("Plaintiff's

---

[4] The audit is cognizable on this motion because it is recorded in Ready Capital's 2024 Form 10-K, which is filed publicly with the SEC. *See* Dkt. 43-2 ("2024 Form 10-K"). The Court may take judicial notice of documents publicly filed with the SEC on a motion to dismiss. *See Citadel Equity Fund Ltd. v. Aquila, Inc.*, 168 F. App'x 474, 476 (2d Cir. 2006); *ATSI Commc'ns*, 493 F.3d at 98 (same). It is independently cognizable because the CAC cites it, *see* CAC ¶¶ 25, 236, 239, and thereby incorporates it by reference. *See supra* note 1 (stating that all documents attached to the Clark Declaration, including the 2024 Form 10-K, are cognizable on this basis).

allegations regarding the Company's loss reserves are undermined by the fact that its independent auditor . . . reviewed their accuracy and concluded that, 'in all material aspects, the Company's financial statements were accurate.'"); *Malin v. XL Cap. Ltd.*, 499 F. Supp. 2d 117, 148 (D. Conn. 2007), *aff'd*, 312 F. App'x 400 (2d Cir. 2009) (summary order) (falsity inadequately pled where plaintiff made "no allegation [that] any auditor or actuary has qualified or withdrawn its opinion"); *Druskin v. Answerthink, Inc.*, 299 F. Supp. 2d 1307, 1325–26 (S.D. Fla. 2004) (noting lack of allegation that assigned value was "questioned by the Company's auditors").

For the foregoing reasons, the CAC does not adequately plead falsity with respect to any of the challenged opinion statements.

*d. Assessment of the CAC's claims based on statements reporting other financial metrics*

The second category of challenged statements comprises Ready Capital's statements regarding its net income, distributable earnings, and dividends. These, detailed above, *see supra* p. 6, report standard financial metrics. The CAC's claim that these are false or misleading is derivative of its challenge to the loan valuation. It alleges falsity on the ground that these statements embedded the inaccurate valuation of, and/or reserving for, the Portland Project loan.

As noted, the CAC's central thesis is that, "given the issues faced by the Portland Project," the consequences for construction and sales, and the borrowers' "financial distress," Ready Capital was obliged during the class period to write down the value of the Portland loan, which "was overvalued on Ready Capital's financial statements." CAC ¶ 199 (cleaned up). As to the specific financial metrics above, it alleges that, and as a result of the loan's overvaluation, "Defendants' statements concerning Ready Capital's net income, allowance for reserves, distributable earnings, net book value, carrying values, dividends, and amounts calculated

therefrom" were materially false or misleading. *Id*. (for 3Q statements); *see also id*. ¶ 216 (same for 4Q statements).

A line of financial data is ordinarily a statement of fact. *In re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 569 (S.D.N.Y. 2007). But, where the challenged item embeds—and is allegedly false because of—a subjectively calculated loss reserve, courts have sometimes evaluated these statements on the standards applicable to statements of opinion, and held them actionable to the same extent as the underlying loss reserve opinion. *See, e.g.*, *Martin*, 2026 WL 878343, at *13 ("Plaintiffs cannot show a Section 10(b) violation based on [] allegedly false or misleading statements that were, in turn, based on loss reserves estimates or calculations."); *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d at 312 (statement of net income premised on allegedly untimely valuation allowance is opinion).

Here, regardless of whether Ready Capital's line items are analyzed as statements of fact or opinion, the CAC has not plausibly pled the falsity of these data. For the reasons reviewed above, the loan valuations on which the CAC's theory of falsity rests have not been pled as false. And the CAC does not otherwise support its claim that, to be accurate, Ready Capital was required to have reported lower net income, lower distributable earnings, lower dividends, and higher GAAP losses during the class periods. *See Woolgar*, 477 F. Supp. 3d at 226.

Here, too, the fact that independent auditor Deloitte issued unqualified opinions to the effect that Ready Capital's financial statements "present[ed] fairly, in all material respects, the financial position of the Company," and that the company maintained "effective internal controls" over financial reporting, 2024 Form 10-K at 101, 103, and did not require a restatement of any earlier financial report, undermines the premise that the statements of portfolio-wide financial metrics during the class period were false. *See, e.g.*, *Woolgar*, 477 F. Supp. 3d at 228–

29 (in finding challenged statements non-actionable, noting that "review of [Defendant's] financial statements by such independent parties did not result in any restatement, withdrawal, or qualification during the Class Period"); *Druskin*, 299 F. Supp. 2d at 1325–26 & 1324 n.27 (noting absence of allegations that company's financial results were restated); *Malin*, 499 F. Supp. 2d at 148 (same).

Therefore, the CAC does not adequately plead falsity with respect to the second category of challenged statements.

*e. Flattering statements about loan and credit performance*

The balance of the challenged statements—defendants' positive statements about Ready Capital's portfolio and prospects—are all either non-actionable puffery or forward-looking statements protected by the PSLRA's safe harbor provision.

i. Puffery

Statements of "simple economic projections, expressions of optimism, and other puffery" are non-actionable. *Novak*, 216 F.3d at 315; *see also Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 576 n.15 (S.D.N.Y. 2014), *aff'd sub nom. In re Lululemon Sec. Litig.*, 604 F. App'x 62 (2d Cir. 2015) (summary order). Statements are mere puffery, and hence non-actionable, when they are "too general to cause a reasonable investor to rely upon them," *ECA*, 553 F.3d at 206; *see also Kleinman v. Elan Corp.*, 706 F.3d 145, 153 (2d Cir. 2013).

Four statements challenged by the CAC fall into this category. These projections and expressions of optimism are "so vague, broad, and non-specific that a reasonable investor would not rely on [them]," and hence are puffery. *In re General Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 384 (S.D.N.Y. 2012). These are:

- Capasse's statement that Ready Capital's ongoing efforts to cycle into market-yielding investments "position the company to improve earnings moving into year

end." CAC ¶ 187. *See Steamfitters Local 449 Pension Plan v. Skechers U.S.A., Inc.*, 412 F. Supp. 3d 353, 363 (S.D.N.Y. 2019) (statement that "we believe we are well positioned to maintain this growth" is the "definition" of non-actionable puffery).

- Capasse's statements that (1) the company was seeing "improving credit metrics across the loan portfolio," CAC ¶ 187, and (2) the company's mergers-and-acquisitions portfolio was seeing "improving credit performance," *id.* ¶ 192. *See Burr v. Equity Bancshares, Inc.*, No. 19 Civ. 4346, 2020 WL 6063558, at *6 (S.D.N.Y. Oct. 14, 2020) (statements that a corporation's "credit quality is 'strong'" and that its credit quality had "improved" are puffery).
- Zausmer's statement that "I think the $0.25 level is a good baseline" for the dividend. CAC ¶ 210. That statement of opinion lacks "sufficient specificity to offer any guarantee of some concrete fact or outcome." *Steamfitters Local 449 Pension Plan*, 412 F. Supp. 3d at 363.

*See, e.g.*, *City of Pontiac Policemen's and Firemen's Ret. Sys.*, 752 F.3d at 185 (upholding dismissal of claims based on puffery); *Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996) (same); *Shemian v. Research in Motion Ltd.*, No. 11 Civ. 4068, 2013 WL 1285779, at *23 (S.D.N.Y. Mar. 29, 2013) (dismissing claims based on puffery).

ii. PSLRA Safe Harbor

The remainder of the statements in this third category are forward-looking statements within the PSLRA's safe harbor. Each comprises "a projection of revenues, income, [or] earnings," "plans and objectives of management for future operations," or "a statement of future economic performance." 15 U.S.C. § 78u–5(i)(1).

"As a general rule, statements whose truth cannot be ascertained until some time after the time they are made are 'forward-looking statements.'" *In re Bear Stearns Cos., Inc. Sec., Derivative, and ERISA Litig.*, 763 F. Supp. 2d 423, 493 (S.D.N.Y. 2011) (collecting cases). "[W]ords such as 'expect' identify forward-looking statements." *Slayton*, 604 F.3d at 769; *see also Harris v. Ivax Corp.*, 182 F.3d 799, 804–806 (11th Cir. 1999). Four of Ahlborn's challenged statements on earning calls are of this nature:

- That it was Ready Capital's "expectation" that its 2Q book value of $12.97 per share "is reflective of the clearing levels to execute our portfolio repositioning efforts," CAC ¶ 193;
- That "74%" of the "construction assets acquired in the Mosaic transaction . . . are expected to be repaid at the end of the year," *id.* ¶ 207;
- That Ready Capital's "expectation is that a large portion" of the construction loans in the Mosaic portfolio "clear out in the fourth quarter and turn to actually sort of cash paying investments," *id.* ¶ 208; and
- That "the expectation is that 77% of that balance [of loans acquired in the Mosaic transaction] pays off at quarter end or is rolled into a cash-linked loan at quarter end. So, I think that number is going to come down," *id.* ¶ 209.

These statements by Ahlborn and Zausmer, also on earnings calls, were also forward-looking:

- Ahlborn's statement that Ready Capital was "only accruing interest that we believe to be recoverable," *id.*; and
- Zausmer's statement that "[t]here are no onetime items that I'm aware of" poised to negatively affect earnings for the year, *id.* ¶ 210.

These statements thus are non-actionable if either they were accompanied by meaningful cautionary language or the CAC fails to plead that they were made with knowing falsity. As to the former, Ready Capital's earnings calls were all prefaced by statements that the calls would contain forward-looking projections. *See* Dkts. 43-4 at 2; 43-9 at 3. These prefatory statements also referred to Ready Capital's SEC filings, which contained a detailed recitation of a range of risks that could cause the company's performance to diverge from the projections. *See* 2024 Form 10-K at 19–73 (detailing risk factors); Dkt. 43-11 ("2023 Form 10-K") at 19–69 (same).[5] Under the PSLRA, an oral statement referring listeners to written documents for additional information can constitute meaningful cautionary language. *See* 15 U.S.C. § 78u-5(c)(2)(B). Accordingly, statements of this nature, where coupled with fulsome risk disclosures in the SEC filings contemporaneously referenced, have been held sufficient to trigger the PLSRA's safe harbor. *See, e.g.*, *Pension Tr. Fund for Operating Eng'rs v. Clarivate Plc*, 826 F. Supp. 3d 296,

---

[5] The 2023 and 2024 Forms 10-K, for example, warned that "[p]rovisions for credit losses are difficult to estimate." 2023 Form 10-K at 38; 2024 Form 10-K at 40. These stated that, because those estimates and judgments are "based on a number of factors," "all of which remain uncertain and are subjective," they "may not be correct," which could "severely impact[]" resulting statements of "operations and financial condition." 2023 Form 10-K at 38; 2024 Form 10-K at 40. The company's disclosures included other warnings germane to the Portland Project loan's performance. They warned that (1) "the recent downturn in the real estate market and general economy" may "adversely affect our ability to assess the market value of our portfolio of assets," and that, if estimates later proved incorrect, "we may incur losses that could materially and adversely affect our financial condition," 2023 Form 10-K at 21; *see also* 2024 Form 10-K at 19–20 (similar); (2) the company's "properties may be subject to impairment charges" requiring an adjustment to the net carrying value of the property based on market conditions, tenant performance and legal structure, 2023 Form 10-K at 22; 2024 Form 10-K at 23; (3) the ongoing effects of the Covid-19 pandemic, including any decline in the value of commercial real estate, "would . . . likely negatively impact the value of the loans we own," 2023 Form 10-K at 22; *see also* 2024 Form 10-K at 26 (similar); and (4) loans secured by mixed-use properties—like the Portland Project loan—were particularly "subject to risks of delinquency, foreclosure and loss" because repayment depends on the income derived from operating the property, which could be adversely affected by factors including, salient here, "property location," "changes in . . . local economic conditions," and "social unrest and civil disturbances." 2023 Form 10-K at 24–25; 2024 Form 10-K at 25.

328 (E.D.N.Y. 2026), *reconsideration denied*, 2026 WL 1382982 (E.D.N.Y. May 18, 2026) (safe harbor applies where earnings-call speakers referred listeners to risk disclosures in SEC filings); *In re Dynagas LNG Partners LP Sec. Litig.*, 504 F. Supp. 3d 289, 319 (S.D.N.Y. 2020) (same where speakers referred to cautionary language in press releases); *Fort Worth Employers' Ret. Fund v. Biovail Corp.*, 615 F. Supp. 2d 218, 232–33 (S.D.N.Y. 2009) (same).

To be sure, there are cases holding that, where statements on earnings calls were boilerplate and gave only "generalized warnings about the potential forward-looking statements and encouraging the listeners to review" the issuer's SEC filings, such did not constitute meaningful cautionary language. *In re Virtu Fin., Inc. Sec. Litig.*, 770 F. Supp. 3d 482, 515–16 (E.D.N.Y. 2025); *see also, e.g.*, *In re Salix Pharms., Ltd.*, No. 14 Civ. 925, 2016 WL 1629341, at *11 (S.D.N.Y. Apr. 22, 2016) (same). The case law on this point is not unitary. Nonetheless, here, given the range and detail of the risk warnings in Ready Capital's incorporated SEC filings, the Court's assessment is that the company did supply meaningful cautionary language. That is especially so in that Ready Capital's risk disclosures included warnings directed to the issues implicated by the challenged forward-looking statements (*e.g.*, the uncertain future performance of the company's real estate loans and holdings). *See, e.g.*, 2023 Form 10-K at 27; 2024 Form 10-K at 29 (identifying the construction loans in the Mosaic portfolio by name and warning of potential vulnerabilities, including that unforeseen variables or unrealistic construction budgets may "prolong[] the development and increase[e] the costs of the construction project," in turn delaying the sale or rental of the finished property, "the source of funds for repayment of the loan"); 2023 Form 10-K at 24–25; 2024 Form 10-K at 25 (warning that loans secured by mixed-use, retail, and multifamily properties are "subject to risks of delinquency, foreclosure and loss" to an extent potentially greater than loans secured on single-family residential property).

In any event, for the reasons addressed above and in the discussion of scienter below, the CAC does not adequately plead knowing falsity (or falsity at all) with respect to any challenged statement, including the forward-looking ones. For that independent reason, these statements are protected by the safe harbor.

**B. Scienter**

**1. Applicable Law**

To state a claim for securities fraud under § 10(b) and Rule 10b–5, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). This requires an adequate pleading that the defendant acted with intent "to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 313 (citation omitted). A plaintiff can clear this threshold by pleading facts showing either "(1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA*, 553 F.3d at 198.

To show motive and opportunity, a complaint must allege that defendants "benefitted in some concrete and personal way from the purported fraud." *Id*. (quoting *Novak*, 216 F.3d at 307–08). "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry." *Id*.; *see also Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) (prolonging time in position of authority and desire for increased incentive compensation inadequate motives).

Alternatively, scienter can be based on a pleading of recklessness, "a sufficiently culpable mental state for securities fraud in this circuit." *ECA*, 553 F.3d at 198. Recklessness is, "at the least, . . . an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware

of it." *Id*. (quoting *Novak*, 216 F.3d at 308). Recklessness may be pled based on strong circumstantial evidence, *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001), and a plaintiff may rely on allegations that defendants "knew facts or had access to information suggesting that their public statements were not accurate" or "failed to check information they had a duty to monitor," *ECA*, 553 F.3d at 199 (quoting *Novak*, 216 F.3d at 311).

**2. Application**

*a. Challenged opinion statements*

When a plaintiff challenges an opinion statement, "the falsity and scienter requirements are essentially identical." *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 534 (S.D.N.Y. 2015); *see also City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 301 (S.D.N.Y. 2013) (in challenges to opinion statements, "the dual inquiries of objective falsity and subjective scienter effectively collapse into one: whether the defendant actually believed his own stated opinion"). For the reasons above, the CAC does not adequately plead falsity of the challenged opinion statements; it therefore does not adequately plead scienter with respect to these.

*b. Challenged statements of fact*

With respect to the balance of the challenged statements, the CAC fails to plead either that defendants had the motive and opportunity to commit fraud or strong circumstantial evidence of recklessness. *See ECA*, 553 F.3d at 198.

i. Motive and opportunity

The CAC does not plead that defendants "benefitted in some concrete and personal way from the purported fraud." *Id.* (quoting *Novak*, 216 F.3d at 307–08). It does not allege that any defendant sold any stock (or made any stock trade) during the class period. The absence of insider stock sales during a time when defendants ostensibly knew undisclosed facts impeaching Ready Capital's prior positive statements undermines the CAC's claim of scienter. *See, e.g., In*

*re N. Telecom Sec. Litig.*, 116 F. Supp. 2d 446, 462 (S.D.N.Y. 2000) (lack of stock sales "is inconsistent with an intent to defraud shareholders"); *Plumbers & Steamfitters Loc. 773 Pension Fund*, 694 F. Supp. 2d at 299 (lack of stock sales suggests the "absence of any nefarious motives"). And, as the CAC acknowledges, Ready Capital repurchased 8.1 million shares during the second and fourth quarters of 2024, during the class period. CAC ¶¶ 193, 231. That, too, is inconsistent with scienter. *Frankfurt-Trust Inv. Luxembourg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 225 (S.D.N.Y. 2013) (share repurchases during class period "tend to negate a finding of scienter because it would make no economic sense for a company to buy back its stock at a price it knows to be inflated").

In an assertion absent from the CAC, plaintiff states, in opposing the motion to dismiss, that defendants had "a motive to delay recognition of the impairment" of the loan so as "to preserve Ready Capital's dividend." Opp. at 3. Even assuming that argument is procedurally proper, *but see Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (plaintiff not entitled to amend pleadings through statements made in opposition to motion to dismiss), the motive to preserve a dividend is an inadequate basis from which to infer scienter. Like "the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation," that interest is "common to most corporate officers." *ECA*, 553 F.3d at 198; *see also In re Lottery.com, Inc. Sec. Litig.*, 715 F. Supp. 3d 506, 554 (S.D.N.Y. 2024) (collecting cases refusing to infer scienter based on motive to preserve higher share price). And any thesis that the defendants were motivated by longer-term stock-price growth would not support an inference of scienter either, because it presupposes an illogical scheme that "could not have continued in perpetuity," but instead necessarily would have been revealed, as it was, at the time of the early 2025 appraisals. *See Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 600

(S.D.N.Y. 2016) (finding scienter inadequately pled where defendants "would have known that their efforts to prop up" stock by feigning likely FDA approval "would be revealed, in relatively short order," when FDA rejected drug application); *In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434, 447 (S.D.N.Y. 2006) (same for allegation of motive to inflate stock price, since any dramatic increase in such would cause reporters to "quickly uncover the scheme").

ii. Recklessness

The CAC predominantly bases its claim of scienter on the theory that the facts known to defendants supplied circumstantial evidence of their recklessness. *See* CAC ¶¶ 272–273, 277; Opp. at 22. Where, as here, a complaint lacks factual allegations supporting a motive to defraud, the strength of its circumstantial allegations of recklessness must be correspondingly greater to adequately plead scienter. *Xie v. Nano Nuclear Energy Inc.*, No. 24 Civ. 6057, 2026 WL 63715, at *7 (S.D.N.Y. Jan. 8, 2026) (quoting *ECA*, 553 F.3d at 198–99).

To plead scienter on a theory of recklessness, a complaint "must specifically identify the reports or statements" that contradict the challenged statements. *Novak*, 216 F.3d at 309. As to documentary materials, the CAC, as reviewed above, is devoid of such. It does not specifically identify any internal Ready Capital documents that ostensibly put defendants on notice that the Portland Project loan, from an accounting perspective, was overvalued or under-reserved. It does not specify "which reports revealed the widespread lending problems, what information those reports contained, and whether the reports contradicted [the company's] public declarations." *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d at 352; *see also Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 251 (S.D.N.Y. 2012) (complaint did not plead scienter where it did not allege that defendants "had any contemporaneous basis to believe that the information they relayed was incorrect").

Nor do the CAC's attributions to CWs support an inference of recklessness, for the same reasons that they do not support subjective falsity, set out *supra*, pp. 22–28.

The CAC separately alleges that scienter may be inferred from the prominence of the Portland Project loan in Ready Capital's portfolio. It alleges that, because the loan was "Ready Capital's largest" and made "material contributions [to] Ready Capital's financials," defendants "would have closely monitored" the factors potentially affecting its valuation, and thus "knew the true extent of the issues facing" the Portland Project and loan. CAC ¶¶ 268–270. But that inference, without more, does not plead scienter. Defendants' appreciation of the significant challenges presented by Portland Project does not establish their recklessness in not writing it down earlier. *See Glaser*, 772 F. Supp. 2d at 591; *Chapman*, 466 F. Supp. 3d at 399 (allegations that underlying operation had "a lot of [] issues," and was a "constant subject of discussion" did not show defendants knew or believed that warranty reserves taken for it were inaccurate).

The CAC likewise notes the "sophisticat[ion]" of Ready Capital and its managers, CAC ¶ 271, and plaintiff notes the individual defendants' presumed grasp of the nuances of the loan and the company's portfolio, Opp. at 22. But even crediting these generalities, they do not sustain an inference of scienter based on recklessness, which would require adequate pleading that defendants had concrete information impugning the challenged accounting treatment. "[B]oilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their [positions] are insufficient to plead scienter." *In re Sotheby's Holdings, Inc.*, No. 00 Civ. 1041, 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000). And "simply alleging that executive defendants are 'closely involved' in running their business is not enough to show that they had access to contradictory information." *City of N. Mia. Beach Police*

*Officers' & Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp.*, No. 19 Civ. 10825, 2021 WL 212337, at *10 (S.D.N.Y. Jan. 21, 2021).

c. *Core-operations theory*

In opposing the motion to dismiss for lack of well-pled scienter, plaintiffs, finally, invoke the "core operations" doctrine. Opp. at 24–25. That doctrine, which predates the PSLRA, is that, when the challenged corporate statements were made at a time when contradictory facts of critical importance to the company were or should have been apparent, an inference arises that high-level officers and directors knew those facts. *See In re Atlas Air Worldwide Holdings, Inc Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004). The PSLRA's passage, however, cast the core-operations doctrine into doubt. Absent guidance from the Second Circuit, courts in this District have split over its continuing vitality. *See In re Wachovia Sec. Litig.*, 753 F.3d at 353 (collecting cases on both sides).

Even assuming that the core-operations inference survives the PSLRA, it does not salvage the claim of scienter here, for three reasons.

First, the doctrine generally applies only to operations constituting "nearly all of a company's business." *Thomas v. Shiloh Indus., Inc.*, No. 15 Civ. 7449, 2017 WL 1102664, at *4 (S.D.N.Y. Mar. 23, 2017) (citation omitted); *see also In re Rockwell Med., Inc. Sec. Litig.*, No. 16 Civ. 1691, 2018 WL 1725553, at *14 (S.D.N.Y. Mar. 30, 2018) (doctrine did not apply where complaint did not plead that operation "ever comprised 'nearly all of'" defendant company's business); *Reilly v. U.S. Physical Therapy, Inc.*, No. 17 Civ. 2347, 2018 WL 3559089, at *18 (S.D.N.Y. July 23, 2018) (same). But the Portland Project loan, although the largest of Ready Capital's loans, accounted for less than 5% of the company's portfolio. *See* CAC ¶ 5 (Portland Project loan, at $490 million, is "nearly 5%" of Ready Capital's portfolio); Dkt. 47 at 10 (Portland Project loan represents "less than 5% of an 1,800-loan, $9.4 billion portfolio"); 2024

Form 10-K at 104 (disclosing total liabilities of $8.2 billion and $9.8 billion for the years ended 2024 and 2023, respectively). *See, e.g.*, *Tyler v. Liz Claiborne*, 814 F. Supp. 2d 323, 342–44 (S.D.N.Y. 2011) (operation comprising 16% of company's revenue is not "core"); *Hensley v. IEC Elecs. Corp.*, No. 13 Civ. 4507, 2014 WL 4473373, at *5 (S.D.N.Y. Sep. 11, 2014) (same, where operation comprised about 15% of total revenue).

Second, courts in this Circuit have applied the doctrine only where it "bolster[s] other evidence of scienter." *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 533 (S.D.N.Y. 2020). It is not "independently sufficient to raise a strong inference of scienter." *Shemian*, 2013 WL 1285779, at *18 (citation omitted). In other words, the doctrine "can only be a buoy, not a life raft." *In re Diebold Nixdorf, Inc., Sec. Litig.*, No. 19 Civ. 6180, 2021 WL 1226627, at *15 (S.D.N.Y. Mar. 30, 2021). No other such evidence is pled here.

Third, and most important, even assuming the doctrine were good law and that it enabled plaintiffs to broadly impute to defendants knowledge about the Portland loan, its premise—that contradictory facts about the Portland loan existed that, if known, mandated a different real-time accounting treatment of reserves or loan valuation—lacks support in the CAC. The CAC ably pleads the difficulties confronting the project. But it does not plead facts that required, in real time, a different accounting treatment. As demonstrated above, the CAC's core premise, that a write-down was required earlier, is an *ipse dixit*, unsupported by pled facts.

The CAC, in sum, does not allege facts sufficient to give rise to a strong inference that defendants acted with the requisite state of mind under § 10(b) and Rule 10b–5 in making any challenged statements. It fails to adequately plead scienter.

### C. Loss Causation

Defendants also contest the pleadings of loss causation. *See* Mot. at 22–24; CAC ¶¶ 288–294. In light of its holding that the CAC does not plead an actionable statement or omission or

scienter, the Court does not have occasion to reach this issue. *See zCap Equity Fund LLC v. LuxUrban Hotels Inc.*, 792 F. Supp. 3d 407, 445 n.10 (S.D.N.Y 2025).

**D. Control-Person Claims Under Section 20 of the Exchange Act**

Finally, the CAC brings control-person claims against the individual defendants under § 20(a) of the Exchange Act. These claims are based on its claim of a primary § 10(b) violation by Ready Capital. CAC ¶¶ 318–32; *see ATSI Commc'ns*, 493 F.3d at 108 (setting out elements of a § 20(a) claim, including a primary violation). In light of the holding that the CAC does not plausibly allege a primary § 10(b) violation, the CAC necessarily does not plead control person liability under § 20(a). *See ATSI Commc'ns*, 493 F.3d at 108.

**CONCLUSION**

For the foregoing reasons, the Court grants the motion to dismiss the CAC in full and with prejudice. The Clerk of Court is respectfully directed to terminate the motion at docket 42, and to close this case.

SO ORDERED.

Paul A. Engelmayer

PAUL A. ENGELMAYER
United States District Judge

Dated: September 18, 2026
New York, New York